

FILED

MAY 1 6 2008
MAY 1 6 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| TEMPCO ELECTRIC HEATER CORPORATION, an Illinois Corporation | ) ) ) ) ) | |
| PLAINTIFF, | | **08CV2870** |
| v. | | **JUDGE SHADUR** |
| | | **MAG. JUDGE KEYS** |
| J.L. BECKER CO., INC., d/b/a J.L. BECKER COMPANY a Michigan Corporation | ) ) ) | |
| DEFENDANT. | ) ) | |

### COMPLAINT

Plaintiff, Tempco Electric Heater Corporation, by its attorneys, Whyte Hirschboeck Dudek S.C., by Ann M. Maher and Joseph E. Gumina, for its Complaint against J.L. Becker Co., Inc., d/b/a J.L. Becker Company, states as follows:

### Nature of Action

1.  This an action for breach of express and implied warranties related to the sale of an annealing furnace from Defendant, J.L. Becker Co., to Plaintiff, Tempco Electric Heater Corporation. Plaintiff's claims arise from Defendant's failure to provide an annealing furnace conforming to the specifications of the parties' agreement as well as Defendant's failure to cure the non-conforming defects affecting the proper operation of the annealing furnace.

## The Parties

2.    Plaintiff, Tempco Electric Heater Corporation ("Tempco"), is an Illinois corporation with its principal place of business in Wood Dale, Illinois. Tempco designs and manufactures electric heating elements, temperature sensors, and temperature controls and employs over 300 employees at its Wood Dale facilities. Tempco's products are used for industrial, commercial, scientific, and medical purposes. Tempco distributes its products nationally and internationally through a network of authorized distributors, manufacturers' representatives and direct sales employees.

3.    Defendant, J.L. Becker Co., Inc., doing business as J.L. Becker Company ("J.L. Becker"), is incorporated under and by virtue of the laws of the State of Michigan with its principal place of business located at 41150 Joy Road, Plymouth, Michigan. J.L. Becker designs, manufactures and installs heating treating equipment systems, including annealing furnaces.

## Jurisdiction and Venue

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that this lawsuit involves parties who are citizens of different states and that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.    This Court has personal jurisdiction over J.L. Becker as J.L. Becker has transacted business in the State of Illinois and has entered into contracts substantially connected with the State of Illinois.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a) and (c) in that a substantial part of the events or omissions giving rise to the claims alleged have occurred within this judicial district and a substantial part of the property that is the

subject of this action, particularly the annealing furnace sold by J.L. Becker to Tempco, is situated within this judicial district where this court sits.

## GENERAL ALLEGATIONS

7.   Tempco was founded in 1972 by Fermin Adames, its current President.

8.   Tempco manufactures several product lines that make use of tubular heating elements, including, but not limited to, Tubular Heaters, Process Heaters, Maxiband Heaters, and Cast-In Heaters. Each of the previously mentioned product lines either consist of or comprise the use of tubular heating elements.

9.   Tempco's product lines that either consist of, or use, tubular heating elements currently represent over 35 percent of Tempco's annual gross sales dollars.

10.   Tempco has invested substantial monies and time to promote and establish the product lines referred to above in paragraph 8.

11.   A critical and vital element in the manufacturing process of tubular heating elements includes the ability to anneal metal sheath materials such as steel, copper-coated steel, stainless steels, Incoloy®, Inconel®, and copper that comprises the tubular heating elements. The tubular heating elements are annealed by running the tubular elements through an annealing furnace.

12.   An annealing furnace is a furnace that heats the tubular heating elements as the elements lay flat on a mesh conveyor belt to temperatures ranging from approximately 1700° F to 2150° F. Following the tubular heating elements being heated in the heating section of the annealing furnace, the tubular heating elements are cooled at a proportionally controlled rate in the cooling section of the furnace. The tubular heating elements are exposed to an exothermic gas (created through combustion of natural gas

and air in a specific gas-air ratio). Exothermic gas consists of nitrogen, hydrogen, carbon-monoxide, carbon-dioxide, and water vapor. The percentages of each of the gases which comprise exothermic gas depends on the gas-air ratio. The tubular elements that run in this furnace atmosphere need to be processed through a targeted and stable dew point environment and controlled within the furnace either to protect the product against oxidation or to promote oxidation.

13. The annealing process makes malleable the metal sheathing of the tubular heating elements which allows the tubular heating elements to be formed into virtually any shape or configuration without cracking or fracturing.

14. Tempco currently owns and operates one mesh belt annealing furnace manufactured by Sunbeam (n/k/a Seco/Warwick) (hereinafter referred to as the "Seco/Warwick annealing furnace") which has been in service, at Tempco, for over twenty-four (24) years. Given the age of the Seco/Warwick annealing furnace, it is close to surpassing its expected useful life.

15. Tempco utilizes its Seco/Warwick annealing furnace in the manufacturing process of Tempco's tubular heating elements. The ability to anneal tubular heating elements is a vital and critical component in the manufacturing process as without the ability to anneal, Tempco would be unable to produce, process, and sell tubular heating elements and other related heating element products.

16. Recently, Tempco has been unable to use its current Seco/Warwick annealing furnace to anneal certain of its tubular heating elements due to the age of this annealing furnace. This has caused Tempco to subcontract a certain portion of its annealing process for specific types of tubular heating elements to a third party.

17.     Tempco would suffer grievous economic harm as well as damage to its reputation in the marketplace if its current annealing furnace failed and Tempco did not have a replacement annealing furnace on-hand to anneal its tubular heating elements.

18.     Given the age of the Seco/Warwick annealing furnace, referred to above in paragraph 14, Tempco decided that it needed to replace this annealing furnace with a new annealing furnace, and, subsequently, decided to purchase a new annealing furnace from J.L. Becker.

19.     On or about January 15, 2007 Tempco issued a purchase order number, #068731, to J.L. Becker for the purchase of a new annealing furnace and accessories which J.L. Becker accepted on or about January 16, 2007 (hereinafter the "Proposal"). A true and correct copy of the Proposal is attached hereto as Exhibit A.

20.     On or about January 26, 2007, Tempco and J.L. Becker entered into a purchase contract (hereinafter the "Purchase Contract") whereby J.L. Becker agreed to sell, design, manufacture, install, start up and debug and Tempco agreed to buy one new 26" Mesh Belt Annealing Furnace which also included, as part of said new annealing furnace, one (1) 4000 CFH Exothermic Gas Generator, one (1) 4000 CFH Refrigerant Gas Dryer, a Closed Loop Water System, a Second Pump, a Stand By Pumping System-Natural Gas, a Hydrogen Analyzer, a Dew Point Analyzer, a CMS system, and one Mezzanine to hold the annealing furnace's Silicon Controlled Rectifiers ("SCRs") and Transformers (hereinafter collectively referred to as the "Furnace"). A true and correct copy of the Purchase Contract as described in this paragraph 20 is attached hereto as Exhibit B.

21.     Tempco, at the time that it negotiated for and purchased the Furnace, informed J.L. Becker that it was purchasing the Furnace in order to replace its aging Seco/Warwick annealing furnace.

22.     The purchase price of the Furnace, as provided for in the Purchase Contract and described in paragraph 20, above, was $362,900.00 U.S. Dollars. *See* Exhibit B.

23.     The Proposal and Purchase Contract required J.L. Becker, among other things, to design the Furnace to achieve certain atmospheric conditions, including, but not limited to, that J.L. Becker would provide one 4000 CFH Exothermic Gas Generator to provide inlet exothermic gas to one refrigerant atmosphere dryer capable of cooling 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F. *See* Exhibit B.

24.     The Purchase Contract (Exhibit B) also provided, among other things, J.L. Becker's express warranty that:

     (a)     The construction, workmanship and materials of the Furnace will be first quality, free from defects which render the Furnace inefficient for its intended purpose;

     (b)     J.L. Becker would warranty its workmanship and non perishable items for a period of one (1) year, except that perishable items such as (alloys, heating elements, conveyor etc.) would be covered by the manufacturer's warranty;

     (c)     Any defect found in material or workmanship within one year of operation will be replaced or repaired at J.L. Becker's expense; and

(d)    When the Furnace is installed, J.L. Becker will start up and debug the Furnace and train Tempco's personnel on the operation and maintenance of the Furnace.

25.    J.L. Becker designed, manufactured, and then installed the Furnace at Tempco's Wood Dale, Illinois facility with the installation commencing on or about September 6, 2007 and completed in late October 2007.

26.    J.L. Becker agreed to make the Furnace fully operational for Tempco's intended purpose.

27.    J.L. Becker chose the type of materials and components that would make up the Furnace.

28.    Tempco relied on J.L. Becker's skill and expertise in designing and manufacturing the Furnace, including, but not limited to, the ability of the Furnace to operate with an exothermic atmosphere and for the refrigerant dryer to cool inlet exothermic gas to 40° F dew point at a specified rated flow capacity.

29.    J.L. Becker was aware at the time that the Purchase Contract was entered into between the parties that the refrigerant dryer, as a component of the Furnace, needed to achieve a consistent 40° F dew point.

30.    Prior to acceptance of the Proposal and execution of the Purchase Contract, J.L. Becker assured Tempco that the refrigerant dryer, as a component of the Furnace, would be able to achieve a consistent 40° F dew point.

31.    Tempco relied on J.L. Becker's representations, as alleged in paragraph 30 above, in deciding to purchase the Furnace from J.L. Becker.

32.    From the time that J.L. Becker completed installation of the Furnace, Tempco has encountered the following non-conforming defects with the operation of the

Furnace which J.L. Becker has been unable to correct and/or remedy with said defects continuing to exist through the date of the filing of this Complaint, which are as follows:

a. The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F;

b. The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F to 50° F;

c. The refrigerant dryer nor its prototype replacement has been able to deliver a consistent 40° F dew point at the Furnace gas inlet;

d. The original refrigerant dryer froze up and its replacement, the prototype replacement dryer, also freezes up causing the dew point to rise to unacceptable levels;

e. Steel product running through the Furnace is experiencing undesired and unacceptable oxidation both inside the Furnace and after leaving the protective atmosphere;

f. An excessive amount of carbon soot is being deposited on the mesh belt of the Furnace and on Tempco's tubular heating element product running through the Furnace;

g. Excessive amounts of water are collecting in the exothermic gas piping of the Furnace;

h. The Furnace is venting exothermic gas containing a high concentration of carbon monoxide into Tempco's Wood Dale facility where employees work;

i. Product leaving the Furnace is leaving the Furnace at a approximate temperature range between 350° F and 450° F which makes the product too hot for Tempco's employees to handle;

j.  The Furnace's external throat area reaches an external temperature exceeding 160° F creating a safety hazard to Tempco's employees; and

k.  Lugs and studs that attach the power wires from the secondary of the transformers to the heating elements of the Furnace have begun to burn off.

33.  The non-conforming defects with the Furnace as enumerated in paragraph 32, above, were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

34.  Beginning in November 2007 Tempco notified J.L. Becker of the following non-conforming defects with the Furnace:

a.  The refrigerant dryer was operating improperly and freezing up; and

b.  The Furnace's external throat area had a significant design flaw in that the surface temperature of the throat entrance area exceeded 700° F when the Furnace reached an operating temperature of 2050° F.

35.  On or about November 12, 2007, J.L. Becker attempted to correct the excessive external temperature defect with the Furnace's throat area, as referred to in paragraph 34(b), above, by attempting to install a water jacket around the throat area which was rejected by Tempco as an improper remedy to correct the defect. On or about November 19, 2007, J.L. Becker agreed to fabricate a new insulated throat area and installed a new insulated throat area on the Furnace on or about December 3, 2007, however, after installation the external temperature of the throat area continued to exceed 160° F.

36.     Also, on or about November 12, 2007, J.L. Becker attempted to correct the defect with the refrigerant dryer, as referred to in paragraph 34(a), above, with no success.

37.     On or about December 7, 2007, J.L. Becker removed the refrigerant dryer from the Furnace due to the nonconforming defects with the refrigerant dryer, as referred to in paragraph 34(a), above, and shipped said refrigerant dryer back to its Michigan facility to try to remedy the nonconforming defect.

38.     On or about December 27, 2007 Tempco memorialized the non-conforming defects of the Furnace in a letter to J.L. Becker and revoked acceptance of the existing refrigerant dryer demanding that the refrigerant dryer be replaced to meet the operating specifications as specified in the Purchase Contract.  A true and correct copy of that letter is attached hereto as Exhibit C.

39.     At the time that Tempco caused to be delivered its December 27, 2007 letter (Exhibit C) to J.L. Becker, as referred to above in paragraph 38, J.L. Becker had failed to make the Furnace operational due to the nonconforming defects enumerated in paragraph 34, above.

40.     On or about January 31, 2008, J.L. Becker indicated to Tempco that it had completed the production of a new prototype refrigerant dryer for the Furnace and that the new prototype refrigerant dryer will perform according to the specifications as set forth in the Purchase Contract.  J.L. Becker memorialized its intentions regarding the new prototype refrigerant dryer in a letter to Tempco dated January 31, 2008 which a true and correct copy is attached hereto as Exhibit D.

41.    On or about February 1, 2008 J.L. Becker communicated to Tempco that it would install the new prototype refrigerant dryer, as referred to above in paragraph 40, in order to get the generator and Furnace up and running.    J.L. Becker further communicated to Tempco that if this new prototype refrigerant dryer did not perform up to Tempco's expectations, J.L. Becker would buy a replacement refrigerant dryer from another source at J.L. Becker's expense.

42.    J.L. Becker memorialized its intentions in a letter to Tempco, dated February 1, 2008, regarding installation of the new prototype refrigerant dryer as well as its intention to provide Tempco with a replacement dryer from another source if the new prototype refrigerant dryer failed to perform according to Tempco's expectations. A true and correct copy of J.L. Becker's February 1, 2008 letter is attached hereto as Exhibit E.

43.    J.L. Becker represented in its February 1, 2008 letter (Exhibit E) to Tempco that the new prototype refrigerant dryer would be capable of achieving 40° F dew point at 4000 CFH.

44.    Tempco relied on J.L. Becker's representations made in J.L. Becker's February 1, 2008 letter (Exhibit E) regarding the capabilities of the new prototype refrigerant dryer to achieve a consistent dew point temperature.

45.    On or about February 4, 2008, in response to J.L. Becker's February 1, 2008 letter (Exhibit E), Tempco accepted J.L. Becker's offer of supplying a new prototype replacement refrigerant dryer, except Tempco demanded if the new prototype refrigerant dryer did not work according to Tempco's satisfaction, J.L. Becker would provide specifically a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer in its place.

46.     J.L. Becker signed Tempco's February 4, 2008 letter agreeing to Tempco's condition that the replacement dryer be a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer if the new prototype refrigerant dryer failed to perform up to Tempco's expectations. A true and correct copy of Tempco's February 4, 2008 letter, signed by J.L. Becker, acknowledging J.L. Becker's agreement as alleged in this paragraph is attached hereto as Exhibit F.

47.     On or about February 11, 2008, J.L. Becker commenced installation of the new prototype refrigerant dryer, as referred to above in paragraph 40, on the Furnace.

48.     On or about February 14, 2008, J.L. Becker, after installation of the new prototype refrigerant dryer, began start up of the Furnace for testing purposes.

49.     On or about February 18, 2008, J.L. Becker attempted, again, to start up the Furnace which this time allowed Tempco to run tubular heating element product through the Furnace, however, the surface quality of the tubular heating elements after annealing and also upon exiting the Furnace were of poor quality with sooty deposits and oxidation of the steel tubular elements.

50.     On or about February 22, 2008, J.L. Becker removed the dew point analyzer from the Furnace to check calibration because the dew point analyzer was providing a dew point reading of approximately 55° F from the new prototype refrigerant dryer. J.L. Becker returned the dew point analyzer to the manufacturer who indicated that the analyzer was accurate for the range noted above. The dew point reading on February 22, 2008 of approximately 55° F was unacceptable and represented a non-conforming defect with the Furnace.

51.    On or about February 25, 2008, Tempco, on its own, started up the Furnace and found within a few days excessive amounts of water in the exothermic gas piping running from the new prototype refrigerant dryer to the gas inlet of the Furnace. The collection of the excessive amounts of water in the exothermic gas piping represents a nonconforming defect and required Tempco to shut down the Furnace.

52.    On or about February 28, 2008, following installation of the new prototype refrigerant dryer, Tempco communicated to J.L. Becker that excessive water was collecting at the flow meter on the Furnace and that excessive amounts of water was bypassing the dryer unit requiring Tempco to manually disassemble the exothermic gas piping system to drain the excess water from the Furnace.

53.    On or about March 3, 2008, J.L. Becker designed and installed a drip leg at the flow meter to address the excessive amounts of water collecting at the flow meter as referred to above in paragraphs 51 and 52. The drip leg consists of a solenoid valve that operates by automatically opening and closing allowing water and exothermic gas to be released into Tempco's work facility.

54.    The exothermic gas that J.L. Becker has allowed to be released into Tempco's facility through its design and installation of the drip leg, as referred above in paragraph 53, consists of carbon monoxide in the range of 50,000 parts per million, or greater, in normal operation.

55.    The U.S. Occupational Safety and Health Administration prohibits employee exposure to more than 50 parts of carbon monoxide per million parts of air averaged during an 8-hour time period. J.L. Becker's design and installation of the drip leg, as referred to above in paragraph 53, above, by allowing carbon monoxide to be

vented into Tempco's workplace facility represents a safety hazard to the health of Tempco's employees and further represents a non-conforming defect with the Furnace.

56.    On or about March 10, 2008, Tempco notified J.L. Becker of the following non-conforming defects with the Furnace, as follows:

> a.    The Furnace does not produce consistent bright annealed steel with the stainless steel and Incoloy® being very dirty with sooty loose black deposits;
>
> b.    The dew point meter, measured in dew point, is 20 degrees higher than the outlet temperature of the refrigerant dryer;
>
> c.    Excessive amounts of water are bypassing the new prototype refrigerant dryer and collecting in the exothermic gas piping;
>
> d.    The new prototype replacement refrigerant dryer froze up; and
>
> e.    The external temperature of the throat area continues to exceed 160° F despite J.L. Becker's attempt to insulate the area.

57.    Also on or about March 10, 2008, Tempco notified J.L. Becker that it would have to correct all of the non-conforming defects affecting the Furnace on or before March 24, 2008 in order to make the Furnace operational allowing Tempco to produce quality annealed tubular heating elements, otherwise, Tempco would demand that J.L. Becker remove its non-functional furnace from Tempco's facility and refund to Tempco all of its monies that it had paid to J.L. Becker for the Furnace. A true and correct copy of Tempco's March 10, 2008 letter is attached hereto as Exhibit G.

58.    On or about March 13, 2008, J.L. Becker sent three J.L. Becker employees to Tempco's Wood Dale, Illinois facility, including J.L. Becker's chief engineer, in an attempt to cure the non-conforming defects affecting the operation of the Furnace. While

at Tempco's facility, J.L. Becker's chief engineer was shown Tempco's March 10, 2008 letter (Exhibit G) and was asked by Tempco whether the non-conforming defects enumerated in this letter could be remedied and corrected. J.L. Becker's chief engineer assured Tempco, after being shown Tempco's March 10, 2008 letter, that J.L. Becker could correct and cure all of the related non-conforming defects affecting the Furnace to make the Furnace operational. J.L. Becker then proceeded to attempt to correct the following non-conforming defects, as follows:

        a.      The high dew point and related water accumulation in the exothermic gas piping;

        b.      The problem associated with the refrigerant dryer freezing up;

        c.      The problem associated with the excessive external temperature of the throat area; and

        d.      The product quality issue with respect to the tubular heating elements being processed through the Furnace system.

59.     Following J.L. Becker's attempt to correct the nonconforming defects as enumerated in Tempco's March 10, 2008 letter (*See* Exhibit G), J.L. Becker failed to correct or cure any of said non-conforming defects.

60.     The non-conforming defects enumerated Tempco's March 10, 2008 letter (Exhibit G) were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

61.     On or about March 24, 2008, J.L. Becker, again, attempted to start up the Furnace, but a problem with a pressure valve on the Furnace prevented start up.

62.     On or about March 25, 2008, after the pressure valve was repaired, J.L. Becker, again, started up the Furnace and this time Tempco began to run tubular heating

element product through the Furnace on March 26, March 27, and March 28, 2008, however, the surface quality of the product, after exiting the Furnace, was poor with more sooting and steel oxidation. The nonconforming defects, as enumerated in paragraph 58, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

63.     On or about March 31, 2008, Tempco attempted to start up the Furnace, again, and further attempted to run tubular heating element product through the Furnace from March 31, 2008 through April 4, 2008, however, Tempco experienced poor surface quality with the tubular heating element product run through the Furnace. The nonconforming defects, as enumerated in paragraph 58, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

64.     On April 4, 2008, Tempco, upon discovering an imbalance of load current on the Furnace, opened the transformer covers on the Furnace and observed that the buss terminal of the transformer that provides power to the heating elements on the Furnace had significant electrical burnt marks on the studs and lugs connecting the power wires. All output terminals on the transformer showed signs of excessive temperature, imminent failure, and one connection had completely melted off. Tempco then proceeded to shut down the Furnace out of concern that the burnt electrical connections on the Furnace posed a serious fire risk. The burnt electrical wires and the contributing cause(s) of said failure represent a nonconforming defect with the Furnace.

65.     On or about April 11, 2008, Tempco communicated to J.L. Becker that its attempt to cure the defects associated with the Furnace have been unsuccessful and that the Furnace continues to remain non-operational due to the non-conforming defects.

Tempco notified J.L. Becker, at this time, that the following non-conforming defects still exist with the operation of the Furnace:

a.    The new prototype replacement refrigerant dryer has never accomplished a 40° F dew point, and at best only achieved a 55° F dew point;

b.    The new prototype replacement refrigerant dryer is releasing large quantities of water;

c.    The new prototype replacement refrigerant dryer continues to freeze up during normal operations;

d.    The Furnace continues to fail to produce quality annealed tubular heating elements resulting in a poor product for Tempco;

e.    There remains excessive soot on the mesh belt and all tubular heating element products leaving the Furnace;

f.    All tubular heating element products are leaving the Furnace at approximately 350-400° F which is hotter than the 225° F specified in the Purchase Contract which is one of the causes of the steel to oxidize leaving the furnace;

g.    The external temperature of the throat area continues to exceed 160° F;

h.    Excessive water collects in the Furnace's exothermic gas piping system;

i.    The Furnace is purposefully venting exothermic gas containing a high concentration of carbon monoxide into Tempco's Wood Dale facility where employees work; and

j.    The lugs and studs that attach the power wires from the secondary of the transformers to the heating elements of the Furnace have begun to burn off

66.     The non-conforming defects enumerated in paragraph 65, subparagraphs a through j, above, were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

67.     Through April 11, 2008, Tempco had provided J.L. Becker a reasonable opportunity to correct all of the non-conforming defects affecting the proper operation of the Furnace.

68.     Through the date that this Complaint was filed with this Court, J.L. Becker has failed to correct any of the non-conforming defects affecting the Furnace to make the Furnace operational for Tempco's intended purpose.

69.     From the time that J.L. Becker completed installation of the Furnace in October 2007 through the date of the filing of this Complaint, the Furnace has been unable to operate in a manner to meet the operating specifications as set forth in the Purchase Contract, including, but not limited to, the ability of the refrigerant dryer to achieve a consistent 40° F dew point.

70.     On or about April 11, 2008, Tempco notified J.L. Becker that despite of all of the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker.  Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 11, 2008 of which a true and correct copy is attached hereto as Exhibit H.

71.     On or about April 16, 2008, J.L. Becker responded to Tempco's April 11, 2008 letter (Exhibit H) by informing Tempco that it (J.L. Becker) had "met all items,

criteria for the equipment supplied as outlined in [its] proposal and as stated on [the] purchase order."

72.    On or about April 22, 2008, Tempco, again, as it did in its April 11, 2008 letter (Exhibit H), informed J.L. Becker that despite of all the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker. Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 22, 2008 of which a true and correct copy is attached hereto as Exhibit I.

73.    Tempco had paid to J.L. Becker $290,320, in accordance with the terms of the Purchase Contract, which said amount represents eighty percent (80%) of the purchase price of the Furnace.

74.    Pursuant to the terms of the Purchase Contract, the final twenty percent (20%) of the purchase price was to be paid by Tempco to J.L. Becker, net, 30 days after installation and start up.

75.    The Purchase Contract further provided that start up of the Furnace also included debugging of the Furnace.

76.    J.L. Becker failed to start up and debug the Furnace in accordance with the terms of the Purchase Contract thereby relieving Tempco, under the terms of the Purchase Contract, of its obligation to pay the final twenty percent (20%) of the purchase price of the Furnace to J.L. Becker.

77.    Tempco has performed all of its obligations under the Purchase Contract.

78.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to subcontract a portion of the annealing process of its tubular heating elements to a third party at a significant expense to Tempco.

79.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to continue to operate its Seco/Warwick annealing furnace which has required Tempco to expend monies on water, utilities, and repairs that it would not otherwise would have had J.L. Becker made the Furnace operational within a reasonable time after installation in accordance with the specifications of the Purchase Contract.

80.    Tempco reserves the right to rely on all terms of the Proposal and the Purchase Contract and all other representations of J.L. Becker in support of its claims.

81.    Tempco is a "Buyer" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(a).

82.    J.L. Becker is a "Seller" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(d).

83.    The Furnace constitutes "Goods" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-105(1).

84.    This is a "transaction in goods" to which 810 ILCS 5/2-102 and 810 ILCS 5/2-105 are applicable.

## COUNT I

## REVOCATION OF ACCEPTANCE
### (810 ILCS 5/2-608)

85.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

86.    Tempco accepted the Furnace without discovering the above defects due to the fact that Tempco was unable to detect the defects in the Furnace until it was installed and J.L. Becker attempted to start it up at Tempco's Wood Dale, Illinois facility.

87.    In the alternative, Tempco reasonably assumed, and J.L. Becker represented through its expressed and implied warranties and otherwise, that all of the aforesaid defects and/or nonconformities would be cured within a reasonable time.

88.    After numerous attempts by J.L. Becker to cure the defects and/or nonconformities associated with the Furnace and Tempco having provided J.L. Becker reasonable opportunities over an extended period of time to correct all of the said nonconforming defects, it has become apparent to Tempco that the defects and/or nonconformities associated with the Furnace could not be reasonably cured.

89.    The defects and/or nonconformities of the Furnace substantially impair its value to Tempco.  Moreover, Tempco has lost faith and confidence in the Furnace and cannot reasonably rely upon it for the ordinary purpose of which the Furnace was purchased.

90.    Tempco previously notified J.L. Becker of the defects and/or nonconformities and Tempco's intent to revoke acceptance of the Furnace and demanded the refund of its purchase price for the Furnace. (*See* Exhibit H and Exhibit I).

91.    Tempco has paid J.L. Becker $290,320 toward the purchase price for the Furnace.

92.    J.L. Becker nevertheless refused to accept return of the Furnace and has refused to refund to Tempco any part of the sum equal to the monies Tempco has paid

toward the purchase price of the Furnace. As a direct result, Tempco has suffered damages and is entitled to recovery, pursuant to 810 ILCS 5/2-711 and 5/2-715.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.     Declare that Plaintiff properly revoked acceptance of the Furnace in accordance with 810 ILCS 5/2-608 and enter judgment in Plaintiff's favor and against Defendant, J.L. Becker Co., Inc., for the full amount of all monies that that Plaintiff paid to Defendant for the Furnace;

B.     Declare that Defendant must immediately disassemble and remove the Furnace from Plaintiff's facility, at Defendant's own cost and expense;

C.     Assess consequential and incidental damages incurred by Plaintiff against Defendant, J.L. Becker Co., Inc., together with interest thereon;

D.     Grant such other and further relief as the Court may deem just and proper.

## COUNT II

### BREACH OF CONTRACT
**(Failure to Provide the Furnace Free From Defects
Which Renders it Inefficient for its Intended Purpose)**

93.     Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

94.     J.L. Becker expressly warranted in the Purchase Contract that the construction, workmanship and materials will be first quality, free from defects which render the Furnace inefficient for its intended purpose.

95.     J.L. Becker breached this warranty as set forth above in paragraph 94.

96.     Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

97.     As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 94, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.     For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.     For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.     For costs, fees and disbursements associated with this action; and

D.     For such other and further relief as the Court may deem just and proper.

## COUNT III

### BREACH OF CONTRACT
### (Failure to Start Up and Debug the Furnace)

98.     Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

99.     J.L. Becker expressly warranted in the Purchase Contract that J.L. Becker would start up and debug the Furnace.

100.     J.L. Becker breached this warranty as set forth above in paragraph 99.

101.     Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

102.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 99, Tempco has suffered actual, incidental, and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.    For return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT IV

### BREACH OF CONTRACT
### (Failure to Provide a Refrigerant Dryer Capable of Cooling 4000 CFH of Inlet Exothermic Gas to a Dew Point of Approximately 40° F to 50° F)

103.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

104.    J.L. Becker expressly warranted in the Purchase Contract that it would provide one (1) refrigerant atmosphere dryer to cool 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F.

105.    J.L. Becker breached this warranty as set forth above in paragraph 104.

106.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

107.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 104, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.    For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT V

### BREACH OF CONTRACT
### (Failure to Provide Furnace in Compliance with All Applicable Laws)

108.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

109.    J.L. Becker expressly warranted in the Purchase Contract that it would provide the Furnace to Tempco in compliance with and conforming to all applicable laws and government orders, rules, and regulations.

110.    The Furnace, as stated by J.L. Becker, fails to comply with National Fire Protection Association ("NFPA") standards and, consequently, fails to comply with all applicable corresponding Occupational Safety and Health Administration standards ("OSHA") promulgated by the U.S. Department of Labor under the authority of the Occupational Health and Safety Act, 29 U.S.C. § 651, *et seq.*, as would be applicable to the type and category of equipment that the Furnace represents as external parts of the furnace exceed 160° F and are not otherwise adequately guarded to protect employees from severe burns and injuries.

111.    The Furnace, upon information and belief, exposes employees to more than 50 parts per million (time weighted average) of carbon monoxide in the workplace which exceeds OSHA permissible exposure limits for carbon monoxide as provided for in 29 CFR 1910.1000 Table Z-1.

112.    The Furnace fails to comply with 29 U.S.C. § 654(a)(1), OSHA's General Duty Clause, as it creates a recognized hazard in Tempco's workplace likely to cause death or serious physical harm to its employees.

113.    J.L. Becker breached this warranty as set forth above in paragraph 109.

114.    J.L. Becker has failed to adequately remedy the non-conforming defects, as alleged in paragraphs 110 and 111, above, and the non-conforming defects continue to exist.

115.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

116.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth in paragraph 109, above, Tempco has suffered actual, incidental, and

consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc. and in favor of Plaintiff as follows:

A.     For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.     For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.     For costs, fees and disbursements associated with this action; and

D.     For such other and further relief as the Court may deem just and proper.

## COUNT VI

### BREACH OF IMPLIED WARRANTY
### (Fitness for a Particular Purpose)

117.   Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

118.   J.L. Becker impliedly warranted that the Furnace purchased by Tempco would be fit for Tempco's particular business purpose.

119.   Tempco relied on this implied warranty of fitness for a particular purpose to its detriment, and relied on the purported expertise of J.L. Becker in designing, manufacturing, and installing the Furnace.

120.   J.L. Becker breached its implied warranty of fitness for a particular purpose, as the Furnace purchased by Tempco was defective in design, manufacture, and

installation, and was not fit for the particular purpose of annealing tubular heating elements.

121.    J.L. Becker failed to adequately remedy the defects in the Furnace; and the Furnace continues to be unfit for its particular purpose at the time of revocation.

122.    As a direct and proximate result of J.L. Becker's breach of this implied warranty, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach of its implied warranty of fitness for a particular purpose;

B.    For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

**COUNT VII**
**(Alternative to Count I)**

**BREACH OF CONTRACT—CONTRACTUAL RESCISSION**

123.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

124.    Pursuant to the Purchase Contract, in the event of breach of warranty by J.L. Becker, notwithstanding prior acceptance by Tempco, Tempco may, in addition to all other remedies, at Tempco's option, return the Furnace for credit.

125.    In particular the Purchase Contract provides as follows:

All warranties shall survive inspection, test, acceptance of and payment by TEMPCO. In the event of breach of warranty, and notwithstanding prior acceptance, TEMPCO may, in addition to all other remedies, (a) at TEMPCO'S option, either return for credit or require prompt correction or replacement of the defective or non-conforming goods, and (b) cancel all or any part of the undelivered portion of this order. In no event shall payment be deemed to constitute acceptance. (*See* Exhibit B)

126.    J.L. Becker has breached both expressed and implied warranties contained in the Purchase Contract because the Furnace was defective in design, materials, workmanship, and/or installation, as more fully described in paragraphs 32, 34, 56, 58 and 65, above.

127.    Tempco has met all obligations on its part to be performed under the Purchase Contract.

128.    Tempco has provided J.L. Becker with ample opportunity to repair or replace the Furnace, and J.L. Becker has failed to adequately repair or replace the Furnace so that it can function as warranted in the Purchase Contract.

129.    Pursuant to the Purchase Contract and because of J.L. Becker's breach of expressed and implied warranties with regard to the operation of the Furnace, Tempco has elected to return the Furnace to J.L. Becker and has further requested that J.L. Becker restore to Tempco all monies that Tempco has paid to J.L. Becker for the Furnace.

130.    J.L. Becker has failed and refused to accept return of the Furnace and to restore to Tempco the monies that Tempco had paid to J.L. Becker for the Furnace.

131.    As a direct and proximate cause of J.L. Becker's breach of the Purchase Contract, Tempco has been damaged in the amount of excess of $290,320.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.    Enter judgment in Plaintiff's favor and against Defendant, J.L. Becker Co., Inc., in the amount representing the monies that Tempco paid to J.L. Becker toward the purchase price of the Furnace and further order Defendant to disassemble and remove the Furnace from Tempco's facility at Defendant's own cost and expense;

B.    Award Plaintiff its costs, expense, fees and disbursements of this action; and

C.    Grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VIII
### UNJUST ENRICHMENT

132.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

133.    Tempco conferred a pecuniary benefit on J.L. Becker at the express request of J.L. Becker by purchasing the Furnace, and Tempco has a reasonable expectation of receiving valuable consideration for such benefit rendered.

134.    If J.L. Becker is permitted to retain such benefit without compensating Tempco for its losses, J.L. Becker will be unjustly enriched.

135.    Tempco is entitled to damages against J.L. Becker, in the amount of the detriment to Tempco, to be determined at trial, and all other damages to which Tempco is entitled as a result of the benefits conferred upon J.L. Becker.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For return of an amount equal to amount of monies that Plaintiff paid to Defendant toward the purchase price of the Furnace;

B.    For costs, expenses, fees and disbursements associated with this action; and

C.    For such other and further relief that this Court deems just and appropriate.

Dated this 16th day of May, 2008

TEMPCO ELECTRIC HEATER CORPORATION

By: _____
Joseph E. Gumina
One of its Attorneys

Ann Maher
Joseph E. Gumina (ARDC# 6238512)
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
(414) 978-5326 (Telephone)
(414) 223-5000 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TEMPCO ELECTRIC HEATER CORPORATION, an Illinois Corporation | ) ) ) ) ) | |
| PLAINTIFF, | ) ) ) | |
| v. | ) ) ) | Case No.: |
| J.L. BECKER CO., INC., d/b/a J.L. BECKER COMPANY a Michigan Corporation | ) ) ) ) | |
| DEFENDANT. | ) ) ) | |

# EXHIBITS TO COMPLAINT

Ann Maher
Joseph E. Gumina (ARDC# 6238512)
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
(414) 978-5326 (Telephone)
(414) 223-5000 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

WHD\5835969.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| TEMPCO ELECTRIC HEATER CORPORATION, an Illinois Corporation | ) ) ) ) ) | |
| PLAINTIFF, | ) ) | |
| v. | ) ) | Case No.: |
| J.L. BECKER CO., INC., d/b/a J.L. BECKER COMPANY a Michigan Corporation | ) ) ) ) | |
| DEFENDANT. | ) ) | |

**LIST OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT |
|---|---|
| A. | Contract Proposal |
| B. | Purchase Contract |
| C. | December 27, 2007 Letter-From Tempco to J.L. Becker Co. |
| D. | January 31, 2008 Letter-From J.L. Becker Co. to Tempco |
| E. | February 1, 2008 Letter-From J.L. Becker to Tempco |
| F. | February 4, 2008 Letter-From Tempco to J.L. Becker Co. |
| G. | March 10, 2008 Letter-From Tempco to J.L. Becker Co. |
| H. | April 11, 2008 Letter-From Tempco to J.L. Becker Co. |
| I. | April 22, 2008 Letter-From Tempco to J.L. Becker Co. |

# *facsimile* TRANSMITTAL

company: _TEMPCO_

attention: _ANDREW HAGEN_

fax: _630 - 350 - 0232_

from: _JOHN BECKER_

date: _1/16/07_

---

**YOU SHOULD RECEIVE ____ PAGES FOLLOWING THIS COVER SHEET.**
**IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (734)656-2000.**

_ANDY, ATTACHED IS THE SIGNED_
_PROPOSAL INDICATING OUR ACCEPTANCE._

---

**THE BEST SINGLE SOURCE FOR ALL YOUR HEAT TREATING REQUIREMENTS**

J.L. Becker Company
41150 Joy Rd.
Plymouth, MI 48170
734-656-2000   Fax 734-656-2009
visit us on the web @ www.jlbecker.com

**EXHIBIT A**

TO: John Becker
CC: Bill Van Etten
FROM: Andy Hagen / Tempco Electric Heater Corporation.
DATE: 1/15/07
RE: 26" Mesh Belt 225 kW Annealing Furnace

Please accept Tempco Electric Heater Corporation PO # 68731 for a new annealing
furnace and accessories as described in the following J.L.Becker proposal:

- Quote dated December 4, 2006 # 4691-06 rev.2
(Package price)

To be amended with the following clarifications, additions, and specifications:

The following documents shall be incorporated in to the Purchase Order for reference.

- Quote dated October 16, 2006, # 4691-06 rev.1 (as a package price)
- Quote dated October 26, 2006 # 4691-06 rev.1 (sample ports and closed loop system)
- Fax dated 11-17-06 (CMS system control and monitoring)
- Fax dated 11-10-06 (Sample Screens, CMS)

Clarifications, additions and specifications:

## FURNACE

1. Load and discharge tables should be minimum 36" from exit of flame curtain
   door to centerline of roller. Over all furnace length can increase accordingly.

2. Furnace shall be equipped with steel alloy flame curtain plate doors at the
   entrance and exit of the entire furnace. All doors shall be adjustable from 11" to
   1" opening.

   Manually operated insulated steel alloy plate doors on the entrance and exit of the
   8' furnace section (inner doors) are optional, and can be added within 5 weeks of
   starting project.
   Option Cost: $6,000.00

3. The sidewalls shall be insulated with firebrick, with an insulation value equivalent
   to 4-1/2" of 2600 °F insulating firebrick, 4-1/2" of 2000 °F insulating firebrick, 4-
   1/2" of high temperature insulating block. The floor and roof can stay as quoted.

4. Height from floor to belt to be determined by Tempco, but will be in the range of
   40"-42".

5. Furnace color to be chosen by Tempco.

## COOLING SYSTEM

1.  Cooling system must be adequate for J.L. Becker's new (1) 225 kW belt furnace, (1) 4000 cfh exo-generator, (1) 4000 cfh drier and our existing (1) 75 kW Seco-Warwick belt furnace, (1) 1000 cfh exo-generator, and (1) 1000 cfh drier.

    Prior research has put the requirement at approximately 1M BTU/hr and 100 gal/min. Propylene glycol is preferred to ethylene glycol. Please provide some calculations for your capacity of equipment.

2.  Cooling pumping system will incorporate a second backup pump as supplied in quote dated October 16, in addition to the stand-by natural gas pump.

3.  Cooling system will incorporate an evaporative misting system to assist the air exchangers during hot days per verbal assurance by Mr. Becker in a meeting at our facility in October.

4.  Required air-cooled exchangers will be evenly split between two separate units provided with shut off valves to isolate units independently.

5.  A sump tank, pump, level switch, and overflow switch will be provided and installed for our existing 75kW belt furnace to provide hook up to water cooling system as provided on quote dated October 26.

6.  Power failure backup pump shall be natural gas powered.

## MEZZANINE

1.  Mezzanine is an option to be included in basic order, but can be cancelled up to 5 weeks after project start. See option pricing.

1.  Mezzanine must comply with all OSHA and NEC regulations with regard to access and electrical working clearance.

2.  Closed floor or open grading to be determined. Open grading preferable.

## OPTIONS

1.   Generator will be supplied with auto-start and interface to CMS as provided on quote dated October 16, 2006.

2.   CMS will monitor and control at a minimum all of the items presented to Tempco on a fax dated 11-17-06 from Bill Van Etten.

3.   % Hydrogen and dew point can be monitored from the furnace section, the output of the drier, and one cooling section, selectable from the CMS system per quote dated October 26, 2006.

4.   Field installation will include all closed loop water cooling supply and return connections to our existing furnace, generator, and drier.

5.   Distances to some components will exceed 10', but no more than 30'.


PRICE:              $350,000.00

OPTIONS:
  Mezzanine:          $12,900.00

TOTAL:             $362,900.00


TERMS:

30%   Down with Purchase Order
25%   After 10 weeks of project start
25%   Upon acceptance of equipment at J.L Becker and prior to shipping
20%   30 days after installation and startup.


Please e-mail me back to accept. I will then write up a formal PO and get the down payment processed.

Thanks,
Andy


January 16, 2007

We have reviewed the above proposal and we accepti  Thank you for your valued order and we look forward to working with you on this project.

John Becker

Date:    January 16, 2007

**TEMPCO Electric Heater Corporation**
807 N. Central Ave. Wood Dale, IL 60191-1452 USA
(630) 350-2252 • Fax (630) 350-1210
E-Mail: info@tempco.com
**MANUFACTURER OF THERMAL COMPONENTS**
D.U.N.S. 05 945 7820  IL Resale No. 222-685-5

** PURCHASE ORDER **

P068731 - 00

**SHIP TO**
**   SAME AS ABOVE **

J.L.BECKER
41150 JOY ROAD
PLYMOUTH MI 48150
US

**ORDER PLACED WITH:**
CONF.TO JOHN L. BECKER II

**BILL TO**
**   SAME AS ABOVE **

**PAGE**   1

**PHONE**
630-960-0674

**FAX**
734-656-2009

| P.O. DATE | VENDOR | SHIP VIA | FOB DESC. | TERMS | DELIVERY DATE |
|---|---|---|---|---|---|
| 1/29/07 | V02254 | TRUCK PPD/ADD | YOUR PLANT | SEE BELOW | SEE BODY |

SPECIAL CHARGES          FREIGHT          **BUYER:** Ron Slabas          023
                                          **PHONE:** 630-477-3244

| DESCRIPTION | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|
| PER YOUR JOB NUMBERS J-3454 - J-3457 AND | | | |

QUOTATION DATED 1/26/07
TERMS ARE AS FOLLOWS:
30% DUE WITH PURCHASE ORDER
25% DUE 10 WEEKS AFTER PROJECT START
25% DUE UPON ACCEPTANCE OF THE EQUIPMENT
ON J.L. BECKER'S FLOOR PRIOR TO SHIPPING
    DUE NET 30 DAYS AFTER INSTALLATION
AND START UP

CODE 18705

COPY

    1 ITEM- PRODUCT EQUIPT.    1
   JOB NBR - ANDY HAGEN
   G/L ACCT-        17100
DIRECT PRODUCTION EQUIPTMENT
(1) 26" MESH BELT FURNACE WHICH INCLUDES
THE FOLLOWING:
                        DELIVER ON  6/08/07          1.000 EA        362900.0000        362900.00
(1) 4000 CFH EXOTHERMIC GAS GENERATOR
(1) 4000 CFH REFRIGERANT GAS DRYER
CLOSED LOOP WATER SYSTEM
SECOND PUMP
STAND BY PUMPING SYSTEM - NATURAL GAS
HYDROGEN ANALYZER
DEW POINT ANALYZER
FURNACE CMS SYSTEM
MEZZANINE TO HOLD THE NEW FURNACE SCR'S
AND TRANSFORMERS, NEW GENERATOR AND

**PLEASE ACKNOWLEDGE THIS ORDER BY RETURN FAX**

*"We strive for quality!"*
Qu..y starts with you . . . our vendor!

ACKNOWLEDGEMENTS SHOWING DELIVERY SCHEDULE MUST
BE RECEIVED WITHIN 10 DAYS TO VALIDATE THIS ORDER
PURCHASE ORDER AND PART NUMBER MUST APPEAR ON INVOICE & PACKAGE
SCREEN FOR ACCURACY - ADVISE IF DISCREPANCIES
CHANGES MUST BE CONFIRMED IN WRITING
THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE HEREOF

TOTAL VALUE

**EXHIBIT B**          **CONTINUED**

AUTHORIZED BY _____

## Terms and Conditions

**ASSIGNMENT** – Seller shall not delegate any duties, nor assign any rights or claims under this contract or for breach thereof, without prior written consent of TEMPCO; any such attempted delegation or assignment shall be void. All claims for monies due or to become due Seller or any of Seller's subsidiary or affiliated companies from TEMPCO, or any of TEMPCO'S subsidiary or affiliated companies, whether under this order or otherwise, shall be subject to deduction for any setoff or counterclaim arising out of this or any other transaction or transactions between Seller or any of its subsidiary or affiliated companies, and TEMPCO or any of its subsidiary or affiliated companies, and whether such setoff or counterclaim arose before or after any assignment of this order by Seller.

**BANKRUPTCY** – In the event of (a) any proceedings, voluntary or involuntary, in bankruptcy or insolvency by or against Seller, or (b) the appointment, with or without the Seller's consent, of an assignee for the benefit of creditors or of a receiver, or (c) Seller's ceasing to conduct its operations in accordance with accepted business practices (including inability to meet its obligations as they mature), then TEMPCO shall be entitled to elect to cancel any unfilled part of this order without any liability whatsoever. Whether or not TEMPCO so elects to cancel, TEMPCO may, at TEMPCO'S sole election, pay Seller its actual direct out-of-pocket costs of performance hereunder to the date of such cancellation, as approved by TEMPCO, in which event the goods or uncompleted portions of the goods shall be the property of TEMPCO and Seller shall safely hold the same for a reasonable time subject to receipt of TEMPCO'S written shipping instructions or disposition instructions.

**BUYER'S PROPERTY** – All material including tools and equipment furnished or specifically paid for by TEMPCO and any replacement thereof, or any materials affixed or attached thereto, shall be and remain the property of TEMPCO, shall be subject to removal at any time without additional cost upon demand by TEMPCO, shall be used only in filling orders from TEMPCO, shall be kept separate from other material or tools and shall be clearly identified as the property of TEMPCO. It shall be the responsibility of the Seller to maintain, keep in good condition, and replace when necessary at Seller's expense all such tools, material and equipment in order that such tools, material and equipment at all times have the capacity to produce parts in conformance with TEMPCO'S order. Seller assumes all liability for loss or damage, with the exception of normal wear and tear, and agrees to supply detailed statements of TEMPCO'S property in Seller's possession, custody or control at monthly intervals or as otherwise agreed upon. All such materials, tools and equipment, while in Seller's possession, custody or control shall be held at Seller's risk and shall be kept insured by Seller at Seller's expense in an amount equal to replacement cost with loss payable to TEMPCO.

**CHANGES** – TEMPCO shall have the right to make changes in this order (including quantity). If changes affect delivery or price, Seller shall promptly notify TEMPCO, and in no event shall additional charges or price increases be allowed without specific written authorization. If the quantity covered by this order is reduced in quantity or cancelled, it shall be Seller's responsibility to make every effort to minimize any costs in connection therewith, including immediately cancelling production schedules, and diverting material for other uses. Cancellation charges, if any, shall be subject to negotiation and in no case shall exceed the lesser of Seller's out-of-pocket costs for those quantities released for production with TEMPCO'S approval, or Seller's actual expenditures hereunder at the time of cancellation. In no event shall cancellation charges apply unless written notice of intent to make such cancellation charges by Seller is sent within 30 days after notice of reduction in quantity or cancellation.

**COMPLIANCE WITH LAWS** – Seller warrants and agrees that all goods delivered pursuant to this order shall be produced, sold and delivered to TEMPCO in compliance with and conforming to all applicable laws and government orders, rules and regulations. Seller shall furnish to TEMPCO upon request certificates or other evidence showing compliance with this paragraph.

**CONTRACT** – The parties hereto agree that the laws of the State of Illinois shall govern the validity, interpretation, and enforcement of this order and the acceptance thereof.

**DELIVERIES** – TEMPCO'S production schedules are based upon the agreement that materials will be delivered to TEMPCO by the date specified on the face of this purchase order. Time is therefore the essence of this order. If any deliveries are not made at the time and in the quantity agreed upon, TEMPCO may cancel this order with respect to all or any part of the goods covered hereby and in any event hold Seller responsible for damages resulting from Seller's default.

**GENERAL** – These Terms and Conditions together with those appearing on the face hereof constitute the contract of sale regardless of the manner in which this order is accepted. Any additional or different terms proposed by seller are objected to and shall be of no effect.

**INDEMNITY** – Seller shall indemnify and save TEMPCO free and harmless from and against any and all claims, damages, liabilities or obligations of whatsoever kind, including but not limited to damage or destruction of property and injury or death of persons, resulting or allegedly resulting from or connected with (a) the quality of the goods sold, (b) Seller's performance hereunder, or (c) any default or breach of its obligations hereunder. Seller by acceptance of this purchase order hereby assumes the entire and full responsibility and liability for any and all damages, injury, loss and expense of any kind or nature whatsoever to all persons, whether employees or others and to all property, arising out of or in any manner resulting from the execution of work provided for in this contract and work incidental thereto, or occurring in connection therewith, whether the same arises from negligence or otherwise, even though such damages, injury, loss or expenses are attributable to the joint, concurrent or contributory negligence of TEMPCO, its agents, servants or employees. Seller agrees to indemnify, save harmless and defend TEMPCO, its agents, servants and employees from and against any and all such damages, injury, loss and expense, including attorney's fees and expense of litigation arising out of or in any manner resulting from or occurring in connection with the execution of the work herein provided for, and work incidental thereto, or occurring in connection with or resulting from the use by Seller's subcontractors, agents or employees or others, of any materials, tools, implements, appliances, scaffolding ways, condition of premises, works or machinery or other personal or real property of TEMPCO or others. The foregoing shall apply whether any claims resulting in any such damages, injury, loss or expense arise under the common law or under any applicable workman's compensation law or other statute, or otherwise. Seller will furnish the TEMPCO with proper evidence that the Seller is insured against the responsibility and liability assumed herein with limits of not less than the following: Bodily Injury – $500,000/$1,000,000; Property Damage – $500,000.

**INSPECTION AND REJECTION** – Final inspection shall be on TEMPCO'S premises unless otherwise agreed in writing. TEMPCO'S inspection and testing may, at TEMPCO'S option, be made under operating conditions after installation or incorporation of the goods into any plant, facility or equipment of which they are to be a part. As to goods rejected as not conforming to this order, TEMPCO may, at TEMPCO'S option (1) hold the goods at Seller's expense and risk; (2) Return the goods to Seller at Seller's expense, for repair, replacement or credit; (3) Retain the goods with an equitable reduction in price; or (4) Repair the goods at Seller's expense. TEMPCO'S exercise of one of the foregoing options as to any non-conforming goods shall not preclude TEMPCO'S exercise of any other option with respect to other non-conforming goods. TEMPCO reserves the right, even after it has paid for and accepted said goods, to make a claim against Seller on account of any goods which do not prove to be satisfactory or are defective, irrespective of TEMPCO'S failure to notify Seller of a rejection of non-conforming goods or revocation of acceptance thereof, or to specify with particularity any defect in non-conforming goods after rejection or acceptance thereof.

**INVOICES** – Seller shall mail invoices promptly to allow TEMPCO sufficient time for processing and payment within discount period. Discount period begins on the day the invoice or merchandise is received, whichever is later. C.O.D. shipments will not be accepted. Drafts will not be honored.

**OPEN END ORDER** – Any estimated quantities, or any portions thereof, shall not be considered as ordered and TEMPCO is not committed to its purchase unless and until quantities are placed on the initial purchase order or subsequent purchase order release. As part of the consideration for the initial order, Seller hereby grants an option to TEMPCO to purchase the indicated estimated quantity on the terms and conditions herein set forth.

**PACKAGING & RISK OF LOSS** – Seller shall properly package all goods for safe shipment to TEMPCO. All risk of loss of and/or damage to the goods covered hereby will be upon Seller until the goods are physically delivered to TEMPCO'S plant, notwithstanding any delivery terms or shipping instructions stated on the face hereof or given to TEMPCO.

**PRICES** – Seller warrants that the prices for the goods sold or services to be furnished to TEMPCO under this order are not less favorable than those currently extended to any other customer for the same or like goods or services in equal or less quantities. In the event Seller reduces its prices for such goods or services prior to complete delivery of all goods or the furnishing of all services covered by this order, Seller agrees to reduce, correspondingly, the price of the goods or services covered hereby.

**PROOF OF SHIPMENT** – Seller shall, at the time of shipment, forward to TEMPCO the express receipt or bill of lading, signed by the carrier, evidencing the fact that shipment has been made.

**QUANTITIES** – Shipments must equal exact amounts ordered unless otherwise agreed to in writing by TEMPCO. Any unauthorized quantity is subject to TEMPCO'S rejection and return at Seller's expense.

**SUPPLEMENTARY INFORMATION** – Any specifications, drawings, notes, instructions, engineering notices, or technical data referred to in this order shall be deemed to be incorporated herein by reference as if fully set forth. In case of any discrepancies or questions, it is Seller's responsibility to refer to TEMPCO for decision, interpretation, or further instructions, and no such decision, interpretation or further instruction shall be binding on TEMPCO unless reduced to writing and signed by TEMPCO.

**TAXES** – Except as may be otherwise expressly provided on the face of this order, the contract price includes all applicable Federal, State and Local taxes, duties, tolls, fees, import charges and other government exactions. TEMPCO shall have no liability to pay Seller any amount in excess of the purchase price specified herein.

**TITLE TO DRAWINGS AND SPECIFICATIONS** – TEMPCO shall at all times have title to all drawings and specifications furnished by TEMPCO to Seller and intended for use in connection with this purchase order. Seller shall use such drawings and specifications and all such other information as may be disclosed to Seller by TEMPCO only in connection with this order and shall not disclose such drawings, specifications or information to any person, firm or corporation except TEMPCO'S or Seller's employees, subcontract or Government inspectors in connection with this order. The Seller shall upon TEMPCO'S request, and upon completion of the order, without the necessity for any such request, promptly return all drawings and specifications to TEMPCO.

**WAIVER** – Neither the waiver by TEMPCO, nor TEMPCO'S failure to insist on performance of any term, condition or provision hereof, nor TEMPCO'S failure to exercise any right or privilege, nor TEMPCO'S waiver of any breach, shall be or be construed as a waiver of any other term, provision, condition, right, privilege or breach, nor a waiver of any subsequent breach of the same term, condition or provision, nor shall it be or be deemed to be a waiver of any provisions of any subsequent order. TEMPCO'S rights and remedies provided hereunder and by law shall be cumulative.

**WARRANTY** – In addition to any and all other express, implied and statutory warranties, Seller expressly warrants that all goods sold hereunder shall be free from defects in design, workmanship and materials; shall conform strictly to applicable specifications, drawings and approved samples, if any, and shall be merchantable. Seller acknowledges that Seller knows the particular purposes for which the goods covered hereby are required and that TEMPCO is relying on Seller's skill and judgment to select and furnish goods, and any applicable services, which are suitable for such purposes, and Seller warrants that the goods and any services covered hereby shall be fit and sufficient for the purposes intended. Such warranties, together with all other service warranties of Seller, shall run to TEMPCO, its successors, assignees and customers. All warranties shall survive inspection, test, acceptance of and payment by TEMPCO. In the event of breach of warranty, and notwithstanding prior acceptance, TEMPCO may, in addition to all other remedies, (a) at TEMPCO'S option, either return for credit or require prompt correction or replacement of the defective or non-conforming goods, and (b) cancel all or any part of the undelivered portion of this order. In no event shall payment be deemed to constitute acceptance.

**TEMPCO Electric Heater Corporation**
607 N. Central Ave. Wood Dale, IL 60191-1452 USA
(630) 350-2252 • Fax (630) 350-1210
E-Mail: info@tempco.com
**MANUFACTURER OF THERMAL COMPONENTS**
D.U.N.S. 05 945 7820   IL Resale No. 222-685-5

**\*\* PURCHASE ORDER \*\***

P068731 - 00

**SHIP TO**
**\*\*   SAME AS ABOVE \*\***

J.L.BECKER
41150 JOY ROAD
PLYMOUTH MI 48150
US

**ORDER PLACED WITH:**
CONF.TO JOHN L. BECKER II

**BILL TO**                           **PAGE**    2
**\*\*   SAME AS ABOVE \*\***

**PHONE**                  **FAX**
630-960-0674          734-656-2009

| P.O. DATE | VENDOR | SHIP VIA | FOB DESC. | TERMS | DELIVERY DATE |
|-----------|--------|----------|-----------|-------|---------------|
| 1/29/07 | V02254 | TRUCK PPD/ADD | YOUR PLANT | SEE BELOW | SEE BODY |

| SPECIAL CHARGES | FREIGHT | BUYER: | | |
|-----------------|---------|--------|---|---|
| | | Ron Slabas | | 023 |
| | | PHONE: 630-477-3244 | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | AMOUNT |
|-------------|----------|------------|--------|
| DRYER | | | |
| INSTALLATION INCLUDED | | | |

**PLEASE ACKNOWLEDGE THIS ORDER BY RETURN FAX**

*"We strive for quality!"*
*Quality starts with you . . . our vendor!*

TOTAL VALUE        362900.00

ACKNOWLEDGEMENTS SHOWING DELIVERY SCHEDULE MUST
BE RECEIVED WITHIN 10 DAYS TO VALIDATE THIS ORDER
PURCHASE ORDER AND PART NUMBER MUST APPEAR ON INVOICE & PACKAGE
SCREEN FOR ACCURACY - ADVISE IF DISCREPANCIES
CHANGES MUST BE CONFIRMED IN WRITING

AUTHORIZED BY

# Terms and Conditions

**ASSIGNMENT** – Seller shall not delegate any duties, nor assign any rights or claims under this contract or for breach thereof, without prior written consent of TEMPCO; any such attempted delegation or assignment shall be void. All claims for monies due or to become due Seller or any of Seller's subsidiary or affiliated companies from TEMPCO, or any of TEMPCO'S subsidiary or affiliated companies, whether under this order or otherwise, shall be subject to deduction for any setoff or counterclaim arising out of this or any other transaction or transactions between Seller or any of its subsidiary or affiliated companies, and TEMPCO or any of its subsidiary or affiliated companies, and whether such setoff or counterclaim arose before or after any assignment of this order by Seller.

**BANKRUPTCY** – In the event of (a) any proceedings, voluntary or involuntary, in bankruptcy or insolvency by or against Seller, or (b) the appointment, with or without the Seller's consent, of an assignee for the benefit of creditors or of a receiver, or (c) Seller's ceasing to conduct its operations in accordance with accepted business practices (including inability to meet its obligations as they mature), then TEMPCO shall be entitled to elect to cancel any unfilled part of this order without any liability whatsoever. Whether or not TEMPCO so elects to cancel, TEMPCO may, at TEMPCO'S sole election, pay Seller its actual direct out-of-pocket costs of performance hereunder to the date of such cancellation, as approved by TEMPCO, in which event the goods or uncompleted portions of the goods shall be the property of TEMPCO and Seller shall safely hold the same for a reasonable time subject to receipt of TEMPCO'S written shipping instructions or disposition instructions.

**BUYER'S PROPERTY** – All material including tools and equipment furnished or specifically paid for by TEMPCO and any replacement thereof, or any materials affixed or attached thereto, shall be and remain the property of TEMPCO, shall be subject to removal at any time without additional cost upon demand by TEMPCO, shall be used only in filling orders from TEMPCO, shall be kept separate from other material or tools and shall be clearly identified as the property of TEMPCO. It shall be the responsibility of the Seller to maintain, keep in good condition, and replace when necessary at Seller's expense all such tools, material and equipment in order that such tools, material and equipment at all times have the capacity to produce parts in conformance with TEMPCO'S order. Seller assumes all liability for loss, with the exception of normal wear and tear, and agrees to supply detailed statements of TEMPCO'S property in Seller's possession, custody or control at monthly intervals or as otherwise agreed upon. All such materials, tools and equipment, while in Seller's possession, custody or control shall be held at Seller's risk and shall be kept insured by Seller at Seller's expense in an amount equal to replacement cost with loss payable to TEMPCO.

**CHANGES** – TEMPCO shall have the right to make changes in this order (including quantity). If changes affect delivery or price, Seller shall promptly notify TEMPCO, and in no event shall additional charges or price increases be allowed without specific written authorization. If the quantity covered by this order is reduced in quantity or cancelled, it shall be Seller's responsibility to make every effort to minimize any costs in connection therewith, including immediately cancelling production schedules, and diverting material for other uses. Cancellation charges, if any, shall be subject to negotiation and in no case shall exceed the lesser of Seller's out-of-pocket costs for those quantities released for production with TEMPCO'S approval, or Seller's actual expenditures hereunder at the time of cancellation. In no event shall cancellation charges apply unless written notice of intent to make such cancellation charges by Seller is sent within 30 days after notice of reduction in quantity or cancellation.

**COMPLIANCE WITH LAWS** – Seller warrants and agrees that all goods delivered pursuant to this order shall be produced, sold and delivered to TEMPCO in compliance with and conforming to all applicable laws and government orders, rules and regulations. Seller shall furnish to TEMPCO upon request certificates or other evidence showing compliance with this paragraph.

**CONTRACT** – The parties hereto agree that the laws of the State of Illinois shall govern the validity, interpretation, and enforcement of this order and the acceptance thereof.

**DELIVERIES** – TEMPCO'S production schedules are based upon the agreement that material will be delivered to TEMPCO by the date specified on the face of this purchase order. Time is therefore the essence of this order. If any deliveries are not made at the time and in the quantity agreed upon, TEMPCO may cancel this order with respect to all or any part of the goods covered hereby and in any event hold Seller responsible for damages resulting from Seller's default.

**GENERAL** – These Terms and Conditions together with those appearing on the face hereof constitute the contract of sale regardless of the manner in which this order is accepted. Any additional or different terms proposed by seller are objected to and shall be of no effect.

**INDEMNITY** – Seller shall indemnify and save TEMPCO free and harmless from and against any and all claims, damages, liabilities or obligations of whatsoever kind, including but not limited to damage or destruction of property and injury or death of persons, resulting or allegedly resulting from or connected with (a) the quality of the goods sold, (b) Seller's performance hereunder, or (c) any default by Seller or breach of its obligations hereunder. Seller by acceptance of this purchase order hereby assumes the entire and full responsibility and liability for any and all damages, injury, loss and expense of any kind or nature whatsoever to all persons, whether employees or others, and to all property arising out of or in any manner resulting from the execution of work provided for in this contract and work incidental thereto, or occurring in connection therewith, whether the same arises from negligence or otherwise, even though such damages, injury, loss or expenses are attributable to the joint, concurrent or contributory negligence of TEMPCO, its agents, servants or employees. Seller agrees to indemnify, save harmless and defend TEMPCO, its agents, servants and employees from and against any and all such damages, injury, loss and expense, including attorney's fees and expense of litigation arising out of or in any manner resulting from or occurring in connection with the execution of the work herein provided for, and work incidental thereto, or occurring in connection with or resulting from the use by Seller's subcontractors, agents or employees of others, of any materials, tools, implements, appliances, scaffolding ways, condition of previous works or machinery or other personal or real property of TEMPCO or others. The foregoing shall apply whether any claims resulting in any such damages, injury, loss or expense arise under the common law or under any applicable workman's compensation law or other statute, or otherwise. Seller will furnish the TEMPCO with proper evidence that the Seller is insured against the responsibility and liability assumed herein with limits of not less than the following: Bodily injury – $500,000/$1,000,000; Property Damage – $500,000.

**INSPECTION AND REJECTION** – Final inspection shall be on TEMPCO'S premises unless otherwise agreed in writing. TEMPCO'S inspection and testing may, at TEMPCO'S option, be made under operating conditions after installation or incorporation of the goods into any plant, facility or equipment of which they are to be a part. As to goods rejected as not conforming to this order, TEMPCO may, at TEMPCO'S option (1) Hold the goods at Seller's expense and risk; (2) Return the goods to Seller at Seller's expense, for repair, replacement or credit; (3) Retain the goods with an equitable reduction in price; or (4) Repair the goods at Sellers expense. TEMPCO'S exercise of one of the foregoing options as to any non-conforming goods shall not preclude TEMPCO'S exercise of any other option with respect to other non-conforming goods. TEMPCO reserves the right, even after it has paid for and accepted said goods, to make a claim against Seller on account of any goods which do not prove to be satisfactory or are defective, irrespective of TEMPCO'S failure to notify Seller of a rejection of non-conforming goods or revocation of acceptance thereof, or to specify with particularity any defect in non-conforming goods after rejection or acceptance thereof.

**INVOICES** – Seller shall mail invoices promptly to allow TEMPCO sufficient time for processing and payment within discount period. Discount period begins on the day the invoice or merchandise is received, whichever is later. C.O.D. shipments will not be accepted. Drafts will not be honored.

**OPEN END ORDER** – Any estimated quantities, or any portions thereof, shall not be considered as ordered and TEMPCO is not committed to its purchase unless and until quantities are placed on the initial purchase order or subsequent purchase order release. As part of the consideration for the initial order, Seller hereby grants an option to TEMPCO to purchase the indicated estimated quantity on the terms and conditions herein set forth.

**PACKAGING & RISK OF LOSS** – Seller shall properly package all goods for safe shipment to TEMPCO. All risk of loss of and/or damage to the goods covered hereby will be upon Seller until the goods are physically delivered to TEMPCO'S plant, notwithstanding any delivery terms or shipping instructions stated on the face hereof or given to TEMPCO.

**PRICES** – Seller warrants that the prices for the goods sold or services to be furnished to TEMPCO under this order are not less favorable than those currently extended to any other customer for the same or like goods or services in equal or less quantities. In the event Seller reduces its price for such goods or services prior to complete delivery of all goods or the furnishing of all services covered by this order, Seller agrees to reduce, correspondingly, the price of the goods or services covered hereby.

**PROOF OF SHIPMENT** – Seller shall, at the time of shipment, forward to TEMPCO the express receipt or bill of lading, signed by the carrier, evidencing the fact that shipment has been made.

**QUANTITIES** – Shipments must equal exact amounts ordered unless otherwise agreed to in writing by TEMPCO. Any unauthorized quantity is subject to TEMPCO'S rejection and return at Seller's expense.

**SUPPLEMENTARY INFORMATION** – Any specifications, drawings, notes, instructions, engineering notices, or technical data referred to in this order shall be deemed to be incorporated herein by reference as if fully set forth. In case of any discrepancies or questions, it is Seller's responsibility to refer to TEMPCO for decision, interpretation, or further instructions, and no such decision, interpretation or further instruction shall be binding on TEMPCO unless reduced to writing and signed by TEMPCO.

**TAXES** – Except as may be otherwise expressly provided on the face of this order, the contract price includes all applicable Federal, State and Local taxes, duties, tolls, fees, import charges and other government exactions. TEMPCO shall have no liability to pay Seller any amount in excess of the purchase price specified herein.

**TITLE TO DRAWINGS AND SPECIFICATIONS** – TEMPCO shall at all times have title to all drawings and specifications furnished by TEMPCO to Seller and intended for use in connection with this purchase order. Seller shall use such drawings and specifications and all such other information as may be disclosed to Seller by TEMPCO only in connection with this order and shall not disclose such drawings, specifications or information to any person, firm or corporation except TEMPCO'S or Seller's employees, subcontract or Government inspectors in connection with this order. The Seller shall upon TEMPCO'S request, and upon completion of the order, without the necessity for any such request, promptly return all drawings and specifications to TEMPCO.

**WAIVER** – Neither the waiver by TEMPCO, nor TEMPCO'S failure to insist on performance of any term, condition or provision hereof, nor TEMPCO'S failure to exercise any right or privilege, nor TEMPCO'S waiver of any breaches, shall be or be construed as a waiver of any other term; provision, condition, right, privilege or breach, nor a waiver of any subsequent breach of the same term, condition or provision, nor shall it be or be deemed to be a waiver of any provisions of any subsequent order. TEMPCO'S rights and remedies provided hereunder and by law shall be cumulative.

**WARRANTY** – In addition to any and all other express, implied and statutory warranties, Seller expressly warrants that all goods sold hereunder shall be free from defects in design, workmanship and materials; shall conform strictly to applicable specifications, drawings and approved samples, if any, and shall be merchantable. Seller acknowledges that Seller knows the particular purposes for which the goods covered hereby are required and that TEMPCO is relying on Seller's skill and judgment to select and furnish goods, and any applicable services, which are suitable for such purposes, and Seller warrants that the goods and any services covered hereby shall be fit and sufficient for the purposes intended. Such warranties, together with all other service warranties of Seller, shall run to TEMPCO, its successors, assignees and customers. All warranties shall survive inspection, test, acceptance of and payment by TEMPCO. In the event of breach of warranty, and notwithstanding prior acceptance, TEMPCO may, in addition to all other remedies, (a) at TEMPCO'S option, either return for credit or require prompt correction or replacement of the defective or non-conforming goods, and (b) cancel all or any part of the undelivered portion of this order. In no event shall payment be deemed to constitute acceptance.

# J. L. BECKER COMPANY

QUALITY HEAT TREATING EQUIPMENT AND COMPONENTS

January 26, 2007

Tempco Electric Heater Corporation
607 N. Central Avenue
Wood Dale, Il. 60191

Attention:  Mr. Andrew Hagen
Reference:  Your Purchase Order #68731
            Our Reference Job Numbers J-3454 – J-3457
            26" Mesh Belt Annealing Furnace, Exothermic Generator, Dryer, and
            Water System
Subject:    Purchase Contract

Dear Mr. Hagen,

## PURCHASE CONTRACT

Thank you for your valued purchase order #68731, we look forward to working with you
on this project. I have combined from various communications data and your e-mail
message dated January 23, 2007 that will become the official content of the purchase
contract as described herein.

For your convenience I have assigned the following job numbers for the project:
    J-3454 – 26" Mesh Belt Furnace, CMS, Analyzers
    J-3455 – 4000 CFH Exothermic Generator and 4000 CFH Dryer
    J-3456 – Water System
    J-3457 – Installation, Mezzanine

The J. L. Becker agrees to provide the following equipment.
1.  One (1) 26" mesh belt furnace
2.  One (1) 4000 CFH Exothermic Generator
3.  One (1) 4000 CFH Refrigerant Dryer
4.  One (1) Closed loop water system.
5.  One (1) Mezzanine to hold the new furnace SCR's and Transformers, new
    generator and dryer

**Item #1:     26" Mesh Belt Furnace**

The J.L. Becker Company will provide one (1) mesh belt annealing furnace as described herein.

The furnace will be similar in dimensions to your existing Seco Warwick conveyor furnace. The rated capacity of the furnace will be 964 lbs. per hour based on a belt loading of 18 lbs/lineal foot and a nominal belt speed of 9.6"/min. The actual capacity may vary based on the ability of the part to absorb the available heat, part configuration, part loading, part density and belt speed.

The 26" wide mesh belt furnace approximate dimensions will be:

| | | |
|---|---|---|
| Load Area | 3'- 0" long | (from exit of flame curtain door to centerline of front idler roller) |
| Atmosphere Curtain | 2'- 8" long | |
| Preheat | 1'- 6" long | |
| Heating Chamber | 8'- 0" long | |
| (Effective Heating Area) | | |
| Pre-Cool Area | 2'- 0" long | |
| Flange Plate connection | 4" long | |
| Water Cooling | 20'- 1" long | |
| (2) 10' long water coolers | | |
| Atmosphere Curtain/Discharge Hood | 3'– 6" long | |
| Discharge Table | 3'- 0@ long | (from exit of flame curtain door to centerline of discharge drum) |
| Approx Total | 44'- 1" long | |

Approximate overall furnace dimensions:        7'-0" wide x 44'- 1" long

| | |
|---|---|
| Load height (nominal) | 40 - 42" high (from floor to belt, drawing shows 41" final to be determined by Tempco) |
| Clear height above the belt | 11" high |
| Belt Width | 26" wide |
| Zones of control | Two |
| Heat Input | 225 KW |
| Zone #1 150 – 5 feet | |
| Zone #2   75 – 3 feet | |

| | |
|---|---|
| Operating Temperature | $2050_1$ F. |
| Maximum Temperature | $2100_1$ F. |
| Belt speed | (variable) |
| Design speed | 9.6"/min |
| Estimated Capacity | 964 lbs/hr. |
| Based on 18 lbs/lineal foot | |

2

## Furnace Case

The furnace case will be fabricated from mild steel plates welded gas tight, reinforced with structural steel members. The top plates will be sectional design, bolted together to facilitate access for furnace maintenance. The side buss bar and terminal covers will be bolted and gasketed to make an atmosphere seal. The floor and end plates will be 3/8" thick and the side plates 1/4" thick. The structural reinforcements will be heavy duty I-beams and channels. All flanges will be 3/8" or 2" thick.

## Furnace Insulation

The furnace will be lined as follows:

| | |
|---|---|
| Sidewalls: | 4½" of 2600°F Insulating firebrick (IFB), 4½" of 2000°F (IFB) and 4½" of high temperature block. |
| Floor: | 11" of insulating material facing the heated area. |
| Roof: | 12" ceramic fiber modules stud welded to the roof plate. |

The floor supports the refractory piers which supports the hearth plates. The belt will be supported through the furnace by silicon carbide hearth plates.

## Heating Elements

The furnace will be heated by silicon carbide heating elements, mounted above and below the load and configured for two (2) zones of control. Our new design for mounting the buss bars consists of a threaded electrically isolated stand off mounted to the furnace case. The aluminum buss bar will be mounted to the stand off isolated by a threaded connection. The element strap will mount to the buss bar assembly. This new arrangement will provide a longer life than transite board, more efficient, and ease of maintenance. The elements will extend through the sidewalls for terminal connection to aluminum buss bars by braided straps and clamps. Protective guards will be provided over the element and buss bar connection assembly.

## Furnace Power Control

The elements will be controlled in each zone by a phase angle fired HDR or equal SCR power controller with heat sink thermostats and current limit designed to operate off 480 volts, 3 phase, 60 Hertz. Each SCR controller will be housed in its own disconnect panel and will have its own independently housed Marelco or equal Scott T connected, multi tap transformer with manual tap switches. High temperature shut down will be achieved by a high limit control instrument wired to a circuit breaker with undervoltage release.

## Cooling Sections

We will provide 20 feet of water- cooling which consist of (2) 10 foot long standard designed cooling sections. The sections will be fabricated from mild steel plates welded liquid tight. The mounting flange plates will be heavy duty thick mild steel plates. There will be a water inlet and temperature control valve for the water, and on the outlet a pressure relief valve. These will be provided for each cooler. Cleanout assemblies will be provided on each side of the cooler.

The cooling systems will be designed as such for the elements to be cooled from 1650°F to 1000°F within 200 seconds. The system will be designed for the elements to exit the furnace line (no flame curtain) at a minimum of 225°F.

## Transition Section

Located between the heating section and the first cooling section will be a slow cool transition section. The section will slow cool the parts prior to the water cooling sections.

## Charge Vestibule

A charge vestibule will be provided at the end of the furnace. The insulated vestibule will be fabricated from mild steel plates welded gas tight and will include a manually operated adjustable (1" to 11") steel plate door. An exhaust stack mounting plate will be provided on top of the vestibule section for attaching to customer supplied exhaust stack. A pilot assembly will be provided to burn off excess atmosphere gas.

## Discharge Vestibule

A discharge vestibule will be provided at the end of the furnace. The insulated vestibule will be fabricated from mild steel plates welded gas tight and will include a manually operated adjustable (1" to 11") steel plate door. An exhaust stack mounting plate will be provided on top of the vestibule section for attaching to customer supplied exhaust stack. A pilot assembly will be provided to burn off excess atmosphere gas.

## Conveyor Belt

One (1) 26" wide 314 stainless steel wire mesh conveyor belt will be provided. The belt will be driven by an adjustable drive package consisting of an inverter variable speed drive, AC inverter duty motor, and a speed reducer. The burlic type drive, will consist of a drive drum, pinch roller, belt travel take up mechanism. The drive roller will be neoprene lagged with a spring loaded pinch roller for tension. The belt will return underneath the furnace on skid pans.

## Atmosphere System

The furnace will be designed to operate with an exothermic atmosphere. Inlets for the atmosphere will be provided in the transition section and each cooling section. Components will be provided to complete the atmosphere system. The components will include but not be limited to Waukee flow meter, latch type shut off valve, solenoids, pressure relief regulator and pressure switches to complete the system.
By having atmosphere in the cooling sections will help cool the parts and preheat the gas to improve efficiency.

## Furnace Instruments

We will provide the following instruments
1.    Furnace temperature controlled through the CMS
2.    Two (2) Honeywell UDC 2300 high limit temperature controllers
3.    Four (4) thermocouple protection tube assemblies

A NEMA 12 control panel will be provided to house the instruments and all necessary electrical components to complete the electrical control system. The free standing panel will be prewired ready for service connection at your plant. Furnace mounted components will be prewired to a junction box. The control system will meet or exceed safety standards. Two (2) NEMA 12 enclosures will be provided to house the SCR=s. The panels will be prewired ready for service connection at your plant.

## Sample Ports

We will provide three (3) sample ports; (1) in the furnace, (1) in the cooler, and (1) in the inlet line. Solenoid valves through the CMS allows you to choose what sample you wish to select from. The sample ports are piped to a common header which is connected to the Dew Point and Hydrogen analyzer.

### Item #2:    4000 CFH Exothermic Gas Generator

One (1) 4,000 CFH exothermic gas generator will be provided as described herein. The generator will be designed for a variable output design. If an output amount from the generator is required which is less than 4,000, the unit will adjust per the required output. The variable output is adjustable up to approximately 50% of the total output amount.

The generator will be fabricated with a horizontal, round style combustion chamber. The combustion chamber will be mounted to a heavy duty structural steel frame. The combustion and cracking chamber will be lined with insulating fire brick with a diffusion wall of super duty fire brick.  Nickel impregnated catalyst for efficient gas cracking will be provided. The generator combustion chamber will be water cooled with an outer jacket.  The combustion system will be manufactured with a nozzle mix burner system.

We will supply an air blower mixor assembly complete with air filter, motor, by-pass regulator and gas balancing regulator. We will supply two (2) Waukee flow meters, one for gas metering and one for air metering and a safety shut off valve, three (3) pressure switches, a motor starter and an alarm horn. The system will incorporate flame supervision relay with a flame safety system and temperature controller. Type "R" thermocouple will be provided. Installed to provide safe operation of the generator and incorporating electric spark ignition.

The atmosphere gas leaves the generator through a catalyst bed, water cooled end plate, water cooled elbow, mild steel pipe within a pipe pre cooling assembly, shell and tube type tube bundle with a separator box and condensate trap. This method of cooling improves the longevity of the shell and tube heat exchanger.

### Generator Auto Start and Interface with Computer Management System (CMS)

We will provide necessary components for generator auto start and interface the generator controls with the furnace CMS system.

**Item #3:**     **4000 CFH Atmosphere Dryer**

We will provide one (1) refrigerant atmosphere dryer to cool 4000 CFH of inlet exothermic gas to approximately 401F to 501F. The dryer will be piped and wired complete with necessary motor starter, pressure switch, temperature control, pressure gauge and temperature gauge.

**Item #4:**     **Closed Loop Water System**

We will provide a closed loop water system designed to handle the following pieces of equipment:
> (1) New 225 KW furnace
> (1) New 4000 CFH exothermic generator
> (1) Existing 75 KW Seco-Warwick furnace
> (1) Existing 1000 CFH exothermic generator

To make the system a closed loop, we will provide a sump tank, pump, level switch and over flow switch. Water from your existing furnace coolers will drain into the sump tank. Water from the sump tank will be pumped to the new system reservoir tank.

The system will include an air-cooled heat exchanger and pumping station. The heat exchanger will be a split system which consists of copper tube heat transfer coil, propeller fans driven by independent direct drive motors, fan plenums, and fan guards. The fans will be prewired to a common control box with non fused lockable disconnect. The self-supported exchanger housing will be fabricated from light gage galvanized steel. The closed loop pumping station includes a pump rated at 70 gpm with TEFC motor and nominal 300 gallon sealed reservoir tank, drain connection, pump shut off valves, check valve and pressure gage.

A NEMA 12 electrical enclosure will be provided to house the disconnect switch, motor starter, and temperature controller for cycling the air-cooled heat exchanger. The cooling system will incorporate an evaporative misting system to assist the air exchanger during hot days.

## Back Up Pump

We will provide a second identical pump for "back up status" complete with necessary by-pass valves. This will allow the system to continue operating when the first pump is shut off for service or maintenance. The two pumps provided will be identical and rated for the same flow performance.

## Stand by Third Pump

A third pump driven by some independent power source to include auto start will be provided.

## Mezzanine

We will provide a mezzanine to be located over the furnace cooling sections. The mezzanine will be a free-standing structural steel frame with stairway access to the mezzanine grating platform. The structure will be sized to support the furnace SCR 's panels, transformers, 4000 CFH Exothermic Generator and Dryer.

## Hydrogen Analyzer

We will provide a hydrogen analyzer that will monitor a range of Hydrogen 0-20% and interfaced with the CMS. The analyzer is mounted in a panel complete with sample pump and filtration.

## Dew Point Analyzer

We will provide a dew point to operate in the range of –40 to + 80°F. The analyzer is mounted in a panel and interfaced with the CMS for monitoring. The analyzer includes a built in pump, flow meter, filter and hose.

## Computer Management System (CMS) For Furnace

We will provide one (1) Computer Management System (CMS) to monitor functions for the furnaces.  The system includes a color monitor computer based touch screen, keyboard terminal with mouse with necessary proprietary software for control and information processing applications. The CMS system is designed to monitor, gather and internally record data functions. Also the CMS system allows input retrieval modules to collect, store and retrieve the data as required. The system is capable to interface with a Customer's supplied printer to obtain a hard copy of the desired data.

The touch screen displays the furnaces operations and other selectable information and various events such as temperature in each zone, temperature set point in each zone, belt speed (residence time), cooler temperatures, monitor alarms, trending charts and part tracking.

The CMS screen will display various selectable information such as alarm conditions i.e. high/low temperatures in the coolers, atmosphere dryer, conveyor drive fault, failed to run, among others to choose from. Furnace temperature set point, temperature hi/low limits, belt speed, residence time etc. The information available and features of the CMS can be tailored to meet your needs and/or criteria and would be finalized during engineering after receipt of an order.

The information sent via fax to you on November 17, 2006 includes features for a typical continuous mesh belt furnace. During the initial Engineering review meeting specific items you wish to select and monitor will be discussed in addition to typical standard items. Engineering will develop sample screens and reviewed during the final engineering approval meeting.

| Monitors | Controls |
|---|---|
| Temperature in zones #1 and #2 | Temperature in zones #1 and #2 |
| Belt Speed | Belt Speed |
| Residence Time through furnace system | Belt Speed |
| Temperature in cooler #1 and #2 | Temperature in cooler #1 and #2 |
| Generator Exo flow | Total blower speed/natural gas |
| Generator Jacket Temperature | Monitors temperature. |
| Generator Blower | Run/Not Run |
| Generator Flame | Running/Not running |
| Hydrogen Analyzer | % Hydrogen |
| Dew Point Analyzer | Monitors analyzer functions |
| Water Pump | Running/Not running |
| Back Up Pump | Running/Not running |

Additional items, features and selectable items are available and discussed during Initial Engineering review meeting.

### Item #5:    Installation Of The Equipment

We will provide labor and materials to install the equipment at your facility as follows:

1. We will make arrangements for trucking the equipment to your facility. Customer to pay all trucking costs
2. We will load the equipment on trucks for shipping.
3. We will make arrangements for riggers to receive, off load the equipment, move to job site, spot and level the equipment. Customer to pay all rigger costs.
4. We will provide labor and materials to make the furnace final assembly and connections.

5. We will provide labor and materials to make final connection to your properly sized utilities located on the equipment. We will provide labor and materials to make the necessary electrical connections from the control panel to the furnace mounted components and SCR. Customer to bring the drops to point connection on the control panels and SCR panels.
6. When the equipment is installed, we will provide the services of a technician to start up, debug the equipment and train your personnel on the operation and maintenance of the equipment.

## Customer To Provide The Following Items:

1. Pay for all shipping costs
2. Provide riggers and equipment to receive, unload and move to the job site the equipment and related components.
3. Provide labor and materials for any site work such as foundation, level floor, drains, roof penetration.
4. Bring all utilities to point of connection located on the equipment.
5. Provide labor and materials to make any building penetrations for the exhaust stacks and vent lines.
6. Provide and install all exhaust stacks, vent lines and ducts as desired or required.
7. Provide on an as need base the use of a lift truck
8. Provide an adequate area for storage of tools and equipment during installation.
9. Provide a clear access from the unload area to the job site.
10. Provide labor and materials for operating equipment during start up.
11. Provide a suitably sized disconnect supply feed to the furnace and generator control panel connection point.
12. Provide 2 psi minimum of natural gas to the generator
13. Provide all fluids (water, glycol, chemicals) for the equipment including initial filling of system.

## Utilities

| | |
|---|---|
| Electrical | 480 volts, 3 phase, 60 Hertz |
| | Brought to point of connection for control panel, SCR panels |
| Natural Gas | 1000 BTU's/Hr. 2 psi minimum for the generator |
| Water | @ 30 PSI |

## Drawings And Instruction Manuals

General arrangement, wiring and piping schematics will be provided for Purchaser's approval prior to the start of fabrication. Upon completion of start-up we will provide the following items:

1. One (1) set of operating manuals and maintenance instructions along with a recommended spare parts list
2. One (1) set of manufacturers instruction and maintenance manuals as provided by manufacturers.
3. One (1) set of furnace layout drawings.

The technical data and information contained in this proposal is as accurate as we can provide at this time. Some deviation may be required as we process through the design and manufacturing of this equipment. We reserve the right to correct all typographical errors.

## General

The equipment will be assembled, piped, and wired prior to shipping. Temporary electrical connections will be made for testing the equipment and demonstrating to the customer.

## Paint

The equipment will be painted with one primer coat and one finish coat per Tempco color selection prior to shipping. If the color selected by Tempco is different than standard industrial grade Sherwin Williams paint such as a two part epoxy paint or other special paint there would be an additional charge for the paint.

## Shipping

All major components will be shipped as nearly assembled as practical and any components removed for shipping will be match marked for ease of reassembly. The unit will be shipped as complete as possible to conform to shipping and highway limitations.

## PRICE

**Price (To Include The Following)** ..............................................   **$ 350,000.00**
(1) 26" mesh belt furnace
(1) 4000 CFH Exothermic Gas Generator
(1) 4000 CFH Refrigerant Gas Dryer
Closed Loop Water System
Second pump
Stand by Pumping System – natural gas
Hydrogen Analyzer
Dew Point Analyzer
Furnace CMS System
Field Installation

**Price for Mezzanine** .................................................................   **$ 12,900.00**
The Mezzanine can be cancelled up to 5 weeks after project start.

**Inner Doors:**

If you decide to purchase manually operated insulated steel alloy plate doors on
the entrance and exit of the 8 foot heating section (inner door). This can be
added within 5 weeks of starting project.
**Price (Adder for inner doors)** ..............................................   **$  6,000.00**

**Freight**     F.O.B. Shipping Point, Customer to pay all shipping costs including any
items dropped shipped to the plant site.

**Delivery**    (16) to (18) weeks ARO based on the availability of materials and our
currentwork load. We estimate approximately 1 week or ten working days
for installation

**Terms**     30% due with purchase order
25% due after 10 weeks of project start
25% due upon acceptance of the equipment on our floor and prior to
shipping
20% due net 30 days after installation and start up.



## General Warranty

The construction, workmanship and materials will be first quality, free from defects which render this equipment inefficient for its intended purpose. We warranty our workmanship and non perishable items for a period of one (1) year. Perishable items such as (alloys, heating elements, conveyor belt etc.) will be covered by the manufacturer's warranty. Any defect found in material or workmanship within one year of operation will be replaced or repaired at the expense of the J. L. Becker Company.

We cannot be held responsible for any abnormal situations, which may disrupt the general flow of material for completion of the equipment and will be in addition to the time quoted herein. The amount of any present or future sales, use taxes, income taxes or any other taxes imposed by the U.S. Government, State, County, or City are in addition to price in this proposal and is payable by the customer.

Thank you for your order and the opportunity to submit this purchase contract document. We look forward to working with you on this project. Please feel free to contact me if I may be of further assistance.

Best regards,
**J.L. Becker Company**


Mr. John L. Becker II
President

Cc    Bill Van Etten



*Visionary Solutions for Industry* Since 1972

Temperature Controllers & Sensors ◦ Heating Elements ◦ Process Heating Systems

December 27, 2007

**By Overnight Courier**
Mr. John L. Becker, President
J.L. Becker Company
41150 Joy Road
Plymouth, MI 48170

Dear Mr. Becker,

I am sure you are aware of our ongoing and troubled annealing furnace project. It is now coming close to a year since we awarded the J.L. Becker Company a purchase order and issued a down payment check dated January 29, 2007.

Pursuant to such order, your company is to provide Tempco a quality annealing furnace system to bright anneal our copper and steel tubular heating elements at 1600 to 1800 degrees Fahrenheit, and black oxide anneal our stainless steel and incoloy tubular heating elements at 2050 degree Fahrenheit in a rich exogas atmosphere.

I must say that I am extremely disappointed in the performance of your Company with respect to this matter. Consequently I felt it necessary to write to you directly with the hope of amicably resolving these troubling issues. The rather sad story follows:

The original contract specified a 16 to 18 week delivery. After various design and construction problems uncovered in our inspection of the equipment at your site in July of this year were corrected, the furnace finally arrived at our facility on September 6, 2007, taking roughly twice as long as the lead-time stated in the contract.

As if a doubling of the lead-time were not bad enough, since the delivery of the unit there has been an ongoing and endless series of problems and needed repairs regarding various components and the system setup necessary for the proper operation of this furnace. You are aware of many of these issues; all have been documented and such documentation will be provided upon request.

To summarize, all significant problems we have encountered can be attributed to one or more of the following:
1. Careless installation of components by your Company.
2. The utilization of incorrect specifications in the manufacturing process by your firm.
3. Faulty engineering designs developed by your firm.
4. Inadequate inspections and testing prior to shipment of this system.

Once again, we will be happy to provide you with specific documentation, but most frustrating is the fact that it has been a full four months since delivery and the furnace is still not in operation, never having produced a single pound of product for Tempco.

Tempco Electric Heater Corporation
607 N. Central Avenue ◦ Wood Dale, IL 60191-1452  USA ◦ 630.350.2252 ◦ Fax: 630.350.0232
E-mail: info@tempco.com ◦ Web: www.tempco.com

**EXHIBIT C**



The ramifications of this delay are quite concerning and could be very costly. Fortunately our 27-year-old Seco-Warwick furnace has been reliable and continues to operate. The advanced age of this equipment was the only reason we purchased the new furnace. If this older furnace fails we will not only lose current orders in house, but we may also permanently lose large customers and the future business these relationships represent.

If your failure to perform and perform on a timely basis causes Tempco to lose business and/or some or all of our customer base, rest assured that we will hold the J.L. Becker Company fully responsible. By any acceptable business standard, paying substantial sums of money and still not having an operable furnace system after nearly a year is disgraceful to say the least.

Our tubular element production is the lifeblood of our business. Without an annealing furnace we will have no product to ship. Consequently our losses could be in the range of millions of dollars. Needless to say, we consider this a very serious issue.

To further elaborate on this nightmare of an experience, an expected two-week installation extended to a full seven weeks to late October 2007, when an attempt was made to put the furnace in operation. When the furnace reached an operating temperature of 2050 degrees Fahrenheit, a significant design flaw was uncovered on the furnace entrance throat area, causing an unacceptable external temperature of over 700 degrees Fahrenheit! This created an obvious, unacceptable and very serious safety risk, not to mention the possibility of this temperature melting wire and conduit located nearby.

Also at that same time, a critical but common and simple component, an exogas refrigerant drier, was not operating correctly. The drier was freezing up thereby preventing the exogas temperature from ever getting below 50 degrees Fahrenheit, when the accepted industry standard is 40 degrees Fahrenheit. A low dew point is necessary and required for our product. To date, we have never been able to run any product through this furnace as a result of this unresolved problem.

Upon the discovery of this problem, the furnace was shut down. Numerous unsuccessful attempts were made to get the refrigerant drier properly operational. Adding insult to injury, return service calls were also required to replace other less critical but faulty components uncovered during this attempt to run the system.

After much correspondence regarding the design flaw in the throat area, your firm, ignoring our requests for a proper repair, tried to install an inadequate quick fix for the throat area involving water jackets that would theoretically lower the case temperature.

This was not an acceptable solution since it would result in Tempco having to pay for lost energy efficiency for the life of the furnace, calculated at several thousand dollars per year. Consequently, we stood firm on our request to insulate the throat area, a common industry practice, which conserves heat and acts to preheat the product before entering the furnace. This incidentally is considered a **best** practice in the industry.

2



Through conversations with Becker staff, it was determined that the entire throat would be insulated with as much insulation thickness as possible, perhaps as much as four inches. We were disappointed to observe that upon delivery, only two inches of insulation had been installed. Why the bare minimum was used is a mystery to us, given the challenges of the fix. This fix did significantly improve the performance, decreasing the temperature of the throat to around 230 degrees Fahrenheit at a furnace temperature of 1800 degrees Fahrenheit, but we still have serious concerns.

First, we are not convinced that the 230 degree Fahrenheit outside temperature meets NFPA or OSHA standards, but we will research this matter and provide you with our conclusions. Second, we are concerned that if the furnace temperature were 2050 degrees Fahrenheit, then the outside temperature may rise proportionately or at a greater rate, thereby causing a higher and unacceptable outside surface temperature. **We consider this an open issue and we will expect your firm to rectify any associated problems as we continue testing the furnace and researching the safety regulations.**

The insulated throat was installed the week of December 3, 2007. A further attempt was made to repair the drier during that week. At the end of this week, it became painfully evident that the existing drier will never perform to our requirements for this application. Moreover, the operational parameters that your firm was trying to achieve with this drier are not what is industry standard or what our process requires. The drier was then removed and brought back to your facility by the service men.

After this gas drier debacle, we provided a specific written description of the drier to clarify fully our requirements for this process. This clarification was based on what is considered an industry standard, confirmed by conversations with at least three of your competitors in the industry. **Our requirement stated simply is to provide exogas at a 40 degree Fahrenheit dew point at rated flow capacity, with the ability to turn down the flow and still achieve a 40 degree Fahrenheit dew point to match the exogas generator variable output.**

Representatives of your firm have told us that you contracted an HVAC design firm to design and test this refrigerant drier. A field service man from such design firm was sent in a futile attempt to repair the drier. In conversations with this individual it appears his firm is a general contracting engineering firm, lacking the specialization in exogas refrigerant driers that some other companies have. This lack of expertise would explain the dismal performance of a piece of equipment that is considered a standard and proven device, having been available in the furnace market for over thirty years.

Your firm sent a reply to us on December 14, 2007, proposing in an unspecified way to "modify" the drier design so that some basic parameters can be met, but not agreeing to the industry standard operating temperature of 40 degrees Fahrenheit, instead specifying a 43-degree minimum operating temperature. **Forty three degrees is not acceptable and is not adequate for our process.**



We are convinced that this odd, non-industry standard being proposed is yet another attempt to shoehorn the original poorly designed gas drier back into the project, operating at the extreme margins of its capabilities, instead of providing a properly designed and adequate drier.

We were also told in the letter of December 14 2007 that a crew would be out to modify the furnace the week of December 17, 2007. As indicated, we are convinced that further modifications to the drier will **not** solve the problem, but much to our surprise, to date no crews have arrived and no contact has been forthcoming from your firm.

We feel strongly that we have been more than patient and have made every reasonable attempt to work with the J.L. Becker Company to achieve a successful solution to these problems, but we do not believe you are presently acting in good faith. It seems your intent is to achieve nothing more than marginal results and then abandon the project.

Given the purchase cost of this system of roughly $370,000, we should not be expected to, nor will we accept, any marginal performance from any related component. The exogas refrigerant drier must meet the standard industry specifications to provide exogas at a 40 degree Fahrenheit dew point at the rated flow capacity of the exogas generator you supplied. It must have the ability to turn down the flow and still achieve a 40 degree Fahrenheit dew point to match the exogas generator variable output.

All of your attempts to "patch up" the existing drier have failed. We are not willing to consider accepting a jerry rigged and patched up refrigeration unit. A new unit that will perform as described above is the only acceptable alternative.

**Consequently, we will not under any circumstances accept the existing drier. We therefore demand that your firm replace the existing drier with a unit that performs to the specifications described above. A sign off by Tempco with regard to the manufacturer and specifications for the new drier will also be required.**

**We expect you to provide and install such a unit so that we can get the furnace running and hopefully start to see some return on this rather large investment, which to date has not only failed to add any value, but is actually costing Tempco substantial sums of money.**

We have further determined that an adequate replacement unit will have a cost in the range of $15,000 to $25,000. Needless to say, it would be extremely misguided to sacrifice the performance of a roughly $370,000 system (not including our internal costs) due to an inferior and relatively inexpensive drier.

Further concerning is the fact that the furnace has not operated for any length of time and has never run product. Consequently, we still do not know if other items of concern will surface and need attention. We certainly cannot afford to spend the time and effort that it has taken to get to this point with every problem that may come up in the future.

4



Unfortunately, if the rather painful history of this project is any guide, there will likely be more problems. **Consequently, we demand that the warranty period commence only when this furnace is operating to our satisfaction, and we also expect you to extend the warranty period to twenty-four months.**

As a side issue, we have no complaint with your field service crews, and particularly Matt Becker. Matt and others have been diligently and responsibly trying to deal with the myriad of problems described above. Regardless of how talented these folks are, these problems take time and effort to correct. To state the obvious, such time-consuming correction would not have been necessary had the system been initially designed and manufactured properly. One cannot expect a field crew, no matter how good, to compensate for the inadequacies of these other functions.

We are frankly at a loss to understand the shoddy performance of your engineering, quality control, and overall management that we have seen on this project, which has led me to write this rather unpleasant letter.

**Given the negligent and obfuscating manner in which you have conducted this project, we are constrained to demand that you provide an operational annealing furnace system, to our satisfaction, complying with all contract specifications and industry standards, including our requirements for the drier as described, by no later than the close of business on January 31, 2008. Your past failures notwithstanding, if you fail to perform this time around we will consider you in breach of the contract.**

To restate the specifics, we demand the following from your firm:
1. That you provide and install a replacement drier that performs to the specifications set forth above.
2. That you provide Tempco with an extended warranty period of twenty four months, commencing after all performance issues are resolved to our satisfaction and the furnace is operating in a manner satisfactory to us.
3. That you resolve and correct any outside temperature issues to our satisfaction, based on further testing of the furnace system, coupled with the aforementioned review of all applicable safety regulations.

The J.L. Becker Company worked hard for many years to earn our business, not only for this furnace but also for furnace accessories. You were diligent in providing quotes and even beginning the designing process prior to receiving the order from us. You have had far more complicated and larger projects than this. We were made to feel comfortable enough with you that we gave you the order, instead of going with a much larger and established company that we knew well.

We relied on your expertise and knowledge to provide us with a furnace that is fit for our particular purpose and performs to our satisfaction. It is time for you to live up to your commitment and restore the confidence that has been lost.

You seem willing, if not determined, to risk your reputation as a Company and possibly be faced with legal action over what in hindsight were simple mistakes, made large and complicated by your attempts to justify them, offering the most marginal solution possible, or worse yet, diverting blame to members of our staff for doing their job in keeping Tempco's best interest in mind.

To state the obvious, the J.L. Becker Company needs to make a concerted, re-dedicated effort to deliver on your commitment to provide Tempco Electric Heater Corp. with a quality annealing furnace system, and prove that the confidence we placed in you by awarding you the purchase order in the first place was not a mistake.

I expect a response to this letter in writing by the close of business on January 7, 2007, with a clear timetable of your intentions to complete this project to our satisfaction.

Very truly yours,
TEMPCO ELECTRIC HEATER CORPORATION

Fermin Adames
President

Andy Hagen-Plant Engineering Manager-Tempco
Paul Wickland-CFO-Tempco

# J. L. BECKER COMPANY

QUALITY HEAT TREATING EQUIPMENT AND COMPONENTS

January 31, 2008

Tempco Electric Heater Corporation
607 N. Central Avenue
Wood Dale, Il.  60191

Attention:    Mr. Fermin Adames
Subject:      Your letter dated January 22nd

Dear Mr. Adames,

I am in receipt of your letter dated January 22nd . I have reviewed it and I want to assure you that we will make every effort to resolve the open issues so both of us can move forward to a mutually satisfying completion.

Thank you for the literature you sent on the other dryers which I have reviewed. Our dryers in the 70's was very similar to the dryers in the literature you sent. Because of high water and sewer costs, we have gone to a more efficient unit which is air cooled. One advantage of the water cooled units they are more flexible because of the water cooled condenser.

Our new prototype dryer is completed and currently completing tests on the unit, at 2000 CFH and 3000 CFH we're maintaining a 40°F temperature and at 4000 CFH we're maintaining 43 to 45°F. The performance of the unit is within the parameters as stated in our proposals. We are working with Super Radiator and they're making a new prototype coil which we will receive on Tuesday of next week. We will install the unit, perform tests on Wednesday and are making plans to install on Friday, February 8th. The performance of the new dryer will meet your new requirements.

The other open issue we want to resolve is the exterior temperature. During our final testing of the furnace at temperature, we will inspect the external parts temperature on the equipment. NFPA 2007 edition, 86-13; 5.2.8. states, "External parts of furnaces that operate at temperatures in excess of 160°F (71°C) shall be guarded by location, guard rails, shields or insulation to prevent accidental contact with personnel", which we will do. Please be aware, however, that NFPA specifications are guidelines, nor are they mandatory. May I add that no where in your specifications or our proposals do we state that we will meet NFPA standards.

**EXHIBIT D**

41150 Joy Rd – Plymouth, MI 48170
Phone 734-656-2000 – Fax 734-656-2009

I believe these to be the only open issues. If I have missed or am unaware of something please advise me. I do hope that we have the opportunity to meet personally to go over the open issues and come to an agreeable solution by both parties. Please feel free to call me at 734-516-2814.

Best Regards


John L. Becker
President

# J. L. BECKER COMPANY

QUALITY HEAT TREATING EQUIPMENT AND COMPONENTS

February 1, 2008

Tempco Electric Heater Corporation
607 N. Central Avenue
Wood Dale, Il.  60191

Attention:    Mr. Fermin Adames
Subject:      Your latest e-mail message January 31st

Dear Mr. Adames,

I am in receipt of your e-mail message dated January 31st. I am currently out of the office and will return on Tuesday, February 5th, however, I was able to retrieve my e-mails late last night.

I would like to give you a progress update on the new prototype unit we are testing. The unit has been running in excess of 24 hours @ 2000 CFH, 3000 CFH and 4000 CFH at a constant temperature of 38 – 41°F. The temperature change happens with the volume change and it took only a few minutes to adjust and return back to the lower temperature. We feel this unit meets your needs and satisfaction.

To move things expeditiously, my proposal would be to install this unit, get the generator and furnace up and running. Perform final testing on the equipment and into production mode. If after doing this, you are not happy and do not like the performance of the new prototype unit, we would buy a replacement unit from another source. Delivery for a unit from another source would take 12 to 14 weeks for delivery. When the other unit arrives, we will swap it out and take back J.L. Becker dryer.

The units supplied by another source are water cooled.  At a rate of 300 gph and using an industry standard of 7000 hours for yearly production time, the additional water and sewer usage would be in excess of 2,000,000 gallons, which would be an added utility expense. The water and sewer usage is one of the reasons why we went to an air cooled unit, even though it is less flexible.  Our unit and those from other sources use the same amount of electricity. Using water from your water system is not an option because during certain times of the year the in coming water will not be cold enough.

After your review of the above information, let me know if this is acceptable and we'll schedule installation of the unit and start up, mid to end of next week.  When we are at the site installing the unit we will also take care of the other open issues. You can call me at 734-516-2814.

Best Regards

John L. Becker

**EXHIBIT E**

President



*Visionary Solutions for Industry®* *Since 1972*

Temperature Controllers & Sensors ♦ Heating Elements ♦ Process Heating Systems

February 4, 2008

**By Overnight Courier**
Mr. John L. Becker, President
J.L. Becker Company
41150 Joy Road
Plymouth, MI 48170

Dear Mr. Becker:

Receipt of your February 1, 2008 letter is acknowledged.

After reviewing the content of your letter, we are willing to proceed as you have indicated with respect to your providing and installing a new dryer unit. Obviously the performance must be 100% satisfactory to us. If it fails to perform to our satisfaction, we will require you to replace it with a Seco/Warwick Model REF- 40 (4000 cfh ) dryer. This is the only unit that we will consider as a satisfactory replacement.

I fully understand the lead times relative to obtaining a Seco/Warwick replacement unit, but if your dryer fails to properly perform, we have no choice. I again remind you of the potential liability if our existing furnace fails.

With respect to your comments about water cooled dryer units, I find such comments to be largely incorrect. Two of the three units of which we provided you with literature, are in fact, air cooled units. Moreover, the Seco/Warwick unit referenced above is an air cooled unit. Further, I call your attention to the Seco/Warwick brochure that we sent you which states, "Air cooling is used on sizes 500 cfh to 4000 cfh refrigerant dryers." To somehow imply that these competitor units are 1970s technology is absurd.

Regarding the surface temperature and related radiant heat issue, we expect this problem to be solved and we currently consider it an open issue. We cannot evaluate an appropriate resolution until the entire furnace unit is up and fully running. Assuming this is achieved we will be better able to evaluate the magnitude of the problem and available solutions. Be advised that placing a guard around the surface may protect employees from getting burned if they were to touch it, but there still may be a significant radiant heat problem that will require resolution if the furnace is to be considered safe to operate.

I find the comment appearing in your January 31, 2008 correspondence, that no where in your proposals do you state you will meet NFPA standards, both amusing and sad at the same time. To illustrate this point, please note the following which appears on the Seco/Warwick literature we sent you, **"All of Seco/Warwick equipment adheres to the latest NFPA standards regarding Industrial furnaces and equipment."**

TEMPCO Electric Heater Corporation
607 N. Central Avenue ♦ Wood Dale, IL 60191-1452 USA ♦ 630.350.2252 ♦ Fax: 630.350.0232
E-mail: info@tempco.com ♦ Web: www.tempco.com

**EXHIBIT F**



The final open issue is the extended warranty. As I indicated in previous correspondence, we expect an extended two-year warranty given all of the problems we have had with this furnace thus far. We are concerned that other issues may surface once the unit is running and producing product. We consider this an open and unresolved issue that we will address once you are successful in getting the furnace to run product and operate to our satisfaction.

Two copies of this letter are enclosed. Please sign one and return it to me; the other is for your records. The purpose is to establish a clear understanding as to how we will work together going forward and avoid any future problems or misunderstandings.

Upon your return of a fully executed letter, please contact Andy Hagen to make arrangements for the installation of the dryer unit and the plan for getting the entire furnace unit up and running to our satisfaction. **Do not contact Andy until such time that you have signed and sent the letter as we will not move forward without an executed document.**

Thank you for your cooperation.

Very truly yours,
TEMPCO ELECTRIC HEATER CORPORATION

Fermin Adames
President

Cc: Andy Hagen
    Paul Wickland


ACCEPTED AND AGREED:

John L. Becker, President
JL Becker Company

2-5-08
Date



*Visionary Solutions for Industry* ® *Since 1972*

Temperature Controllers & Sensors ♦ Heating Elements ♦ Process Heating Systems

March 10, 2008

**By Overnight Courier**
Mr. John L. Becker, President
J.L. Becker Company
41150 Joy Road
Plymouth, MI 48170

Dear Mr. Becker:

Receipt of your emailed letter of March 3, 2008 is acknowledged.

Based on this rather painful experience coupled with your ongoing weak and feeble attempts to place responsibility for the failure of this project on anyone other than the appropriate party, (the JL Becker Company), I have lost confidence in anything you propose. Your ongoing and continued failure to take responsibility truly amazes me. Six months have passed since you delivered the furnace to our facility, and we still do not have a functional and performing furnace. This in and of itself is insanely pathetic from a performance perspective.

I am further convinced that the only solutions you will provide on your own will be marginal at best. Specific responses to the points you made in your aforementioned letter are as follows:

1. First of all, the drip leg "solution" proposed and installed by you is half baked at best. I explained this in my February 28, 2008 correspondence to you. Second, Flavio did not agree to install these items. Why is it that you have this insatiable habit of constantly pointing fingers at Tempco employees when you should be taking responsibility for correction of these numerous problems that your firm created? Third, why would we step in and expend our resources to correct a problem you created that should never exist in the first place if the engineering had been at a competent level?

   Your verbiage contained on the second paragraph of point 1 more fully illustrates the lack of competent design engineering employed with respect to this project. By your own admission, water accumulation can always be a challenge, yet your shoddy design does not provide for appropriate water drainage. Moreover, the dryer has too much liquid water carryover also due to poor design. The obvious question is why was the product not engineered in a way to mitigate this problem? You should hang your head in shame over this issue.

**EXHIBIT G**

Your furnace, even after running many hours continuously, does not produce consistent bright annealed steel, and the stainless steel and incoloy is very dirty with sooty, loose black deposits. This is not acceptable. The dew point meter consistently measured a dew point 20 degrees higher than the outlet temperature of the dryer, and it appears the liquid water in the system is the reason for all of these problems, not to mention the safety and maintenance issues already addressed in my last correspondence.

A well designed system is transparent, but since we have been confronted with these problems, we want to make it clear to you what we expect based on common sense requirements and, of course, what we have achieved on our existing 25+ year old furnace. Allow me to remind you that you assured us on many occasions that the performance of your furnace would surpass our existing furnace. The painful reality is that to date this has not happened.

Also be advised that the refrigerant dryer froze up last Thursday night, 2/28/08. It is painfully evident that there is substantial liquid water carryover from this dryer. You have provided a dryer that achieves the temperature without the proper dew point results, which was the true performance requirement.

## Our expectations to resolve these issues are as follows:

a.  With the exogas at a 40 degree F dryer outlet temperature, the dew point meter, taking its sample from the port after the flow meter and before the furnace inlet, should read a 40 degrees F dew point. This equalization of dew points must happen within a reasonable timeframe. This will prove that the low dew point achieved with the dryer is being maintained. A long period drying out the piping is not acceptable.

b.  Exogas piping and the refrigerant dryer should be engineered and installed in such a way that liquid water entrainment is held to an absolute minimum, particularly in any section of the piping directly leading to the furnace inlet.

c.  The refrigerant dryer should **never** freeze up during normal outlet temperature and dew point of 40 degrees F. We have never encountered this problem with our existing Seco furnace/dryer in spite of its 25+ year age. I am convinced that once again, poor engineering design on your part is the cause of this serious performance problem

d.  Any water normally collected in the piping under any conditions should be routed to the existing water/gas trap. Under no circumstances should manual intervention be required to prevent water buildup to a level that can contaminate the atmosphere or piping components, or possibly create a dangerous situation where liquid water is allowed to enter the furnace.

e. The drip leg you recently installed at the furnace inlet valve will be used only as a check to make sure the rest of the piping is functioning properly. We will not accept any requirement for us to incur continuous and ongoing labor to drain the water as a means of compensating for your Company's improper and shoddy design engineering.

f. The clear area under the mezzanine to the left of the furnace must be maintained with at least a 7"5" clear height under all piping.

The water problems discussed above could have been easily been accomplished if the piping had been properly engineered from the beginning, and the water carry over from the dryer minimized by proper design or exit piping modifications. If you knew this might be a problem and did nothing, it is a glaring example of why this project is the worst experience we as a company have ever had regarding a major equipment purchase.

g. Our steel product must come out of the furnace bright annealed. We require that the stainless steel and incoloy tubing have a tight black oxide covering, not easily removed and all products must be thoroughly annealed.

h. The cooling time and temperature requirements of our product in your furnace as specified in the contract will be tested by us and must be met.

2. With regard to the guarding of the throat area, again you have proposed a half baked solution which should have been done right from the very beginning via proper engineering design. Be advised that the section that gets the hottest (450-470 degrees F) is the top plate that holds the atmosphere curtains.

**Our expectation to resolve this issue is as follows:**
We will require insulation first to drop the temperature in the top section, and then we will allow a one inch insulated cover over the entire throat area, as long as it is easily removed to access the curtains. In any event, the outside temperature must not exceed 160 degrees F on all surface areas.

3. The two year warranty is non-negotiable. As set forth in my correspondence of January 22, 2008 and signed off on by you, JL Becker Company will provide Tempco with a two year warranty that covers any and all defects in design, material or workmanship, normal wear and tear excepted. There is nothing more to say with respect to this issue.



All of these requirements, once again, are simple, standard, and would have been easily achieved had the system been properly engineered, assembled, and installed from the start. It should be an embarrassment to you that a customer has to be this detailed for purposes of educating you regarding the required fixes for a standard annealing furnace. Moreover, six months after delivery we still do not have a working system. This is criminal.

On Monday, March 24, 2008 we will start up the J.L. Becker furnace. If the furnace does not achieve all of the requirements listed above within the week ending March 28, 2008, we will be constrained to require that you remove your non-functional furnace from the Tempco facility and refund all monies paid the JL Becker Company by Tempco. Moreover, we may pursue legal action to recover all of our costs and damages caused by your negligence and non-performing furnace.

This plan provides you with two weeks to make sure you have the system ready with all required engineering and piping changes for that week's runoff.

Please read this letter carefully. There will be no more opportunities to correct the mess that you have created. Your past and rather dismal track record is one of failing to listen to what we ask for and consequently failing to comply with our requirements. You have also demonstrated a failure to understand and accept what are considered standard industry requirements for performance of an annealing furnace.

We believe you have totally misrepresented your capabilities, and your ability to provide a functional and quality furnace system, evidenced by the fact that six months have passed since the unit was delivered and it is still not working. We as a company have never felt more swindled. This purchase has by far been the worst, most time consuming, wasteful and exhausting undertaking Tempco has ever experienced with an equipment supplier, not to mention the costs and time incurred by us to manage this mess, coupled with receiving absolutely no value for the nearly $300,000 of Tempco money we paid you in 2007 for what to date remains a non-performing furnace.

This is your last chance to correct this dismal situation. Hopefully common sense will prevail.

Very truly yours,
TEMPCO ELECTRIC HEATER CORPORATION

Fermin Adames
President

Cc: Andy Hagen
    Paul Wickland



*Visionary Solutions for Industry*® *Since 1972*

Temperature Controllers & Sensors ♦ Heating Elements ♦ Process Heating Systems

April 11, 2008

**By Email and Overnight Courier**
Mr. John L. Becker, President
J.L. Becker Company
41150 Joy Road
Plymouth, MI 48170

Dear Mr. Becker,

Once again I am constrained to write to you expressing my extreme disappointment with your Company's failure to perform with respect to the furnace you have supplied Tempco. As you are well aware your Company's performance has included numerous mistakes, poor engineering design, substandard quality control and consequently extremely poor customer satisfaction, evidenced by the fact that over seven months have passed since delivery, and we still do not have a functional furnace system.

As you are aware, you sent three individuals to Tempco on March 13, 2008 (Bill Richardson your chief Engineer, Tom Sutter your Lead Service Technician and Tom McGraw) to address all of the issues noted in my letter to you of March 10, 2008. Andy Hagen, Paul Wickland and I met with Bill Richardson and Tom Sutter at approximately 11:30am on March 13, 2008. Tom McGraw apparently remained outside of the building in his truck.

I gave both gentlemen a copy of my March 10, 2008 letter to read and discuss as Andy, Paul and I left the room for twenty five minutes. Upon our return to the room I expressed my dissatisfaction with you Company's performance, told your employees that I expected all of the noted problems to be corrected and informed them if they were not successful that we would be demanding all monies paid to your Company by Tempco to be returned, requiring that you remove the furnace from the Tempco premises.

I turned to Mr. Richardson and asked him if he and Mr. Sutter had a complete understanding of the noted problems. He answered in the affirmative. I then asked him if he and Mr. Sutter had the wherewithal to correct all of the problems. He answered in the affirmative.

I further told him that if he had any doubt as to his and Mr. Sutter's collective ability to solve all of the problems that he should tell me now and not waste our time. He assured me that collectively they would solve all of the problems to our satisfaction. I also told him that I did not want the J.L. Becker Company personnel assigned to this task to depart until we were satisfied that the furnace was operating properly and producing product to our satisfaction.

**TEMPCO** Electric Heater Corporation
607 N. Central Avenue ♦ Wood Dale, IL 60191-1452  USA ♦ 630.350.2252 ♦ Fax: 630.350.0232
E-mail: info@tempco.com ♦ Web: www.tempco.com

**EXHIBIT H**



Mr. Richardson remained for the remainder of the day on March 13, but then returned to Detroit and never came back to Tempco. Tom Sutter and Tom McGraw were present on 3/13, 3/14 and 3/15/08. Tom Sutter only returned on 3/17 and was here through 3/20/08. Tom Sutter then returned on 3/24 and left for good on 3/28/08.

While neither Andy nor I were closely monitoring the work being performed, it appears that efforts were made to correct the following problems:
1. The dew point and related water entrapment in the piping.
2. The problem associated with the dryer freezing up.
3. The problem associated with the throat area temperature.
4. The product quality issue with respect to product produced by the furnace system.

The attempts made to resolve these problems have failed dismally. The following issues and problems remain open even though your Chief Engineer assured us with confidence he would not waste our time and would correct the existing performance of the furnace system. The result of his engineering workmanship and performance is disgraceful and pathetic.

1. A 40°F dew point from the dryer was never accomplished. At best a 55°F dew point was read on the meter during your service personnel's recent visit. The meter is also reading 3.2°F lower than actual, so the true dew point is even higher. During the following week, the dew point climbed to 62°F, and a sample from the furnace indicated a dew point of over 80°F.

We know for a fact that your new dryer is releasing large quantities of liquid water as opposed to all liquid water being kept within the dryer and drained off precluding such release. This by itself a measure of the dryer's inefficiency, and all the components you installed are nothing but an attempt to capture that water after the fact.

You know fully well that the purpose of this dryer is to remove moisture, not cool the gas and reintroduce most of the moisture back into the firing chamber of the furnace. This is a further example of a poor design by any applicable criteria. **This solution is completely unacceptable.**

In addition, the dryer has also partially frozen up twice during attempts at normal operation, which has consisted of excessive frosting of external dryer components and a rising of the outlet temperature for extended periods. **This creates an obvious inefficiency and is unacceptable.**

We have researched the matter with other industry experts and have been informed that for this type of equipment, a 40°F dryer outlet temperature will also read a 40°F dew point in all pre-furnace piping, and samples taken from the furnace will normally read a 10°F higher dew point.

Consequently, a 40°F dryer outlet temperature will result in a 50°F furnace dew point. With your furnace a 40°F dryer outlet temperature results in an 80 + °F furnace dew point. **This is substandard not acceptable.**

As indicated in all industry literature, and confirmed by another supplier of this type of equipment, the lower the water content the better the quality of the annealing. The ratio in your furnace of hydrogen to water is very close to the minimum possible for bright annealing steel, and affords us little headroom or flexibility and provides us with no additional ability to process quality annealing relative to incoloy or stainless steel heating elements. **This is unacceptable.**



2. After a few days of running scrap through the furnace with Tom Sutter present, we then ran product that did not meet our specifications and was not even as good as product produced by our existing 27 year old furnace. **This is yet another example of pathetic performance and is considered unacceptable.**

Upon restarting the furnace the following week the quality of the produced product was extremely poor. In fact, it took 3 full days of running before we were able to attain results that were even close to the substandard results obtained the week your service man here and we could only do it for one day as the product became oxidized again. **This performance is unacceptable.**

We are also noticing excessive sooting on the belt and product that is much more than our existing furnace. This may be a result of the high dew point or could be the result of a malfunctioning generator. **In any case this is also unacceptable.**

3. All products are leaving the furnace at 350-400°F, which is much hotter than the 225°F specified in the contract. The flame curtain has little or no effect on this problem. The result is that the steel, if it goes through the furnace bright simply oxidizes when it leaves. **This is unacceptable.**

4. The throat area cover is a marginal and poorly designed patch. It does not cover the entire throat leaving very hot areas accessible, and the top of the guard still gets over 170-180°F. **As indicated in my last letter, this is unacceptable as a surface temperature not exceeding 160°F must be obtained and maintained.**

5. Though mentioned many times as a potential source of problems, running the generator on startup or at idle with the dryer off condenses a substantial amount of water in the piping, which collects at the drip leg by the flow gauge. It appears this subsequently raises the dew point for a substantial time after, thereby creating a further inefficiency. This means every time the generator is on, even if we are only exhausting gas, the dryer needs to be on. **This is inefficient, creates wear and tear on the dryer, causes unnecessary operating cost and is completely unacceptable.**

6. We question the safety of venting exogas into a work area via your drip leg/pulsing valve remedy. The gas has extremely high carbon monoxide content reaching 100,000 ppm. I am sure you are aware that 12,800 ppm is considered lethal. What happens if the pulsing valve sticks? This has the likely potential of being extremely dangerous.

Moreover, significant liability could result if an employee working on or near the furnace system gets even mild carbon monoxide poisoning. What would happen if the pulsing valve sticks at night causing extremely dangerous levels of carbon monoxide? Clearly this creates an extremely dangerous and unacceptable working environment. **This half-baked solution is unacceptable.**

Your "solution" is also masking how much water is actually collecting in the piping during startup, and that amount is significant. The pulsing valve is just releasing water a little at a time and it evaporates quickly. **To again state the obvious, your "solution" with respect to this issue is unacceptable.**



7. With regard to the product quality issue, the belt and the product from the very beginning have been virtually impossible to keep clean. The black sooting is something every one of your own service people appear to be concerned with, as they spent great amounts of time running scrap through the furnace to clean it, but the black soot always immediately comes back, even when running fairly high air to gas ratio of 7.5 to 1.

We are coming to the conclusion that significant excess free carbon is being released from the generator, and has from the start. **Is this the NEXT big problem?** Needless to say, we cannot afford to run large amounts of scrap through the furnace after each production run for cleaning purposes. **This is unacceptable.**

We are a Company that has given you every reasonable opportunity to fix this furnace system. In spite of this courtesy you have continued to literally assault us with poor engineering, poor workmanship and unacceptable performance. In addition to the unresolved and uncorrected problems noted above we have now encountered an additional problem.

**Specifically, we detected a serious and dangerous condition whereby the lugs and studs that attach the power wires from the secondary of the transformers to the heating elements have started to burn off.** Pictures are attached clearly illustrating this new, almost inconceivable and incredibly pathetic problem.

One lug got so hot it actually melted the metal studs away from the insulator, causing it to fall on to the transformer case. Moreover, many connections are showing indication of immanent failure on both transformers. This is yet a further example of shoddy workmanship. As a result of these new problems, the furnace was once again shut down on April 4 and after running for only 10 business days. Needless to say, it cannot be operated at this time for obvious safety reasons.

This incredible ordeal your company has put us through has become extremely tiresome and frustrating. Adding fuel to the fire, you were not able to rectify all of the items detailed in my last letter, written the last time we had to shut the furnace down after just two weeks of running.

The "bottom Line" is this. In spite of your dismal failure to correct the problems noted in my last correspondence **we now have a new problem with both transformer connections in completely different systems.** Sadly, every system installed on this furnace has failed at some point and has had to be repaired in some way. **While sad, this is also completely unacceptable.**

History has shown that as soon as this furnace runs for any length of time we cannot produce quality annealed product and a whole new set of serious problems are uncovered. We cannot understand how your firm can stay in business when providing a system with this level of shoddy performance caused by poor engineering design and a general lack of thought.

You have completely and utterly failed to provide a quality and reliable annealing furnace system, even after we have given you every opportunity to correct your failure to perform and also after waiting an unbelievable seven months past the delivery date. Based on the history and never ending series of problems with respect to this project, we do not believe that this furnace will ever be a reliable or even operational unit. This furnace system you have provided has been, and by all indications, will continue to be a non performing system and a liability to our business operation.



In conclusion, given your blatant failure to perform and obvious breach of contract I am constrained to cancel our order with your company. We have paid the J.L. Becker Company the following sums of money with respect to this project on the indicated dates:

| | |
|---|---|
| January 29, 2007 | $108,870 |
| April 20, 2007 | $90,725 |
| August 30, 2007 | $90,725 |
| Total | $290,320 |

Consequently, I hereby demand that you return the entire sum of $290,320 we have paid to the J.L. Becker Company regarding this project.

In addition, you are also required to remove the entire furnace system from the Tempco premises. We expect this to be accomplished by 5:00pm CDT Friday April 25, 2008. You are to provide a cashier's or bank guaranteed check payable to Tempco Electric Heater Corporation in the amount of $290,320 upon your arrival at our facility. Upon receipt of satisfactory payment we will release the related equipment.

If you fail to accomplish such removal and refund of monies by the date and time indicated, we will turn the matter over to legal counsel instructing them to immediately initiate legal action against the J.L. Becker Company and you personally. Such action shall not only seek to recover the funds already paid to your company, but will also include all of our internal costs incurred with respect to this project, interest costs, storage charges and punitive and exemplary damages as well.

Moreover, if our existing furnace fails in the interim causing us to be unable to anneal product and service our customer base, we will hold you responsible for all associated costs including the loss of any customers which could escalate into millions of dollars.

I look forward to receiving a rapid refund and the expeditious removal of your equipment from the Tempco facility. Thank you for your cooperation.

Very truly yours,
TEMPCO ELECTRIC HEATER CORPORATION

Fermin Adames, President

Cc:  Joseph E. Gumina, Esq.
     Andy Hagen
     Paul Wickland

Enclosure: photos



*Visionary Solutions for Industry*® *Since 1972*

**Temperature Controllers & Sensors ♦ Heating Elements ♦ Process Heating Systems**

April 22, 2008

**By Email and Overnight Courier**
Mr. John L. Becker, President
J.L. Becker Company
41150 Joy Road
Plymouth, MI 48170

Dear Mr. Becker,

Receipt of your April 16, 2008 letter is acknowledged. I find your letter in a word, insulting.

First of all, I find your weak and feeble attempt to characterize your company's blatant failure to perform as a "personality difference" nauseating. I am amazed that a purportedly mature business person would resort to these tactics as opposed to acting like an adult and taking responsibility for the mess you have created.

You have further indicated that you "feel bad" about this situation. You, in fact should feel bad given the pathetic performance of your company with respect to this issue.

I am not surprised that you have chosen to state you simply "disagree with the points in your (my) letter," as opposed to addressing each issue with whatever defense you feel might apply. I fully understand your tactic, weak as it is. It is difficult if not impossible to defend each substantive point I have raised when you have no defense to offer other than to say the issues relate to a "personality difference."

Even more astounding is the fact that you have not had the professionalism to even mention the new problem that we have experienced set forth in my letter of April 11 and fully supported with attached photographs. As set forth in my recent letter, we detected a serious and dangerous condition whereby the lugs and studs that attach the power wires from the secondary of the transformers to the heating elements have started to burn off. This is yet another example of poor and shoddy workmanship. Be aware that burying your head in the sand is not going to make this problem go away. This issue and all others I have raised are real and factual and not the byproduct of a personality conflict which you have feebly attempted to assert.

Rest assured that decisions I make are based on a complete investigation of the facts, and the facts support the reality that you have provided us with a non-performing furnace. **Your furnace is a lemon and I am prepared to prove as such to any judge or jury in a court of law.** Your implication that my decisions and actions are "colored by opinions from some of your (my) personnel," is insulting to my intelligence. Not only is your firm's performance pathetic, your behavior with respect to this matter is disgraceful.

**TEMPCO** Electric Heater Corporation
607 N. Central Avenue ♦ Wood Dale, IL 60191-1452 USA ♦ 630.350.2252 ♦ Fax: 630.350.0232
E-mail: info@tempco.com ♦ Web: www.tempco.com

**EXHIBIT I**



Your comment about furnaces you have manufactured that have been "in operation for ten, twenty, thirty years without significant problems," adds insult to injury. This is especially irritating given the fact that your furnace throughout the testing process has never produced product as good as our existing 27 year old Seco furnace. Moreover, for over seven months your people have been attempting to get the furnace to work properly and have failed dismally in their efforts. The painful reality is that we have had a non-performing piece of junk in our facility for over seven months in spite of the fact that we have paid your firm nearly $300,000 in good faith.

**My position remains unchanged with respect to this matter. You have until 5:00PM CDT Friday April 25, 2008 to remove your furnace from the Tempco facility and refund all related monies as set forth in my April 11 correspondence. If you fail to accomplish this task in a timely manner, legal action shall ensue.**

The ball is in your court. Hopefully common sense will prevail.

Very truly yours,
TEMPCO ELECTRIC HEATER CORPORATION

Fermin Adames, President

Cc: Andy Hagen
     Paul Wickland