UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| **TEMPCO ELECTRIC HEATER CORPORATION**, a Illinois corporation, | ) ) ) ) |  |
| Plaintiff, | ) ) | USDC Case No. 1:08-cv-02870 |
| vs. | ) ) | HON. MILTON I. SHADUR |
|  | ) | MAG. JUDGE ARLANDER KEYS |
| **J. L. BECKER CO., INC.,** d/b/a **J. L. BECKER COMPANY,** a Michigan corporation, | ) ) ) |  |
| Defendant. | ) ) |  |

## DEFENDANT'S MOTION FOR CHANGE OF VENUE

**NOW COMES** Defendant J.L. BECKER COMPANY, INC., by its attorneys, and for its Motion for Change of Venue pursuant to FRCP 12(b)(3) and 28 USC §1404 states as follows:

1.    This is a warranty action involving an annealing furnace ("furnace") manufactured by Defendant and sold to Plaintiff.

2.    Plaintiff filed this action on May 16, 2008, alleging various breach of contract and warranty claims based on alleged defects in the furnace.

3.    Plaintiff's Complaint was filed after Defendant had already filed a lawsuit against Plaintiff in State Court in Michigan ("the Michigan action"), alleging breach of contract claims arising out of Plaintiff's non-payment for the furnace.  A copy of this Complaint is attached as **Exhibit A**.  In response to this Complaint, Plaintiff filed a Counter-Complaint that literally asserts – almost paragraph by paragraph – the very

same claims and allegations as Plaintiff's Complaint in this action. A copy of this Counter-Complaint is attached as **Exhibit B**. Plaintiff subsequently removed the Michigan action to the Eastern District of Michigan. **Exhibit C,** Notice of Removal.

4. Pursuant to 28 USC §1404, "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer a civil action to any other district or division where it might have been brought."

5. This suit should be transferred to the Eastern District of Michigan, where it could have properly been brought under 28 USC §1391(a), since Defendant is a resident of that district.

6. A determination of Defendant's liability in this action necessarily impacts the determination of its liability in the Counter-Complaint asserted by Plaintiff in the Michigan action and, therefore, it is appropriate for both actions to be consolidated before a single court. Additionally, the existence of two lawsuits that are essentially the same pending in two different districts creates the possibility of inconsistent rulings with respect to Defendant's liability in both actions, as well as to the impact of Plaintiff's non-payment on its claims and Defendant's defenses. Thus, the interest of justice mandates not only consolidation of the two actions, but also a transfer of this action to the Eastern District of Michigan.

7. For the above reasons, as well as the reasons stated in Defendant's Brief in Support, this action should be transferred to the Eastern District of Michigan.

**WHEREFORE,** Defendant J.L. Becker requests that this action be transferred to the Eastern District of Michigan, pursuant to 28 USC §1404.

-2-

Defendant
**J.L. BECKER CO., INC.**
**d/b/a J.L. BECKER COMPANY**

/s/ Kelli A. Fitzgerald
KELLI A. FITZGERALD (ARDC #06292812)
Holland & Knight, LLP
Local Counsel for Defendant
131 South Dearborn Street - 30th Floor
Chicago, Illinois 60603
Phone:      (312) 263-3600
Fax:         (312) 578-6666
Email:      kelli.fitzgerald@hklaw.com

ANDREW T. BARAN (P31883)
Giarmarco, Mullins & Horton, P.C.
Attorneys for Defendant
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, Michigan  48084-5280
Phone:      (248) 457-7000
Fax:         (248) 457-7001
E-mail:     abaran@gmhlaw.com

DATE:  July 9, 2008

-3-

# CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

> JOSEPH E. GUMINA (ARDC #6238512)
> ANN M. MAHER
> **WHYTE HIRSCHBOECK DUDEK, S.C.**
> Attorneys for Plaintiff
> 555 East Wells Street, Suite 1900
> Milwaukee, Wisconsin 53202
> Phone:  (414) 978-5326
> Fax:      (414) 223-5000
> jgumina@whdlaw.com

> /s/ Kelli A. Fitzgerald
> KELLI A. FITZGERALD (ARDC #06292812)
> Holland & Knight, LLP
> Local Counsel for Defendant
> 131 South Dearborn Street - 30th Floor
> Chicago, Illinois 60603
> Phone:       (312) 263-3600
> Fax:           (312) 578-6666
> Email:        kelli.fitzgerald@hklaw.com

# 5464544_v1

-4-

EXHIBIT "A"

**FILED**

MAY 16 2008
MAY 16 2008
MICHAEL W. DOBBINS
CLERK. U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| TEMPCO ELECTRIC HEATER CORPORATION, an Illinois Corporation | ) ) ) ) ) |
| PLAINTIFF, |  |
| v. | **08CV2870** |
|  | **JUDGE SHADUR** |
| J.L. BECKER CO., INC., d/b/a J.L. BECKER COMPANY a Michigan Corporation | **MAG. JUDGE KEYS** ) ) ) ) |
| DEFENDANT. | ) ) |

## COMPLAINT

Plaintiff, Tempco Electric Heater Corporation, by its attorneys, Whyte Hirschboeck Dudek S.C., by Ann M. Maher and Joseph E. Gumina, for its Complaint against J.L. Becker Co., Inc., d/b/a J.L. Becker Company, states as follows:

### Nature of Action

1.     This an action for breach of express and implied warranties related to the sale of an annealing furnace from Defendant, J.L. Becker Co., to Plaintiff, Tempco Electric Heater Corporation.  Plaintiff's claims arise from Defendant's failure to provide an annealing furnace conforming to the specifications of the parties' agreement as well as Defendant's failure to cure the non-conforming defects affecting the proper operation of the annealing furnace.

WHD\5834438.1

## The Parties

2.     Plaintiff, Tempco Electric Heater Corporation ("Tempco"), is an Illinois corporation with its principal place of business in Wood Dale, Illinois. Tempco designs and manufactures electric heating elements, temperature sensors, and temperature controls and employs over 300 employees at its Wood Dale facilities. Tempco's products are used for industrial, commercial, scientific, and medical purposes. Tempco distributes its products nationally and internationally through a network of authorized distributors, manufacturers' representatives and direct sales employees.

3.     Defendant, J.L. Becker Co., Inc., doing business as J.L. Becker Company ("J.L. Becker"), is incorporated under and by virtue of the laws of the State of Michigan with its principal place of business located at 41150 Joy Road, Plymouth, Michigan. J.L. Becker designs, manufactures and installs heating treating equipment systems, including annealing furnaces.

## Jurisdiction and Venue

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that this lawsuit involves parties who are citizens of different states and that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over J.L. Becker as J.L. Becker has transacted business in the State of Illinois and has entered into contracts substantially connected with the State of Illinois.

6.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a) and (c) in that a substantial part of the events or omissions giving rise to the claims alleged have occurred within this judicial district and a substantial part of the property that is the

subject of this action, particularly the annealing furnace sold by J.L. Becker to Tempco, is situated within this judicial district where this court sits.

## GENERAL ALLEGATIONS

7.   Tempco was founded in 1972 by Fermin Adames, its current President.

8.   Tempco manufactures several product lines that make use of tubular heating elements, including, but not limited to, Tubular Heaters, Process Heaters, Maxiband Heaters, and Cast-In Heaters. Each of the previously mentioned product lines either consist of or comprise the use of tubular heating elements.

9.   Tempco's product lines that either consist of, or use, tubular heating elements currently represent over 35 percent of Tempco's annual gross sales dollars.

10.   Tempco has invested substantial monies and time to promote and establish the product lines referred to above in paragraph 8.

11.   A critical and vital element in the manufacturing process of tubular heating elements includes the ability to anneal metal sheath materials such as steel, copper-coated steel, stainless steels, Incoloy®, Inconel®, and copper that comprises the tubular heating elements. The tubular heating elements are annealed by running the tubular elements through an annealing furnace.

12.   An annealing furnace is a furnace that heats the tubular heating elements as the elements lay flat on a mesh conveyor belt to temperatures ranging from approximately 1700° F to 2150° F. Following the tubular heating elements being heated in the heating section of the annealing furnace, the tubular heating elements are cooled at a proportionally controlled rate in the cooling section of the furnace. The tubular heating elements are exposed to an exothermic gas (created through combustion of natural gas

and air in a specific gas-air ratio). Exothermic gas consists of nitrogen, hydrogen, carbon-monoxide, carbon-dioxide, and water vapor. The percentages of each of the gases which comprise exothermic gas depends on the gas-air ratio. The tubular elements that run in this furnace atmosphere need to be processed through a targeted and stable dew point environment and controlled within the furnace either to protect the product against oxidation or to promote oxidation.

13.    The annealing process makes malleable the metal sheathing of the tubular heating elements which allows the tubular heating elements to be formed into virtually any shape or configuration without cracking or fracturing.

14.    Tempco currently owns and operates one mesh belt annealing furnace manufactured by Sunbeam (n/k/a Seco/Warwick) (hereinafter referred to as the "Seco/Warwick annealing furnace") which has been in service, at Tempco, for over twenty-four (24) years. Given the age of the Seco/Warwick annealing furnace, it is close to surpassing its expected useful life.

15.    Tempco utilizes its Seco/Warwick annealing furnace in the manufacturing process of Tempco's tubular heating elements. The ability to anneal tubular heating elements is a vital and critical component in the manufacturing process as without the ability to anneal, Tempco would be unable to produce, process, and sell tubular heating elements and other related heating element products.

16.    Recently, Tempco has been unable to use its current Seco/Warwick annealing furnace to anneal certain of its tubular heating elements due to the age of this annealing furnace. This has caused Tempco to subcontract a certain portion of its annealing process for specific types of tubular heating elements to a third party.

17.    Tempco would suffer grievous economic harm as well as damage to its reputation in the marketplace if its current annealing furnace failed and Tempco did not have a replacement annealing furnace on-hand to anneal its tubular heating elements.

18.    Given the age of the Seco/Warwick annealing furnace, referred to above in paragraph 14, Tempco decided that it needed to replace this annealing furnace with a new annealing furnace, and, subsequently, decided to purchase a new annealing furnace from J.L. Becker.

19.    On or about January 15, 2007 Tempco issued a purchase order number, #068731, to J.L. Becker for the purchase of a new annealing furnace and accessories which J.L. Becker accepted on or about January 16, 2007 (hereinafter the "Proposal").  A true and correct copy of the Proposal is attached hereto as Exhibit A.

20.    On or about January 26, 2007, Tempco and J.L. Becker entered into a purchase contract (hereinafter the "Purchase Contract") whereby J.L. Becker agreed to sell, design, manufacture, install, start up and debug and Tempco agreed to buy one new 26" Mesh Belt Annealing Furnace which also included, as part of said new annealing furnace, one (1) 4000 CFH Exothermic Gas Generator, one (1) 4000 CFH Refrigerant Gas Dryer, a Closed Loop Water System, a Second Pump, a Stand By Pumping System-Natural Gas, a Hydrogen Analyzer, a Dew Point Analyzer, a CMS system, and one Mezzanine to hold the annealing furnace's Silicon Controlled Rectifiers ("SCRs") and Transformers (hereinafter collectively referred to as the "Furnace").  A true and correct copy of the Purchase Contract as described in this paragraph 20 is attached hereto as Exhibit B.

5

21.    Tempco, at the time that it negotiated for and purchased the Furnace, informed J.L. Becker that it was purchasing the Furnace in order to replace its aging Seco/Warwick annealing furnace.

22.    The purchase price of the Furnace, as provided for in the Purchase Contract and described in paragraph 20, above, was $362,900.00 U.S. Dollars.    *See* Exhibit B.

23.    The Proposal and Purchase Contract required J.L. Becker, among other things, to design the Furnace to achieve certain atmospheric conditions, including, but not limited to, that J.L. Becker would provide one 4000 CFH Exothermic Gas Generator to provide inlet exothermic gas to one refrigerant atmosphere dryer capable of cooling 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F.    *See* Exhibit B.

24.    The Purchase Contract (Exhibit B) also provided, among other things, J.L. Becker's express warranty that:

> (a)    The construction, workmanship and materials of the Furnace will be first quality, free from defects which render the Furnace inefficient for its intended purpose;

> (b)    J.L. Becker would warranty its workmanship and non perishable items for a period of one (1) year, except that perishable items such as (alloys, heating elements, conveyor etc.) would be covered by the manufacturer's warranty;

> (c)    Any defect found in material or workmanship within one year of operation will be replaced or repaired at J.L. Becker's expense; and

> (d)    When the Furnace is installed, J.L. Becker will start up and
> debug the Furnace and train Tempco's personnel on the
> operation and maintenance of the Furnace.

25.    J.L. Becker designed, manufactured, and then installed the Furnace at
Tempco's Wood Dale, Illinois facility with the installation commencing on or about
September 6, 2007 and completed in late October 2007.

26.    J.L. Becker agreed to make the Furnace fully operational for Tempco's
intended purpose.

27.    J.L. Becker chose the type of materials and components that would make
up the Furnace.

28.    Tempco relied on J.L. Becker's skill and expertise in designing and
manufacturing the Furnace, including, but not limited to, the ability of the Furnace to
operate with an exothermic atmosphere and for the refrigerant dryer to cool inlet
exothermic gas to 40° F dew point at a specified rated flow capacity.

29.    J.L. Becker was aware at the time that the Purchase Contract was entered
into between the parties that the refrigerant dryer, as a component of the Furnace, needed
to achieve a consistent 40° F dew point.

30.    Prior to acceptance of the Proposal and execution of the Purchase
Contract, J.L. Becker assured Tempco that the refrigerant dryer, as a component of the
Furnace, would be able to achieve a consistent 40° F dew point.

31.    Tempco relied on J.L. Becker's representations, as alleged in paragraph 30
above, in deciding to purchase the Furnace from J.L. Becker.

32.    From the time that J.L. Becker completed installation of the Furnace,
Tempco has encountered the following non-conforming defects with the operation of the

Furnace which J.L. Becker has been unable to correct and/or remedy with said defects continuing to exist through the date of the filing of this Complaint, which are as follows:

a.  The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F;

b.  The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F to 50° F;

c.  The refrigerant dryer nor its prototype replacement has been able to deliver a consistent 40° F dew point at the Furnace gas inlet;

d.  The original refrigerant dryer froze up and its replacement, the prototype replacement dryer, also freezes up causing the dew point to rise to unacceptable levels;

e.  Steel product running through the Furnace is experiencing undesired and unacceptable oxidation both inside the Furnace and after leaving the protective atmosphere;

f.  An excessive amount of carbon soot is being deposited on the mesh belt of the Furnace and on Tempco's tubular heating element product running through the Furnace;

g.  Excessive amounts of water are collecting in the exothermic gas piping of the Furnace;

h.  The Furnace is venting exothermic gas containing a high concentration of carbon monoxide into Tempco's Wood Dale facility where employees work;

i.  Product leaving the Furnace is leaving the Furnace at a approximate temperature range between 350° F and 450° F which makes the product too hot for Tempco's employees to handle;

j.     The Furnace's external throat area reaches an external temperature exceeding 160° F creating a safety hazard to Tempco's employees; and

k.     Lugs and studs that attach the power wires from the secondary of the transformers to the heating elements of the Furnace have begun to burn off.

33.    The non-conforming defects with the Furnace as enumerated in paragraph 32, above, were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

34.    Beginning in November 2007 Tempco notified J.L. Becker of the following non-conforming defects with the Furnace:

a.     The refrigerant dryer was operating improperly and freezing up; and

b.     The Furnace's external throat area had a significant design flaw in that the surface temperature of the throat entrance area exceeded 700° F when the Furnace reached an operating temperature of 2050° F.

35.    On or about November 12, 2007, J.L. Becker attempted to correct the excessive external temperature defect with the Furnace's throat area, as referred to in paragraph 34(b), above, by attempting to install a water jacket around the throat area which was rejected by Tempco as an improper remedy to correct the defect. On or about November 19, 2007, J.L. Becker agreed to fabricate a new insulated throat area and installed a new insulated throat area on the Furnace on or about December 3, 2007, however, after installation the external temperature of the throat area continued to exceed 160° F.

36.    Also, on or about November 12, 2007, J.L. Becker attempted to correct the defect with the refrigerant dryer, as referred to in paragraph 34(a), above, with no success.

37.    On or about December 7, 2007, J.L. Becker removed the refrigerant dryer from the Furnace due to the nonconforming defects with the refrigerant dryer, as referred to in paragraph 34(a), above, and shipped said refrigerant dryer back to its Michigan facility to try to remedy the nonconforming defect.

38.    On or about December 27, 2007 Tempco memorialized the non-conforming defects of the Furnace in a letter to J.L. Becker and revoked acceptance of the existing refrigerant dryer demanding that the refrigerant dryer be replaced to meet the operating specifications as specified in the Purchase Contract.  A true and correct copy of that letter is attached hereto as Exhibit C.

39.    At the time that Tempco caused to be delivered its December 27, 2007 letter (Exhibit C) to J.L. Becker, as referred to above in paragraph 38, J.L. Becker had failed to make the Furnace operational due to the nonconforming defects enumerated in paragraph 34, above.

40.    On or about January 31, 2008, J.L. Becker indicated to Tempco that it had completed the production of a new prototype refrigerant dryer for the Furnace and that the new prototype refrigerant dryer will perform according to the specifications as set forth in the Purchase Contract.  J.L. Becker memorialized its intentions regarding the new prototype refrigerant dryer in a letter to Tempco dated January 31, 2008 which a true and correct copy is attached hereto as Exhibit D.

41.    On or about February 1, 2008 J.L. Becker communicated to Tempco that it would install the new prototype refrigerant dryer, as referred to above in paragraph 40, in order to get the generator and Furnace up and running.    J.L. Becker further communicated to Tempco that if this new prototype refrigerant dryer did not perform up to Tempco's expectations, J.L. Becker would buy a replacement refrigerant dryer from another source at J.L. Becker's expense.

42.    J.L. Becker memorialized its intentions in a letter to Tempco, dated February 1, 2008, regarding installation of the new prototype refrigerant dryer as well as its intention to provide Tempco with a replacement dryer from another source if the new prototype refrigerant dryer failed to perform according to Tempco's expectations.    A true and correct copy of J.L. Becker's February 1, 2008 letter is attached hereto as Exhibit E.

43.    J.L. Becker represented in its February 1, 2008 letter (Exhibit E) to Tempco that the new prototype refrigerant dryer would be capable of achieving 40° F dew point at 4000 CFH.

44.    Tempco relied on J.L. Becker's representations made in J.L. Becker's February 1, 2008 letter (Exhibit E) regarding the capabilities of the new prototype refrigerant dryer to achieve a consistent dew point temperature.

45.    On or about February 4, 2008, in response to J.L. Becker's February 1, 2008 letter (Exhibit E), Tempco accepted J.L. Becker's offer of supplying a new prototype replacement refrigerant dryer, except Tempco demanded if the new prototype refrigerant dryer did not work according to Tempco's satisfaction, J.L. Becker would provide specifically a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer in its place.

WIID\5834438.1                    11

46.    J.L. Becker signed Tempco's February 4, 2008 letter agreeing to Tempco's condition that the replacement dryer be a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer if the new prototype refrigerant dryer failed to perform up to Tempco's expectations. A true and correct copy of Tempco's February 4, 2008 letter, signed by J.L. Becker, acknowledging J.L. Becker's agreement as alleged in this paragraph is attached hereto as Exhibit F.

47.    On or about February 11, 2008, J.L. Becker commenced installation of the new prototype refrigerant dryer, as referred to above in paragraph 40, on the Furnace.

48.    On or about February 14, 2008, J.L. Becker, after installation of the new prototype refrigerant dryer, began start up of the Furnace for testing purposes.

49.    On or about February 18, 2008, J.L. Becker attempted, again, to start up the Furnace which this time allowed Tempco to run tubular heating element product through the Furnace, however, the surface quality of the tubular heating elements after annealing and also upon exiting the Furnace were of poor quality with sooty deposits and oxidation of the steel tubular elements.

50.    On or about February 22, 2008, J.L. Becker removed the dew point analyzer from the Furnace to check calibration because the dew point analyzer was providing a dew point reading of approximately 55° F from the new prototype refrigerant dryer. J.L. Becker returned the dew point analyzer to the manufacturer who indicated that the analyzer was accurate for the range noted above. The dew point reading on February 22, 2008 of approximately 55° F was unacceptable and represented a non-conforming defect with the Furnace.

51.    On or about February 25, 2008, Tempco, on its own, started up the Furnace and found within a few days excessive amounts of water in the exothermic gas piping running from the new prototype refrigerant dryer to the gas inlet of the Furnace. The collection of the excessive amounts of water in the exothermic gas piping represents a nonconforming defect and required Tempco to shut down the Furnace.

52.    On or about February 28, 2008, following installation of the new prototype refrigerant dryer, Tempco communicated to J.L. Becker that excessive water was collecting at the flow meter on the Furnace and that excessive amounts of water was bypassing the dryer unit requiring Tempco to manually disassemble the exothermic gas piping system to drain the excess water from the Furnace.

53.    On or about March 3, 2008, J.L. Becker designed and installed a drip leg at the flow meter to address the excessive amounts of water collecting at the flow meter as referred to above in paragraphs 51 and 52. The drip leg consists of a solenoid valve that operates by automatically opening and closing allowing water and exothermic gas to be released into Tempco's work facility.

54.    The exothermic gas that J.L. Becker has allowed to be released into Tempco's facility through its design and installation of the drip leg, as referred above in paragraph 53, consists of carbon monoxide in the range of 50,000 parts per million, or greater, in normal operation.

55.    The U.S. Occupational Safety and Health Administration prohibits employee exposure to more than 50 parts of carbon monoxide per million parts of air averaged during an 8-hour time period. J.L. Becker's design and installation of the drip leg, as referred to above in paragraph 53, above, by allowing carbon monoxide to be

vented into Tempco's workplace facility represents a safety hazard to the health of Tempco's employees and further represents a non-conforming defect with the Furnace.

56.    On or about March 10, 2008, Tempco notified J.L. Becker of the following non-conforming defects with the Furnace, as follows:

   a.   The Furnace does not produce consistent bright annealed steel with the stainless steel and Incoloy® being very dirty with sooty loose black deposits;

   b.   The dew point meter, measured in dew point, is 20 degrees higher than the outlet temperature of the refrigerant dryer;

   c.   Excessive amounts of water are bypassing the new prototype refrigerant dryer and collecting in the exothermic gas piping;

   d.   The new prototype replacement refrigerant dryer froze up; and

   e.   The external temperature of the throat area continues to exceed 160° F despite J.L. Becker's attempt to insulate the area.

57.    Also on or about March 10, 2008, Tempco notified J.L. Becker that it would have to correct all of the non-conforming defects affecting the Furnace on or before March 24, 2008 in order to make the Furnace operational allowing Tempco to produce quality annealed tubular heating elements, otherwise, Tempco would demand that J.L. Becker remove its non-functional furnace from Tempco's facility and refund to Tempco all of its monies that it had paid to J.L. Becker for the Furnace. A true and correct copy of Tempco's March 10, 2008 letter is attached hereto as Exhibit G.

58.    On or about March 13, 2008, J.L. Becker sent three J.L. Becker employees to Tempco's Wood Dale, Illinois facility, including J.L. Becker's chief engineer, in an attempt to cure the non-conforming defects affecting the operation of the Furnace. While

at Tempco's facility, J.L. Becker's chief engineer was shown Tempco's March 10, 2008

letter (Exhibit G) and was asked by Tempco whether the non-conforming defects

enumerated in this letter could be remedied and corrected. J.L. Becker's chief engineer

assured Tempco, after being shown Tempco's March 10, 2008 letter, that J.L. Becker

could correct and cure all of the related non-conforming defects affecting the Furnace to

make the Furnace operational. J.L. Becker then proceeded to attempt to correct the

following non-conforming defects, as follows:

     a.    The high dew point and related water accumulation in the
            exothermic gas piping;

     b.    The problem associated with the refrigerant dryer freezing up;

     c.    The problem associated with the excessive external
            temperature of the throat area; and

     d.    The product quality issue with respect to the tubular
            heating elements being processed through the Furnace
            system.

    59.    Following J.L. Becker's attempt to correct the nonconforming defects as

enumerated in Tempco's March 10, 2008 letter (*See* Exhibit G), J.L. Becker failed to

correct or cure any of said non-conforming defects.

    60.    The non-conforming defects enumerated Tempco's March 10, 2008 letter

(Exhibit G) were caused by the defective and unworkmanlike design and/or manufacture

and/or installation of the Furnace.

    61.    On or about March 24, 2008, J.L. Becker, again, attempted to start up the

Furnace, but a problem with a pressure valve on the Furnace prevented start up.

    62.    On or about March 25, 2008, after the pressure valve was repaired, J.L.

Becker, again, started up the Furnace and this time Tempco began to run tubular heating

element product through the Furnace on March 26, March 27, and March 28, 2008, however, the surface quality of the product, after exiting the Furnace, was poor with more sooting and steel oxidation. The nonconforming defects, as enumerated in paragraph 58, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

63.    On or about March 31, 2008, Tempco attempted to start up the Furnace, again, and further attempted to run tubular heating element product through the Furnace from March 31, 2008 through April 4, 2008, however, Tempco experienced poor surface quality with the tubular heating element product run through the Furnace.    The nonconforming defects, as enumerated in paragraph 58, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

64.    On April 4, 2008, Tempco, upon discovering an imbalance of load current on the Furnace, opened the transformer covers on the Furnace and observed that the buss terminal of the transformer that provides power to the heating elements on the Furnace had significant electrical burnt marks on the studs and lugs connecting the power wires. All output terminals on the transformer showed signs of excessive temperature, imminent failure, and one connection had completely melted off. Tempco then proceeded to shut down the Furnace out of concern that the burnt electrical connections on the Furnace posed a serious fire risk. The burnt electrical wires and the contributing cause(s) of said failure represent a nonconforming defect with the Furnace.

65.    On or about April 11, 2008, Tempco communicated to J.L. Becker that its attempt to cure the defects associated with the Furnace have been unsuccessful and that the Furnace continues to remain non-operational due to the non-conforming defects.

Tempco notified J.L. Becker, at this time, that the following non-conforming defects still exist with the operation of the Furnace:

a.   The new prototype replacement refrigerant dryer has never accomplished a 40° F dew point, and at best only achieved a 55° F dew point;

b.   The new prototype replacement refrigerant dryer is releasing large quantities of water;

c.   The new prototype replacement refrigerant dryer continues to freeze up during normal operations;

d.   The Furnace continues to fail to produce quality annealed tubular heating elements resulting in a poor product for Tempco;

e.   There remains excessive soot on the mesh belt and all tubular heating element products leaving the Furnace;

f.   All tubular heating element products are leaving the Furnace at approximately 350-400° F which is hotter than the 225° F specified in the Purchase Contract which is one of the causes of the steel to oxidize leaving the furnace;

g.   The external temperature of the throat area continues to exceed 160° F;

h.   Excessive water collects in the Furnace's exothermic gas piping system;

i.   The Furnace is purposefully venting exothermic gas containing a high concentration of carbon monoxide into Tempco's Wood Dale facility where employees work; and

j.   The lugs and studs that attach the power wires from the secondary of the transformers to the heating elements of the Furnace have begun to burn off

66.    The non-conforming defects enumerated in paragraph 65, subparagraphs a through j, above, were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

67.    Through April 11, 2008, Tempco had provided J.L. Becker a reasonable opportunity to correct all of the non-conforming defects affecting the proper operation of the Furnace.

68.    Through the date that this Complaint was filed with this Court, J.L. Becker has failed to correct any of the non-conforming defects affecting the Furnace to make the Furnace operational for Tempco's intended purpose.

69.    From the time that J.L. Becker completed installation of the Furnace in October 2007 through the date of the filing of this Complaint, the Furnace has been unable to operate in a manner to meet the operating specifications as set forth in the Purchase Contract, including, but not limited to, the ability of the refrigerant dryer to achieve a consistent 40° F dew point.

70.    On or about April 11, 2008, Tempco notified J.L. Becker that despite of all of the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker. Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 11, 2008 of which a true and correct copy is attached hereto as Exhibit H.

71.    On or about April 16, 2008, J.L. Becker responded to Tempco's April 11, 2008 letter (Exhibit H) by informing Tempco that it (J.L. Becker) had "met all items,

criteria for the equipment supplied as outlined in [its] proposal and as stated on [the] purchase order."

72.    On or about April 22, 2008, Tempco, again, as it did in its April 11, 2008 letter (Exhibit H), informed J.L. Becker that despite of all the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker. Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 22, 2008 of which a true and correct copy is attached hereto as Exhibit I.

73.    Tempco had paid to J.L. Becker $290,320, in accordance with the terms of the Purchase Contract, which said amount represents eighty percent (80%) of the purchase price of the Furnace.

74.    Pursuant to the terms of the Purchase Contract, the final twenty percent (20%) of the purchase price was to be paid by Tempco to J.L. Becker, net, 30 days after installation and start up.

75.    The Purchase Contract further provided that start up of the Furnace also included debugging of the Furnace.

76.    J.L. Becker failed to start up and debug the Furnace in accordance with the terms of the Purchase Contract thereby relieving Tempco, under the terms of the Purchase Contract, of its obligation to pay the final twenty percent (20%) of the purchase price of the Furnace to J.L. Becker.

77.    Tempco has performed all of its obligations under the Purchase Contract.

78.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to subcontract a portion of the annealing process of its tubular heating elements to a third party at a significant expense to Tempco.

79.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to continue to operate its Seco/Warwick annealing furnace which has required Tempco to expend monies on water, utilities, and repairs that it would not otherwise would have had J.L. Becker made the Furnace operational within a reasonable time after installation in accordance with the specifications of the Purchase Contract.

80.    Tempco reserves the right to rely on all terms of the Proposal and the Purchase Contract and all other representations of J.L. Becker in support of its claims.

81.    Tempco is a "Buyer" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(a).

82.    J.L. Becker is a "Seller" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(d).

83.    The Furnace constitutes "Goods" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-105(1).

84.    This is a "transaction in goods" to which 810 ILCS 5/2-102 and 810 ILCS 5/2-105 are applicable.

## COUNT I

### REVOCATION OF ACCEPTANCE
(810 ILCS 5/2-608)

85.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

86.    Tempco accepted the Furnace without discovering the above defects due to the fact that Tempco was unable to detect the defects in the Furnace until it was installed and J.L. Becker attempted to start it up at Tempco's Wood Dale, Illinois facility.

87.    In the alternative, Tempco reasonably assumed, and J.L. Becker represented through its expressed and implied warranties and otherwise, that all of the aforesaid defects and/or nonconformities would be cured within a reasonable time.

88.    After numerous attempts by J.L. Becker to cure the defects and/or nonconformities associated with the Furnace and Tempco having provided J.L. Becker reasonable opportunities over an extended period of time to correct all of the said nonconforming defects, it has become apparent to Tempco that the defects and/or nonconformities associated with the Furnace could not be reasonably cured.

89.    The defects and/or nonconformities of the Furnace substantially impair its value to Tempco. Moreover, Tempco has lost faith and confidence in the Furnace and cannot reasonably rely upon it for the ordinary purpose of which the Furnace was purchased.

90.    Tempco previously notified J.L. Becker of the defects and/or nonconformities and Tempco's intent to revoke acceptance of the Furnace and demanded the refund of its purchase price for the Furnace. (*See* Exhibit H and Exhibit I).

91.    Tempco has paid J.L. Becker $290,320 toward the purchase price for the Furnace.

92.    J.L. Becker nevertheless refused to accept return of the Furnace and has refused to refund to Tempco any part of the sum equal to the monies Tempco has paid

toward the purchase price of the Furnace. As a direct result, Tempco has suffered damages and is entitled to recovery, pursuant to 810 ILCS 5/2-711 and 5/2-715.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.    Declare that Plaintiff properly revoked acceptance of the Furnace in accordance with 810 ILCS 5/2-608 and enter judgment in Plaintiff's favor and against Defendant, J.L. Becker Co., Inc., for the full amount of all monies that that Plaintiff paid to Defendant for the Furnace;

B.    Declare that Defendant must immediately disassemble and remove the Furnace from Plaintiff's facility, at Defendant's own cost and expense;

C.    Assess consequential and incidental damages incurred by Plaintiff against Defendant, J.L. Becker Co., Inc., together with interest thereon;

D.    Grant such other and further relief as the Court may deem just and proper.

## COUNT II

### BREACH OF CONTRACT
**(Failure to Provide the Furnace Free From Defects
Which Renders it Inefficient for its Intended Purpose)**

93.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

94.    J.L. Becker expressly warranted in the Purchase Contract that the construction, workmanship and materials will be first quality, free from defects which render the Furnace inefficient for its intended purpose.

95.    J.L. Becker breached this warranty as set forth above in paragraph 94.

96.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

97.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 94, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.    For return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

**COUNT III**

**BREACH OF CONTRACT**
**(Failure to Start Up and Debug the Furnace)**

98.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

99.    J.L. Becker expressly warranted in the Purchase Contract that J.L. Becker would start up and debug the Furnace.

100.    J.L. Becker breached this warranty as set forth above in paragraph 99.

101.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

102.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 99, Tempco has suffered actual, incidental, and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.    For return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT IV

### BREACH OF CONTRACT
#### (Failure to Provide a Refrigerant Dryer Capable of Cooling 4000 CFH of Inlet Exothermic Gas to a Dew Point of Approximately 40° F to 50° F)

103.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

104.    J.L. Becker expressly warranted in the Purchase Contract that it would provide one (1) refrigerant atmosphere dryer to cool 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F.

105.    J.L. Becker breached this warranty as set forth above in paragraph 104.

106.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

107.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 104, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.    For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

### COUNT V

### BREACH OF CONTRACT
**(Failure to Provide Furnace in Compliance with All Applicable Laws)**

108.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

109.    J.L. Becker expressly warranted in the Purchase Contract that it would provide the Furnace to Tempco in compliance with and conforming to all applicable laws and government orders, rules, and regulations.

110.    The Furnace, as stated by J.L. Becker, fails to comply with National Fire Protection Association ("NFPA") standards and, consequently, fails to comply with all applicable corresponding Occupational Safety and Health Administration standards ("OSHA") promulgated by the U.S. Department of Labor under the authority of the Occupational Health and Safety Act, 29 U.S.C. § 651, et seq., as would be applicable to the type and category of equipment that the Furnace represents as external parts of the furnace exceed 160° F and are not otherwise adequately guarded to protect employees from severe burns and injuries.

111.    The Furnace, upon information and belief, exposes employees to more than 50 parts per million (time weighted average) of carbon monoxide in the workplace which exceeds OSHA permissible exposure limits for carbon monoxide as provided for in 29 CFR 1910.1000 Table Z-1.

112.    The Furnace fails to comply with 29 U.S.C. § 654(a)(1), OSHA's General Duty Clause, as it creates a recognized hazard in Tempco's workplace likely to cause death or serious physical harm to its employees.

113.    J.L. Becker breached this warranty as set forth above in paragraph 109.

114.    J.L. Becker has failed to adequately remedy the non-conforming defects, as alleged in paragraphs 110 and 111, above, and the non-conforming defects continue to exist.

115.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

116.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth in paragraph 109, above, Tempco has suffered actual, incidental, and

consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc. and in favor of Plaintiff as follows:

A.     For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach;

B.     For return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.     For costs, fees and disbursements associated with this action; and

D.     For such other and further relief as the Court may deem just and proper.

## COUNT VI

## BREACH OF IMPLIED WARRANTY
### (Fitness for a Particular Purpose)

117.     Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

118.     J.L. Becker impliedly warranted that the Furnace purchased by Tempco would be fit for Tempco's particular business purpose.

119.     Tempco relied on this implied warranty of fitness for a particular purpose to its detriment, and relied on the purported expertise of J.L. Becker in designing, manufacturing, and installing the Furnace.

120.     J.L. Becker breached its implied warranty of fitness for a particular purpose, as the Furnace purchased by Tempco was defective in design, manufacture, and

installation, and was not fit for the particular purpose of annealing tubular heating elements.

121.    J.L. Becker failed to adequately remedy the defects in the Furnace; and the Furnace continues to be unfit for its particular purpose at the time of revocation.

122.    As a direct and proximate result of J.L. Becker's breach of this implied warranty, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Plaintiff as a result of Defendant's breach of its implied warranty of fitness for a particular purpose;

B.    For  return to Plaintiff of an amount equal to all payments made by Plaintiff to Defendant for the Furnace, or to award Plaintiff such damages, to be determined at trial, as to make Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT VII
### (Alternative to Count I)

### BREACH OF CONTRACT—CONTRACTUAL RESCISSION

123.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

124.    Pursuant to the Purchase Contract, in the event of breach of warranty by J.L. Becker, notwithstanding prior acceptance by Tempco, Tempco may, in addition to all other remedies, at Tempco's option, return the Furnace for credit.

125.    In particular the Purchase Contract provides as follows:

All warranties shall survive inspection, test, acceptance of and payment by TEMPCO. In the event of breach of warranty, and notwithstanding prior acceptance, TEMPCO may, in addition to all other remedies, (a) at TEMPCO'S option, either return for credit or require prompt correction or replacement of the defective or non-conforming goods, and (b) cancel all or any part of the undelivered portion of this order. In no event shall payment be deemed to constitute acceptance. (*See* Exhibit B)

126.    J.L. Becker has breached both expressed and implied warranties contained in the Purchase Contract because the Furnace was defective in design, materials, workmanship, and/or installation, as more fully described in paragraphs 32, 34, 56, 58 and 65, above.

127.    Tempco has met all obligations on its part to be performed under the Purchase Contract.

128.    Tempco has provided J.L. Becker with ample opportunity to repair or replace the Furnace, and J.L. Becker has failed to adequately repair or replace the Furnace so that it can function as warranted in the Purchase Contract.

129.    Pursuant to the Purchase Contract and because of J.L. Becker's breach of expressed and implied warranties with regard to the operation of the Furnace, Tempco has elected to return the Furnace to J.L. Becker and has further requested that J.L. Becker restore to Tempco all monies that Tempco has paid to J.L. Becker for the Furnace.

130.    J.L. Becker has failed and refused to accept return of the Furnace and to restore to Tempco the monies that Tempco had paid to J.L. Becker for the Furnace.

131.    As a direct and proximate cause of J.L. Becker's breach of the Purchase Contract, Tempco has been damaged in the amount of excess of $290,320.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.    Enter judgment in Plaintiff's favor and against Defendant, J.L. Becker Co., Inc., in the amount representing the monies that Tempco paid to J.L. Becker toward the purchase price of the Furnace and further order Defendant to disassemble and remove the Furnace from Tempco's facility at Defendant's own cost and expense;

B.    Award Plaintiff its costs, expense, fees and disbursements of this action; and

C.    Grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VIII
## UNJUST ENRICHMENT

132.    Tempco incorporates and re-alleges paragraphs 1 through 84, inclusive, of this Complaint, as if fully set forth herein.

133.    Tempco conferred a pecuniary benefit on J.L. Becker at the express request of J.L. Becker by purchasing the Furnace, and Tempco has a reasonable expectation of receiving valuable consideration for such benefit rendered.

134.    If J.L. Becker is permitted to retain such benefit without compensating Tempco for its losses, J.L. Becker will be unjustly enriched.

135.   Tempco is entitled to damages against J.L. Becker, in the amount of the detriment to Tempco, to be determined at trial, and all other damages to which Tempco is entitled as a result of the benefits conferred upon J.L. Becker.

WHEREFORE, Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Defendant, J.L. Becker Co., Inc., and in favor of Plaintiff as follows:

A.   For return of an amount equal to amount of monies that Plaintiff paid to Defendant toward the purchase price of the Furnace;

B.   For costs, expenses, fees and disbursements associated with this action; and

C.   For such other and further relief that this Court deems just and appropriate.

Dated this 16th day of May, 2008

TEMPCO ELECTRIC HEATER CORPORATION

By: _____
        Joseph E. Gumina
        One of its Attorneys

Ann Maher
Joseph E. Gumina (ARDC# 6238512)
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
(414) 978-5326 (Telephone)
(414) 223-5000 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

*EXHIBIT "B"*

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

J.L. BECKER CO., INC.,
d/b/a J.L. BECKER COMPANY
a Michigan Corporation,

              Plaintiff and Counter-Defendant,

              Case No.: 08-110677 CK

    v.

**TEMPCO ELECTRIC HEATER**
**CORPORATION**
 a foreign corporation,

              Hon. Warfield Moore

              Defendant and Counter-Plaintiff.

## DEFENDANT TEMPCO ELECTRIC HEATER CORPORATION'S ANSWER AND NOTICE OF AFFIRMATIVE DEFENSES AND DEFENDANT'S COUNTERCLAIMS AGAINST PLAINTIFF

Defendant, Tempco Electric Heater Corporation ("Tempco"), by and through its attorneys, Miller, Canfield, Paddock and Stone, P.L.C., by Catherine T. Dobrowitsky, and, as and for its answer, defenses and counterclaims to the complaint in the above-captioned cause, hereby denies each and every allegation of said complaint except, and only to the extent, as is expressly admitted and/or qualified, as follows:

    1.     Plaintiff J.L. Becker Co., is a Michigan Corporation, and its principal place of business is in Wayne County, Michigan.

    **ANSWER:** Admit.

    2.     Defendant Tempco Electric Heater Corporation, upon information and belief, is an Illinois corporation.

    **ANSWER:** Admit.

WHD\5833346.2

3.    The dispute between the parties arose in Michigan and the contractual provisions in dispute were negotiated and finalized in Michigan.

**ANSWER:** Deny.

4.    The amount in controversy, exclusive of interest and costs exceeds $25,000.

**ANSWER:** Admit.

## GENERAL ALLEGATIONS

5.    Plaintiff incorporates and re-alleges the facts contained in the preceding paragraphs by reference.

**ANSWER:** Tempco realleges and incorporates by reference paragraphs 1 through 4 of its answer with the same force and effect as if set forth fully herein.

6.    On or about January 26, 2007, the parties entered into a purchase contract for the purchase of one 26" Mesh Belt Furnace System, one Exothermic Generator, one refrigerant Dryer, one Closed Loop Water System, and one Mezzanine by Defendant Tempco Electric Heater Corporation (the "Equipment"). (Exhibit A).

**ANSWER:** Tempco admits that on or about January 26, 2007 the parties entered into a purchase contract for a 26" Mesh Belt Furnace System and Tempco further admits that a true and correct copy of the purchase contract is attached as Exhibit A to Plaintiff's Complaint, however, Defendant denies the remainder of the allegations alleged in this paragraph.

7.    The Equipment was manufactured and delivered in compliance with the terms of the parties' agreement by Plaintiff.

**ANSWER:** Deny.

2

8.    The Equipment meets all specifications contained within the parties'
agreement.

**ANSWER:** Deny.

9.    As of the date of filing, there remains due and owing to Plaintiff from
Defendant $75,000 exclusive of accrued interest and late fees.

**ANSWER:** Deny.

10.    Plaintiff has made several requests for payments to Defendant.

**ANSWER:** Deny.

11.    All equipment produced by Plaintiff for the Defendant under the
aforementioned contract was fit for the purpose for which it was designed.

**ANSWER:** Deny.

12.    Defendant has suffered no damage because of any actions or inactions of
Plaintiff.

**ANSWER:** Deny.

**COUNT I**
**BREACH OF CONTRACT**

13.    Plaintiff incorporates the above paragraphs by reference.

**ANSWER:** Tempco realleges and incorporates by reference paragraphs 1
through 12 of its answer with the same force and effect as if set forth fully herein.

14.    On or about January 26, 2007, Plaintiff and Defendant entered into a
contract.

**ANSWER:** Admit.

15.    Plaintiff has complied with the terms of the contract.

**ANSWER:** Deny.

3

16.    Defendant has breached the contract by failure to pay Plaintiff in accordance with the terms of the parties' agreement.

**ANSWER:** Deny.

17.    As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged in an amount in excess of $25,000.

**ANSWER:** Deny.

WHEREFORE, Defendant TEMPCO Electric Heater Corporation prays that this Court dismiss the Complaint and award it costs, attorney fees, interest and whatever further relief the Court deems appropriate.

### COUNT II
### UNJUST ENRICHMENT

18.    Plaintiff incorporates the above paragraphs by reference.

**ANSWER:** Tempco realleges and incorporates by reference paragraphs 1 through 17 of its answer with the same force and effect as if set forth fully herein.

19.    Defendant has had for its use and benefit the Equipment referenced above, and has failed and refused to pay Plaintiff in full for the Equipment.

**ANSWER:** Deny.

20.    As a result of Defendant's conduct, Defendant has been unjustly enriched in an amount in excess of $25,000 and Plaintiff is entitled to entry of a judgment in the amount of its damages, together with costs, statutory interest and attorney fees sustained in collecting the balance due.

**ANSWER:** Deny.

4

WHEREFORE, Defendant TEMPCO Electric Heater Corporation prays that this

Court dismiss the Complaint and award it costs, attorney fees, interest and whatever

further relief the Court deems appropriate.

MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.


By: _____
    Catherine T. Dobrowitsky
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420

Dated:  May 28, 2008.

5

## NOTICE OF AFFIRMATIVE DEFENSES

As and for its affirmative defenses to Plaintiff's Complaint, Tempco Electric Heater Corporation ("Tempco") alleges as follows:

1.    Tempco, under the terms of the purchase contract, was required to pay the final twenty percent (20%) of the purchase price to Plaintiff upon Plaintiff's installation and start up of the furnace system, which included, among other things, that Plaintiff would not only start up the furnace system but also debug it, and, Plaintiff failed to satisfy a condition precedent to obligate Tempco to pay the final twenty percent (20%) of the purchase price as Plaintiff failed to start up the furnace by failing to debug it.

2.    Plaintiff breached its implied warranty of fitness for a particular purpose in that Plaintiff impliedly warranted that the furnace system would be fit for Tempco's particular business purpose, and that Plaintiff breached this implied warranty as the furnace system purchased by Tempco was defective in design, manufacturing, and/or installation, and was not fit for the particular purpose of annealing tubular heating elements.

3.    On or about April 11, 2008, Tempco lawfully revoked acceptance of the furnace system pursuant to 810 ILCS 5/2-608 by providing Plaintiff notice that Tempco was revoking acceptance of the furnace system and demanding return of its purchase monies. Specifically, the furnace system purchased by Tempco was defective in design, manufacturing, and/or installation and Tempco accepted the furnace system without being able to discover all of the defects, or, alternatively, Tempco reasonably assumed that Plaintiff, through its expressed and implied warranties, would cure all of the defects within a reasonable time, and that despite all of the opportunities that Tempco provided Plaintiff to reasonably cure all of the defects it became apparent to Tempco that said

6

defects could not be reasonably cured and that said defects substantially impaired the value of the furnace system to Tempco, and, accordingly, Tempco, on or about April 11, 2008, and, again, on April 22, 2008, provided Plaintiff notice that it (Tempco) was revoking acceptance of the furnace system and demanding that Plaintiff return to Tempco all monies paid to Plaintiff for the furnace system.

4.      Plaintiff breached its expressed warranty that it would provide a furnace system in which the construction, workmanship and materials would be of first quality, free from defects which would render the furnace system inefficient for its intended purpose, and, despite Tempco providing reasonable notice to Plaintiff to cure the defects, the furnace system remains defective in construction, workmanship, materials which render it inefficient for Tempco's intended purpose.

5.      Plaintiff breached its expressed warranty that it would provide one (1) refrigerant atmosphere dryer to cool 4000 CFH on inlet exothermic gas to a dew point of approximately 40° F to 50° F as the refrigerant dryer provided by Plaintiff and its replacement prototype failed to operate within the specification specified in the purchase contract, despite Tempco providing Plaintiff with reasonable notices and opportunities to cure the defects.

6.      Plaintiff breached its expressed warranty that it would provide a furnace system that would be in compliance with and conforming to all applicable laws and government orders, rules and regulations as the furnace system was designed and installed by Plaintiff to vent exothermic gas into Tempco's workplace containing more than 50 parts per million (time weighted average) of carbon monoxide which exceeds OSHA's permissible exposure limits for carbon monoxide as provided for in 29 CFR 1910.1000 Table Z-1 and despite Tempco providing reasonable notice to Plaintiff to cure

7

this defect, the furnace system remains defective in that it does not comply or conform to all applicable laws and government orders, rules and regulations.

7.    Plaintiff breached its expressed warranty that it would provide a furnace system that would be in compliance with and conforming to all applicable laws and government orders, rules and regulations as the furnace system fails to comply with 29 U.S.C. § 654(a)(1), OSHA's General Duty Clause, as it creates a recognized hazard in Tempco's workplace likely to cause death or serious physical harm to Tempco's employees as external parts of the furnace exceed 160° F and are not otherwise adequately guarded to protect employees from severe burns and injuries, and despite Tempco providing Plaintiff with reasonable notices and opportunities to cure the defects, the furnace system remains defective and non-conforming.

8.    On or about February 1, 2008, Plaintiff expressly agreed to provide Tempco with a new replacement prototype refrigerant dryer and further promised that if the new replacement prototype dryer did not perform up to Tempco's expectations, Plaintiff would buy a replacement refrigerant dryer from another source.   On or about February 5, 2008, Plaintiff further agreed that if the new replacement prototype refrigerant dryer did not perform up to Tempco's expectations that Plaintiff would replace it with a new Seco/Warwick Model REF-40 (4000 cfh) refrigerant dryer.  After Plaintiff's installation of the new replacement prototype refrigerant dryer, Tempco, on or about February 28, 2008 and, again, on or about March 10, 2008 and April 11, 2008 notified Plaintiff that the new replacement prototype refrigerant dryer was not performing up to Tempco's expectations.   Consequently, prior to filing this lawsuit, Plaintiff breached its agreement with Tempco by failing to buy Tempco a new replacement refrigerant dryer from Seco/Warwick despite Tempco's previous notices to Plaintiff that

8

the new replacement prototype dryer was not performing up to Tempco's expectations.

9.    Plaintiff has failed to substantially perform under the terms of the purchase contract in that Plaintiff has failed to provide to Tempco a furnace system of first quality free from defects in design, manufacturing and/or installation.

10.    Plaintiff, prior to commencing this lawsuit, failed to make any demand upon Tempco that any payment allegedly due was delinquent or was otherwise due and owing to Plaintiff.

11.    Plaintiff should be enjoined from prosecuting its causes of action against Tempco, or, alternatively, Plaintiff's causes of action should be dismissed because Plaintiff brought this lawsuit purely in anticipation of Tempco's imminent threat of filing its own lawsuit against Plaintiff in Illinois based upon the defective and non-conforming defects of the furnace system and Plaintiff's causes of action are trivial in relation to Tempco's claims against Plaintiff concerning the same subject matter.

12.    Plaintiff has demanded reimbursement of attorneys' fees, however, there does not exist any contract provision or law that entitles Plaintiff to the recovery of any attorneys' fees.

13.    Plaintiff's claims are barred in whole or part by the doctrine of unclean hands.

14.    Plaintiff's claims are barred in whole or part by the doctrines of waiver and/or estoppel.

15.    Plaintiff's breach of the parties' agreement precludes any recovery thereunder.

16.    Tempco is entitled to off-set any amounts allegedly owed against damages caused to it by Plaintiff's conduct.

9

17.    Tempco alleges all affirmative defenses required to be pled under Michigan law for the purposes of avoiding waiver of any such defenses as they may later apply.  Tempco also reserves the right to assert any affirmative defenses that may become available during the course of future discovery in this lawsuit.

**WHEREFORE**, Tempco Electric Heater Corporation requests the Complaint be dismissed with prejudice, with costs and with all other relief deemed appropriate by the Court.

MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.

By: _____
    Catherine T. Dobrowitsky
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420

Dated:  May 28, 2008.

10

## COUNTERCLAIMS

Defendant and Counter-Plaintiff, Tempco Electric Heater Corporation, by and through its attorneys, Miller, Canfield, Paddock and Stone, P.L.C., by Catherine T. Dobrowitsky, and, as for its counterclaims against Plaintiff and Counter-Defendant, J.L. Becker Co., Inc., d/b/a J.L. Becker Company, states as follows:

### Nature of Action

1.     This an action for breach of express and implied warranties related to the sale of an annealing furnace from Counter-Defendant, J.L. Becker Co., to Counter-Plaintiff, Tempco Electric Heater Corporation.  Counter-Plaintiff's claims arise from Counter-Defendant's failure to provide an annealing furnace conforming to the specifications of the parties' agreement as well as Counter-Defendant's failure to cure the non-conforming defects affecting the proper operation of the annealing furnace.

### The Parties

2.     Counter-Plaintiff, Tempco Electric Heater Corporation ("Tempco"), is an Illinois corporation with its principal place of business in Wood Dale, Illinois.  Tempco designs and manufactures electric heating elements, temperature sensors, and temperature controls and employs over 300 employees at its Wood Dale facilities.  Tempco's products are used for industrial, commercial, scientific, and medical purposes.  Tempco distributes its products nationally and internationally through a network of authorized distributors, manufacturers' representatives and direct sales employees.

3.     Counter-Defendant, J.L. Becker Co., Inc., doing business as J.L. Becker Company ("J.L. Becker"), is incorporated under and by virtue of the laws of the State of Michigan with its principal place of business located at 41150 Joy Road, Plymouth,

11

Michigan. J.L. Becker designs, manufactures and installs heating treating equipment systems, including annealing furnaces.

## GENERAL ALLEGATIONS

4.    Tempco was founded in 1972 by Fermin Adames, its current President.

5.    Tempco manufactures several product lines that make use of tubular heating elements, including, but not limited to, Tubular Heaters, Process Heaters, Maxiband Heaters, and Cast-In Heaters. Each of the previously mentioned product lines either consist of or comprise the use of tubular heating elements.

6.    Tempco's product lines that either consist of, or use, tubular heating elements currently represent over 35 percent of Tempco's annual gross sales dollars.

7.    Tempco has invested substantial monies and time to promote and establish the product lines referred to above in paragraph 5.

8.    A critical and vital element in the manufacturing process of tubular heating elements includes the ability to anneal metal sheath materials such as steel, copper-coated steel, stainless steels, Incoloy®, Inconel®, and copper that comprises the tubular heating elements. The tubular heating elements are annealed by running the tubular elements through an annealing furnace.

9.    An annealing furnace is a furnace that heats the tubular heating elements as the elements lay flat on a mesh conveyor belt to temperatures ranging from approximately 1700° F to 2150° F. Following the tubular heating elements being heated in the heating section of the annealing furnace, the tubular heating elements are cooled at a proportionally controlled rate in the cooling section of the furnace. The tubular heating elements are exposed to an exothermic gas (created through combustion of natural gas and air in a specific gas-air ratio). Exothermic gas consists of nitrogen, hydrogen,

carbon-monoxide, carbon-dioxide, and water vapor. The percentages of each of the gases which comprise exothermic gas depends on the gas-air ratio. The tubular elements that run in this furnace atmosphere need to be processed through a targeted and stable dew point environment and controlled within the furnace either to protect the product against oxidation or to promote oxidation.

10.     The annealing process makes malleable the metal sheathing of the tubular heating elements which allows the tubular heating elements to be formed into virtually any shape or configuration without cracking or fracturing.

11.     Tempco currently owns and operates one mesh belt annealing furnace manufactured by Sunbeam (n/k/a Seco/Warwick) (hereinafter referred to as the "Seco/Warwick annealing furnace") which has been in service, at Tempco, for over twenty-four (24) years. Given the age of the Seco/Warwick annealing furnace, it is close to surpassing its expected useful life.

12.     Tempco utilizes its Seco/Warwick annealing furnace in the manufacturing process of Tempco's tubular heating elements. The ability to anneal tubular heating elements is a vital and critical component in the manufacturing process as without the ability to anneal, Tempco would be unable to produce, process, and sell tubular heating elements and other related heating element products.

13.     Recently, Tempco has been unable to use its current Seco/Warwick annealing furnace to anneal certain of its tubular heating elements due to the age of this annealing furnace. This has caused Tempco to subcontract a certain portion of its annealing process for specific types of tubular heating elements to a third party.

13

14.    Tempco would suffer grievous economic harm as well as damage to its reputation in the marketplace if its current annealing furnace failed and Tempco did not have a replacement annealing furnace on-hand to anneal its tubular heating elements.

15.    Given the age of the Seco/Warwick annealing furnace, referred to above in paragraph 11, Tempco decided that it needed to replace this annealing furnace with a new annealing furnace, and, subsequently, decided to purchase a new annealing furnace from J.L. Becker.

16.    On or about January 15, 2007 Tempco issued a purchase order number, #068731, to J.L. Becker for the purchase of a new annealing furnace and accessories which J.L. Becker accepted on or about January 16, 2007 (hereinafter the "Proposal"). A true and correct copy of the Proposal is attached hereto as Exhibit A.

17.    On or about January 26, 2007, Tempco and J.L. Becker entered into a purchase contract (hereinafter the "Purchase Contract") whereby J.L. Becker agreed to sell, design, manufacture, install, start up and debug and Tempco agreed to buy one new 26" Mesh Belt Annealing Furnace which also included, as part of said new annealing furnace, one (1) 4000 CFH Exothermic Gas Generator, one (1) 4000 CFH Refrigerant Gas Dryer, a Closed Loop Water System, a Second Pump, a Stand By Pumping System-Natural Gas, a Hydrogen Analyzer, a Dew Point Analyzer, a CMS system, and one Mezzanine to hold the annealing furnace's Silicon Controlled Rectifiers ("SCRs") and Transformers (hereinafter collectively referred to as the "Furnace"). A true and correct copy of the Purchase Contract as described in this paragraph 17 is attached hereto as Exhibit B.

14

18.     Tempco, at the time that it negotiated for and purchased the Furnace, informed J.L. Becker that it was purchasing the Furnace in order to replace its aging Seco/Warwick annealing furnace.

19.     The purchase price of the Furnace, as provided for in the Purchase Contract and described in paragraph 17, above, was $362,900.00 U.S. Dollars.  *See* Exhibit B.

20.     The Proposal and Purchase Contract required J.L. Becker, among other things, to design the Furnace to achieve certain atmospheric conditions, including, but not limited to, that J.L. Becker would provide one 4000 CFH Exothermic Gas Generator to provide inlet exothermic gas to one refrigerant atmosphere dryer capable of cooling 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F.  *See* Exhibit B.

21.     The Purchase Contract (Exhibit B) also provided, among other things, J.L. Becker's express warranty that:

    (a)     The construction, workmanship and materials of the Furnace will be first quality, free from defects which render the Furnace inefficient for its intended purpose;

    (b)     J.L. Becker would warranty its workmanship and non perishable items for a period of one (1) year, except that perishable items such as (alloys, heating elements, conveyor etc.) would be covered by the manufacturer's warranty;

    (c)     Any defect found in material or workmanship within one year of operation will be replaced or repaired at J.L. Becker's expense; and

    (d)     When the Furnace is installed, J.L. Becker will start up and debug the Furnace and train Tempco's personnel on the operation and maintenance of the Furnace.

15

22.    J.L. Becker designed, manufactured, and then installed the Furnace at Tempco's Wood Dale, Illinois facility with the installation commencing on or about September 6, 2007 and completed in late October 2007.

23.    J.L. Becker agreed to make the Furnace fully operational for Tempco's intended purpose.

24.    J.L. Becker chose the type of materials and components that would make up the Furnace.

25.    Tempco relied on J.L. Becker's skill and expertise in designing and manufacturing the Furnace, including, but not limited to, the ability of the Furnace to operate with an exothermic atmosphere and for the refrigerant dryer to cool inlet exothermic gas to 40° F dew point at a specified rated flow capacity.

26.    J.L. Becker was aware at the time that the Purchase Contract was entered into between the parties that the refrigerant dryer, as a component of the Furnace, needed to achieve a consistent 40° F dew point.

27.    Prior to acceptance of the Proposal and execution of the Purchase Contract, J.L. Becker assured Tempco that the refrigerant dryer, as a component of the Furnace, would be able to achieve a consistent 40° F dew point.

28.    Tempco relied on J.L. Becker's representations, as alleged in paragraph 27 above, in deciding to purchase the Furnace from J.L. Becker.

29.    From the time that J.L. Becker completed installation of the Furnace, Tempco has encountered the following non-conforming defects with the operation of the Furnace which J.L. Becker has been unable to correct and/or remedy with said defects continuing to exist through the date of the filing of this Counterclaim, which are as follows:

16

a.    The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F;

b.    The refrigerant dryer nor its prototype replacement has been able to achieve a consistent output dew point of 40° F to 50° F;

c.    The refrigerant dryer nor its prototype replacement has been able to deliver a consistent 40° F dew point at the Furnace gas inlet;

d.    The original refrigerant dryer froze up and its replacement, the prototype replacement dryer, also freezes up causing the dew point to rise to unacceptable levels;

e.    Steel product running through the Furnace is experiencing undesired and unacceptable oxidation both inside the Furnace and after leaving the protective atmosphere;

f.    An excessive amount of carbon soot is being deposited on the mesh belt of the Furnace and on Tempco's tubular heating element product running through the Furnace;

g.    Excessive amounts of water are collecting in the exothermic gas piping of the Furnace;

h.    The Furnace is venting exothermic gas containing a high concentration of carbon monoxide into Tempco's Wood Dale facility where employees work;

i.    Product leaving the Furnace is leaving the Furnace at a approximate temperature range between 350° F and 450° F which makes the product too hot for Tempco's employees to handle;

j.    The Furnace's external throat area reaches an external temperature exceeding 160° F creating a safety hazard to Tempco's employees; and

k.    Lugs and studs that attach the power wires from the secondary of the transformers to the heating elements of the Furnace have begun to burn off.

30.    The non-conforming defects with the Furnace as enumerated in paragraph 29, above, were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

31.    Beginning in November 2007 Tempco notified J.L. Becker of the following non-conforming defects with the Furnace:

        a.    The refrigerant dryer was operating improperly and freezing up; and

        b.    The Furnace's external throat area had a significant design flaw in that the surface temperature of the throat entrance area exceeded 700° F when the Furnace reached an operating temperature of 2050° F.

32.    On or about November 12, 2007, J.L. Becker attempted to correct the excessive external temperature defect with the Furnace's throat area, as referred to in paragraph 31(b), above, by attempting to install a water jacket around the throat area which was rejected by Tempco as an improper remedy to correct the defect. On or about November 19, 2007, J.L. Becker agreed to fabricate a new insulated throat area and installed a new insulated throat area on the Furnace on or about December 3, 2007, however, after installation the external temperature of the throat area continued to exceed 160° F.

33.    Also, on or about November 12, 2007, J.L. Becker attempted to correct the defect with the refrigerant dryer, as referred to in paragraph 31(a), above, with no success.

34.    On or about December 7, 2007, J.L. Becker removed the refrigerant dryer from the Furnace due to the nonconforming defects with the refrigerant dryer, as referred

18

to in paragraph 31(a), above, and shipped said refrigerant dryer back to its Michigan facility to try to remedy the nonconforming defect.

35.     On or about December 27, 2007 Tempco memorialized the non-conforming defects of the Furnace in a letter to J.L. Becker and revoked acceptance of the existing refrigerant dryer demanding that the refrigerant dryer be replaced to meet the operating specifications as specified in the Purchase Contract.  A true and correct copy of that letter is attached hereto as Exhibit C.

36.     At the time that Tempco caused to be delivered its December 27, 2007 letter (Exhibit C) to J.L. Becker, as referred to above in paragraph 35, J.L. Becker had failed to make the Furnace operational due to the nonconforming defects enumerated in paragraph 31, above.

37.     On or about January 31, 2008, J.L. Becker indicated to Tempco that it had completed the production of a new prototype refrigerant dryer for the Furnace and that the new prototype refrigerant dryer will perform according to the specifications as set forth in the Purchase Contract.  J.L. Becker memorialized its intentions regarding the new prototype refrigerant dryer in a letter to Tempco dated January 31, 2008 which a true and correct copy is attached hereto as Exhibit D.

38.     On or about February 1, 2008 J.L. Becker communicated to Tempco that it would install the new prototype refrigerant dryer, as referred to above in paragraph 37, in order to get the generator and Furnace up and running.    J.L. Becker further communicated to Tempco that if this new prototype refrigerant dryer did not perform up to Tempco's expectations, J.L. Becker would buy a replacement refrigerant dryer from another source at J.L. Becker's expense.

19

39.    J.L. Becker memorialized its intentions in a letter to Tempco, dated February 1, 2008, regarding installation of the new prototype refrigerant dryer as well as its intention to provide Tempco with a replacement dryer from another source if the new prototype refrigerant dryer failed to perform according to Tempco's expectations. A true and correct copy of J.L. Becker's February 1, 2008 letter is attached hereto as Exhibit E.

40.    J.L. Becker represented in its February 1, 2008 letter (Exhibit E) to Tempco that the new prototype refrigerant dryer would be capable of achieving 40° F dew point at 4000 CFH.

41.    Tempco relied on J.L. Becker's representations made in J.L. Becker's February 1, 2008 letter (Exhibit E) regarding the capabilities of the new prototype refrigerant dryer to achieve a consistent dew point temperature.

42.    On or about February 4, 2008, in response to J.L. Becker's February 1, 2008 letter (Exhibit E), Tempco accepted J.L. Becker's offer of supplying a new prototype replacement refrigerant dryer, except Tempco demanded if the new prototype refrigerant dryer did not work according to Tempco's satisfaction, J.L. Becker would provide specifically a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer in its place.

43.    J.L. Becker signed Tempco's February 4, 2008 letter agreeing to Tempco's condition that the replacement dryer be a Seco/Warwick Model REF-40 (4000 CFH) refrigerant dryer if the new prototype refrigerant dryer failed to perform up to Tempco's expectations. A true and correct copy of Tempco's February 4, 2008 letter, signed by J.L. Becker, acknowledging J.L. Becker's agreement as alleged in this paragraph is attached hereto as Exhibit F.

20

44.    On or about February 11, 2008, J.L. Becker commenced installation of the new prototype refrigerant dryer, as referred to above in paragraph 37, on the Furnace.

45.    On or about February 14, 2008, J.L. Becker, after installation of the new prototype refrigerant dryer, began start up of the Furnace for testing purposes.

46.    On or about February 18, 2008, J.L. Becker attempted, again, to start up the Furnace which this time allowed Tempco to run tubular heating element product through the Furnace, however, the surface quality of the tubular heating elements after annealing and also upon exiting the Furnace were of poor quality with sooty deposits and oxidation of the steel tubular elements.

47.    On or about February 22, 2008, J.L. Becker removed the dew point analyzer from the Furnace to check calibration because the dew point analyzer was providing a dew point reading of approximately 55° F from the new prototype refrigerant dryer.  J.L. Becker returned the dew point analyzer to the manufacturer who indicated that the analyzer was accurate for the range noted above.  The dew point reading on February 22, 2008 of approximately 55° F was unacceptable and represented a non-conforming defect with the Furnace.

48.    On or about February 25, 2008, Tempco, on its own, started up the Furnace and found within a few days excessive amounts of water in the exothermic gas piping running from the new prototype refrigerant dryer to the gas inlet of the Furnace. The collection of the excessive amounts of water in the exothermic gas piping represents a nonconforming defect and required Tempco to shut down the Furnace.

49.    On or about February 28, 2008, following installation of the new prototype refrigerant dryer, Tempco communicated to J.L. Becker that excessive water was collecting at the flow meter on the Furnace and that excessive amounts of water was

21

bypassing the dryer unit requiring Tempco to manually disassemble the exothermic gas piping system to drain the excess water from the Furnace.

50.     On or about March 3, 2008, J.L. Becker designed and installed a drip leg at the flow meter to address the excessive amounts of water collecting at the flow meter as referred to above in paragraphs 48 and 49. The drip leg consists of a solenoid valve that operates by automatically opening and closing allowing water and exothermic gas to be released into Tempco's work facility.

51.     The exothermic gas that J.L. Becker has allowed to be released into Tempco's facility through its design and installation of the drip leg, as referred above in paragraph 50, consists of carbon monoxide in the range of 50,000 parts per million, or greater, in normal operation.

52.     The U.S. Occupational Safety and Health Administration prohibits employee exposure to more than 50 parts of carbon monoxide per million parts of air averaged during an 8-hour time period. J.L. Becker's design and installation of the drip leg, as referred to above in paragraph 50, above, by allowing carbon monoxide to be vented into Tempco's workplace facility represents a safety hazard to the health of Tempco's employees and further represents a non-conforming defect with the Furnace.

53.     On or about March 10, 2008, Tempco notified J.L. Becker of the following non-conforming defects with the Furnace, as follows:

        a.     The Furnace does not produce consistent bright annealed steel with the stainless steel and Incoloy® being very dirty with sooty loose black deposits;

        b.     The dew point meter, measured in dew point, is 20 degrees higher than the outlet temperature of the refrigerant dryer;

        c.     Excessive amounts of water are bypassing the new prototype refrigerant dryer and collecting in the exothermic

22

gas piping;

d.   The new prototype replacement refrigerant dryer froze up; and

e.   The external temperature of the throat area continues to exceed 160° F despite J.L. Becker's attempt to insulate the area.

54.   Also on or about March 10, 2008, Tempco notified J.L. Becker that it would have to correct all of the non-conforming defects affecting the Furnace on or before March 24, 2008 in order to make the Furnace operational allowing Tempco to produce quality annealed tubular heating elements, otherwise, Tempco would demand that J.L. Becker remove its non-functional furnace from Tempco's facility and refund to Tempco all of its monies that it had paid to J.L. Becker for the Furnace. A true and correct copy of Tempco's March 10, 2008 letter is attached hereto as Exhibit G.

55.   On or about March 13, 2008, J.L. Becker sent three J.L. Becker employees to Tempco's Wood Dale, Illinois facility, including J.L. Becker's chief engineer, in an attempt to cure the non-conforming defects affecting the operation of the Furnace. While at Tempco's facility, J.L. Becker's chief engineer was shown Tempco's March 10, 2008 letter (Exhibit G) and was asked by Tempco whether the non-conforming defects enumerated in this letter could be remedied and corrected. J.L. Becker's chief engineer assured Tempco, after being shown Tempco's March 10, 2008 letter, that J.L. Becker could correct and cure all of the related non-conforming defects affecting the Furnace to make the Furnace operational. J.L. Becker then proceeded to attempt to correct the following non-conforming defects, as follows:

a.   The high dew point and related water accumulation in the exothermic gas piping;

b.   The problem associated with the refrigerant dryer freezing up;

c.   The problem associated with the excessive external

23

temperature of the throat area; and

d.    The product quality issue with respect to the tubular heating elements being processed through the Furnace system.

56.    Following J.L. Becker's attempt to correct the nonconforming defects as enumerated in Tempco's March 10, 2008 letter (*See* Exhibit G), J.L. Becker failed to correct or cure any of said non-conforming defects.

57.    The non-conforming defects enumerated Tempco's March 10, 2008 letter (Exhibit G) were caused by the defective and unworkmanlike design and/or manufacture and/or installation of the Furnace.

58.    On or about March 24, 2008, J.L. Becker, again, attempted to start up the Furnace, but a problem with a pressure valve on the Furnace prevented start up.

59.    On or about March 25, 2008, after the pressure valve was repaired, J.L. Becker, again, started up the Furnace and this time Tempco began to run tubular heating element product through the Furnace on March 26, March 27, and March 28, 2008, however, the surface quality of the product, after exiting the Furnace, was poor with more sooting and steel oxidation.  The nonconforming defects, as enumerated in paragraph 55, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

60.    On or about March 31, 2008, Tempco attempted to start up the Furnace, again, and further attempted to run tubular heating element product through the Furnace from March 31, 2008 through April 4, 2008, however, Tempco experienced poor surface quality with the tubular heating element product run through the Furnace.    The nonconforming defects, as enumerated in paragraph 55, above, and as further defined in Tempco's March 10, 2008 letter (Exhibit G) continued to exist with the Furnace.

24

61.    On April 4, 2008, Tempco, upon discovering an imbalance of load current on the Furnace, opened the transformer covers on the Furnace and observed that the buss terminal of the transformer that provides power to the heating elements on the Furnace had significant electrical burnt marks on the studs and lugs connecting the power wires. All output terminals on the transformer showed signs of excessive temperature, imminent failure, and one connection had completely melted off.  Tempco then proceeded to shut down the Furnace out of concern that the burnt electrical connections on the Furnace posed a serious fire risk.  The burnt electrical wires and the contributing cause(s) of said failure represent a nonconforming defect with the Furnace.

62.    On or about April 11, 2008, Tempco communicated to J.L. Becker that its attempt to cure the defects associated with the Furnace have been unsuccessful and that the Furnace continues to remain non-operational due to the non-conforming defects. Tempco notified J.L. Becker, at this time, that the following non-conforming defects still exist with the operation of the Furnace:

a.    The new prototype replacement refrigerant dryer has never accomplished a 40° F dew point, and at best only achieved a 55° F dew point;

b.    The new prototype replacement refrigerant dryer is releasing large quantities of water;

c.    The new prototype replacement refrigerant dryer continues to freeze up during normal operations;

d.    The Furnace continues to fail to produce quality annealed tubular heating elements resulting in a poor product for Tempco;

e.    There remains excessive soot on the mesh belt and all tubular heating element products leaving the Furnace;

f.    All tubular heating element products are leaving the Furnace at approximately 350-400° F which is hotter than

25

the 225° F specified in the Purchase Contract which is one
of the causes of the steel to oxidize leaving the furnace;

g.   The external temperature of the throat area continues to
exceed 160° F;

h.   Excessive water collects in the Furnace's exothermic gas
piping system;

i.   The Furnace is purposefully venting exothermic gas
containing a high concentration of carbon monoxide into
Tempco's Wood Dale facility where employees work; and

j.   The lugs and studs that attach the power wires from the
secondary of the transformers to the heating elements of the
Furnace have begun to burn off

63.   The non-conforming defects enumerated in paragraph 62, subparagraphs a
through j, above, were caused by the defective and unworkmanlike design and/or
manufacture and/or installation of the Furnace.

64.   Through April 11, 2008, Tempco had provided J.L. Becker a reasonable
opportunity to correct all of the non-conforming defects affecting the proper operation of
the Furnace.

65.   Through the date that this Counterclaim was filed with this Court, J.L.
Becker has failed to correct any of the non-conforming defects affecting the Furnace to
make the Furnace operational for Tempco's intended purpose.

66.   From the time that J.L. Becker completed installation of the Furnace in
October 2007 through the date of the filing of this Counterclaim, the Furnace has been
unable to operate in a manner to meet the operating specifications as set forth in the
Purchase Contract, including, but not limited to, the ability of the refrigerant dryer to
achieve a consistent 40° F dew point.

26

67.    On or about April 11, 2008, Tempco notified J.L. Becker that despite of all of the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker. Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 11, 2008 of which a true and correct copy is attached hereto as Exhibit H.

68.    On or about April 16, 2008, J.L. Becker responded to Tempco's April 11, 2008 letter (Exhibit H) by informing Tempco that it (J.L. Becker) had "met all items, criteria for the equipment supplied as outlined in [its] proposal and as stated on [the] purchase order."

69.    On or about April 22, 2008, Tempco, again, as it did in its April 11, 2008 letter (Exhibit H), informed J.L. Becker that despite of all the opportunities that J.L. Becker has been given to correct all of the various non-conforming defects affecting the Furnace, the Furnace remains non-conforming, and, consequently, Tempco was revoking its acceptance of the Furnace and demanding return of all of the monies it paid to J.L. Becker. Tempco notified J.L. Becker, as alleged in this paragraph, through a letter dated April 22, 2008 of which a true and correct copy is attached hereto as Exhibit I.

70.    Tempco had paid to J.L. Becker $290,320, in accordance with the terms of the Purchase Contract, which said amount represents eighty percent (80%) of the purchase price of the Furnace.

71.    Pursuant to the terms of the Purchase Contract, the final twenty percent (20%) of the purchase price was to be paid by Tempco to J.L. Becker, net, 30 days after installation and start up.

72.    The Purchase Contract further provided that start up of the Furnace also included debugging of the Furnace.

73.    J.L. Becker failed to start up and debug the Furnace in accordance with the terms of the Purchase Contract thereby relieving Tempco, under the terms of the Purchase Contract, of its obligation to pay the final twenty percent (20%) of the purchase price of the Furnace to J.L. Becker.

74.    Tempco has performed all of its obligations under the Purchase Contract.

75.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to subcontract a portion of the annealing process of its tubular heating elements to a third party at a significant expense to Tempco.

76.    As a direct and proximate result of the nonconforming defects of the Furnace, Tempco has been required to continue to operate its Seco/Warwick annealing furnace which has required Tempco to expend monies on water, utilities, and repairs that it would not otherwise would have had J.L. Becker made the Furnace operational within a reasonable time after installation in accordance with the specifications of the Purchase Contract.

77.    Tempco reserves the right to rely on all terms of the Proposal and the Purchase Contract and all other representations of J.L. Becker in support of its claims.

78.    Tempco is a "Buyer" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(a).

79.    J.L. Becker is a "Seller" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-103(1)(d).

80.    The Furnace constitutes "Goods" under the Illinois Uniform Commercial Code, 810 ILCS 5/2-105(1).

28

81.     This is a "transaction in goods" to which 810 ILCS 5/2-102 and 810 ILCS 5/2-105 are applicable.

## COUNT I
## REVOCATION OF ACCEPTANCE
### (810 ILCS 5/2-608)

82.     Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

83.     Tempco accepted the Furnace without discovering the above defects due to the fact that Tempco was unable to detect the defects in the Furnace until it was installed and J.L. Becker attempted to start it up at Tempco's Wood Dale, Illinois facility.

84.     In the alternative, Tempco reasonably assumed, and J.L. Becker represented through its expressed and implied warranties and otherwise, that all of the aforesaid defects and/or nonconformities would be cured within a reasonable time.

85.     After numerous attempts by J.L. Becker to cure the defects and/or nonconformities associated with the Furnace and Tempco having provided J.L. Becker reasonable opportunities over an extended period of time to correct all of the said non-conforming defects, it has become apparent to Tempco that the defects and/or nonconformities associated with the Furnace could not be reasonably cured.

86.     The defects and/or nonconformities of the Furnace substantially impair its value to Tempco.  Moreover, Tempco has lost faith and confidence in the Furnace and cannot reasonably rely upon it for the ordinary purpose of which the Furnace was purchased.

87.     Tempco previously notified J.L. Becker of the defects and/or nonconformities and Tempco's intent to revoke acceptance of the Furnace and demanded the refund of its purchase price for the Furnace. (*See* Exhibit H and Exhibit I).

88.    Tempco has paid J.L. Becker $290,320 toward the purchase price for the Furnace.

89.    J.L. Becker nevertheless refused to accept return of the Furnace and has refused to refund to Tempco any part of the sum equal to the monies Tempco has paid toward the purchase price of the Furnace.    As a direct result, Tempco has suffered damages and is entitled to recovery, pursuant to 810 ILCS 5/2-711 and 5/2-715.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.    Declare that Counter-Plaintiff properly revoked acceptance of the Furnace in accordance with 810 ILCS 5/2-608 and enter judgment in Counter-Plaintiff's favor and against Counter-Defendant, J.L. Becker Co., Inc., for the full amount of all monies that that Counter-Plaintiff paid to Counter-Defendant for the Furnace;

B.    Declare that Counter-Defendant must immediately disassemble and remove the Furnace from Counter-Plaintiff's facility, at Counter-Defendant's own cost and expense;

C.    Assess consequential and incidental damages incurred by Counter-Plaintiff against Counter-Defendant, J.L. Becker Co., Inc., together with interest thereon;

D.    Grant such other and further relief as the Court may deem just and proper.

## COUNT II
### BREACH OF CONTRACT

**(Failure to Provide the Furnace Free From Defects
Which Renders it Inefficient for its Intended Purpose)**

90.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

30

91.    J.L. Becker expressly warranted in the Purchase Contract that the construction, workmanship and materials will be first quality, free from defects which render the Furnace inefficient for its intended purpose.

92.    J.L. Becker breached this warranty as set forth above in paragraph 91.

93.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

94.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 91, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc., and in favor of Counter-Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Counter-Plaintiff as a result of Counter-Defendant's breach;

B.    For return to Counter-Plaintiff of an amount equal to all payments made by Counter-Plaintiff to Counter-Defendant for the Furnace, or to award Counter-Plaintiff such damages, to be determined at trial, as to make Counter-Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT III
## BREACH OF CONTRACT

### (Failure to Start Up and Debug the Furnace)

95.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

31

96.    J.L. Becker expressly warranted in the Purchase Contract that J.L. Becker would start up and debug the Furnace.

97.    J.L. Becker breached this warranty as set forth above in paragraph 96.

98.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

99.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 96, Tempco has suffered actual, incidental, and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc., and in favor of Counter-Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Counter-Plaintiff as a result of Counter-Defendant's breach;

B.    For return to Counter-Plaintiff of an amount equal to all payments made by Counter-Plaintiff to Counter-Defendant for the Furnace, or to award Counter-Plaintiff such damages, to be determined at trial, as to make Counter-Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

32

**COUNT IV**

**BREACH OF CONTRACT**

**(Failure to Provide a Refrigerant Dryer Capable of Cooling
4000 CFH of Inlet Exothermic Gas to a Dew Point of Approximately 40° F to 50° F)**

100.     Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

101.     J.L. Becker expressly warranted in the Purchase Contract that it would provide one (1) refrigerant atmosphere dryer to cool 4000 CFH of inlet exothermic gas to a dew point of approximately 40° F to 50° F.

102.     J.L. Becker breached this warranty as set forth above in paragraph 101.

103.     Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

104.     As a direct and proximate result of J.L. Becker's breach of the warranty as set forth above in paragraph 101, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc., and in favor of Counter-Plaintiff as follows:

A.     For all consequential, incidental and actual damages incurred by Counter-Plaintiff as a result of Counter-Defendant's breach;

B.     For return to Counter-Plaintiff of an amount equal to all payments made by Counter-Plaintiff to Counter-Defendant for the Furnace, or to award Counter-Plaintiff such damages, to be determined at trial, as to make Counter-Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.     For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT V

## BREACH OF CONTRACT

**(Failure to Provide Furnace in Compliance with All Applicable Laws)**

105.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

106.    J.L. Becker expressly warranted in the Purchase Contract that it would provide the Furnace to Tempco in compliance with and conforming to all applicable laws and government orders, rules, and regulations.

107.    The Furnace, as stated by J.L. Becker, fails to comply with National Fire Protection Association ("NFPA") standards and, consequently, fails to comply with all applicable corresponding Occupational Safety and Health Administration standards ("OSHA") promulgated by the U.S. Department of Labor under the authority of the Occupational Health and Safety Act, 29 U.S.C. § 651, *et seq.*, as would be applicable to the type and category of equipment that the Furnace represents as external parts of the furnace exceed 160° F and are not otherwise adequately guarded to protect employees from severe burns and injuries.

108.    The Furnace, upon information and belief, exposes employees to more than 50 parts per million (time weighted average) of carbon monoxide in the workplace which exceeds OSHA permissible exposure limits for carbon monoxide as provided for in 29 CFR 1910.1000 Table Z-1.

109.    The Furnace fails to comply with 29 U.S.C. § 654(a)(1), OSHA's General Duty Clause, as it creates a recognized hazard in Tempco's workplace likely to cause death or serious physical harm to its employees.

110.    J.L. Becker breached this warranty as set forth above in paragraph 106.

34

111.    J.L. Becker has failed to adequately remedy the non-conforming defects, as alleged in paragraphs 107 and 108, above, and the non-conforming defects continue to exist.

112.    Tempco relied on J.L. Becker's promises, representations, and warranties to its detriment.

113.    As a direct and proximate result of J.L. Becker's breach of the warranty as set forth in paragraph 106, above, Tempco has suffered actual, incidental, and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc. and in favor of Counter-Plaintiff as follows:

A.    For all consequential, incidental and actual damages incurred by Counter-Plaintiff as a result of Counter-Defendant's breach;

B.    For return to Counter-Plaintiff of an amount equal to all payments made by Counter-Plaintiff to Counter-Defendant for the Furnace, or to award Counter-Plaintiff such damages, to be determined at trial, as to make Counter-Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

### (Fitness for a Particular Purpose)

114.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

35

115.   J.L. Becker impliedly warranted that the Furnace purchased by Tempco would be fit for Tempco's particular business purpose.

116.   Tempco relied on this implied warranty of fitness for a particular purpose to its detriment, and relied on the purported expertise of J.L. Becker in designing, manufacturing, and installing the Furnace.

117.   J.L. Becker breached its implied warranty of fitness for a particular purpose, as the Furnace purchased by Tempco was defective in design, manufacture, and installation, and was not fit for the particular purpose of annealing tubular heating elements.

118.   J.L. Becker failed to adequately remedy the defects in the Furnace; and the Furnace continues to be unfit for its particular purpose at the time of revocation.

119.   As a direct and proximate result of J.L. Becker's breach of this implied warranty, Tempco has suffered actual and consequential damages in an amount to be determined at trial and as more particularly described above.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc., and in favor of Counter-Plaintiff as follows:

A.   For all consequential, incidental and actual damages incurred by Counter-Plaintiff as a result of Counter-Defendant's breach of its implied warranty of fitness for a particular purpose;

B.   For return to Counter-Plaintiff of an amount equal to all payments made by Counter-Plaintiff to Counter-Defendant for the Furnace, or to award Counter-Plaintiff such damages, to be determined at trial, as to make Counter-Plaintiff whole as provided for in 810 ILCS 5/2-714;

C.    For costs, fees and disbursements associated with this action; and

D.    For such other and further relief as the Court may deem just and proper.

### COUNT VII

### (Alternative to Count I)

### BREACH OF CONTRACT—CONTRACTUAL RESCISSION

120.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

121.    Pursuant to the Purchase Contract, in the event of breach of warranty by J.L. Becker, notwithstanding prior acceptance by Tempco, Tempco may, in addition to all other remedies, at Tempco's option, return the Furnace for credit.

122.    In particular the Purchase Contract provides as follows:

All warranties shall survive inspection, test, acceptance of and payment by TEMPCO. In the event of breach of warranty, and notwithstanding prior acceptance, TEMPCO may, in addition to all other remedies, (a) at TEMPCO'S option, either return for credit or require prompt correction or replacement of the defective or non-conforming goods, and (b) cancel all or any part of the undelivered portion of this order. In no event shall payment be deemed to constitute acceptance. (*See* Exhibit B)

123.    J.L. Becker has breached both expressed and implied warranties contained in the Purchase Contract because the Furnace was defective in design, materials, workmanship, and/or installation, as more fully described in paragraphs 29, 31, 53, 55 and 62, above.

124.    Tempco has met all obligations on its part to be performed under the Purchase Contract.

37

125.   Tempco has provided J.L. Becker with ample opportunity to repair or replace the Furnace, and J.L. Becker has failed to adequately repair or replace the Furnace so that it can function as warranted in the Purchase Contract.

126.   Pursuant to the Purchase Contract and because of J.L. Becker's breach of expressed and implied warranties with regard to the operation of the Furnace, Tempco has elected to return the Furnace to J.L. Becker and has further requested that J.L. Becker restore to Tempco all monies that Tempco has paid to J.L. Becker for the Furnace.

127.   J.L. Becker has failed and refused to accept return of the Furnace and to restore to Tempco the monies that Tempco had paid to J.L. Becker for the Furnace.

128.   As a direct and proximate cause of J.L. Becker's breach of the Purchase Contract, Tempco has been damaged in the amount of excess of $290,320.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court:

A.   Enter judgment in Counter-Plaintiff's favor and against Counter-Defendant, J.L. Becker Co., Inc., in the amount representing the monies that Tempco paid to J.L. Becker toward the purchase price of the Furnace and further order Counter-Defendant to disassemble and remove the Furnace from Tempco's facility at Counter-Defendant's own cost and expense;

B.   Award Counter-Plaintiff its costs, expense, fees and disbursements of this action; and

C.   Grant Counter-Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VIII
## UNJUST ENRICHMENT

129.    Tempco incorporates and re-alleges paragraphs 1 through 81, inclusive, as if fully set forth herein.

130.    Tempco conferred a pecuniary benefit on J.L. Becker at the express request of J.L. Becker by purchasing the Furnace, and Tempco has a reasonable expectation of receiving valuable consideration for such benefit rendered.

131.    If J.L. Becker is permitted to retain such benefit without compensating Tempco for its losses, J.L. Becker will be unjustly enriched.

132.    Tempco is entitled to damages against J.L. Becker, in the amount of the detriment to Tempco, to be determined at trial, and all other damages to which Tempco is entitled as a result of the benefits conferred upon J.L. Becker.

WHEREFORE, Counter-Plaintiff, Tempco Electric Heater Corporation, respectfully requests that the Court enter judgment against Counter-Defendant, J.L. Becker Co., Inc., and in favor of Counter-Plaintiff as follows:

A.    For return of an amount equal to amount of monies that Counter-Plaintiff paid to Counter-Defendant toward the purchase price of the Furnace;

B.    For costs, expenses, fees and disbursements associated with this action; and

C.    For such other and further relief that this Court deems just and appropriate.

39

MILLER, CANFIELD, PADDOCK and
STONE, P.L.C.

By: _____
      Catherine T. Dobrowitsky
Attorneys for Defendant/Counter-Plaintiff
150 W. Jefferson Avenue, Ste. 2500
Detroit, MI 48226

DATED: May 28, 2008.

DELIB:2976710.1\000000-00000



$3\mathcal{Q}675$                                                                                        $125$

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

$Exhibits A - B$

| | |
|---|---|
| J. L. BECKER CO., INC., <br> d/b/a J. L. BECKER COMPANY, <br> a Michigan corporation, | Case: 2:08-cv-12321 <br> Judge: Roberts, Victoria A <br> MJ: Morgan, Virginia M <br> Filed: 05-29-2008 At 02:18 PM <br> REM BECKER V. TEMPCO ELECTRIC HEATE <br> R CORP (TAM) |

                Plaintiff and Counter-Defendant,

v.

TEMPCO ELECTRIC HEATER CORPORATION,      State Case No. 08-110677 CK
                                            Wayne County Circuit Court

        Defendant and Counter-Plaintiff.          State of Michigan

---

### NOTICE OF REMOVAL

---

       Defendant, Tempco Electric Heater Corporation, by and through its counsel, hereby submits its Notice of Removal, pursuant to 28 U.S.C. §§ 1441 and 1446, and in support of the removal of this action from the Circuit Court of Wayne County, State of Michigan, to the United States District Court for the Eastern District of Michigan, states as follows:

       1.     This action was initiated by Plaintiff, J. L. Becker Co., Inc., in the Circuit Court of Wayne County, State of Michigan, and is currently pending in said Court as Civil Action No. 08-110677 CK.

       2.     This action was filed by Plaintiff on April 25, 2008, and Defendant was served by certified mail/restricted delivery/return receipt requested with a copy of the Summons and Complaint on May 2, 2008.  A copy of the Summons and Return of Service and Summons and Complaint are attached to this Notice as Exhibit A.

3.    Defendant has not been served with any process, pleadings or orders in this action other than the Summons and Return of Service and Summons and Complaint attached hereto as Exhibit A.

4.    This notice is timely filed pursuant to 28 U.S.C. § 1446(b), in that thirty (30) days have not expired since May 2, 2008, the date on which Defendant was served with the Summons and Return of Service and Summons and Complaint.

5.    Plaintiff, J.L. Becker Co., Inc., is incorporated under and by virtue of the laws of the State of Michigan with its principal place of business located in Plymouth, Michigan. Defendant, Tempco Electric Heather Corporation, is incorporated under and by virtue of the laws of the State of Illinois with its principal place of business located in Wood Dale, Illinois.

6.    The above-captioned action is a civil action in which the amount in controversy, upon information and belief, exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Plaintiff's state court complaint alleges that it has been damaged in an amount in excess of $25,000.00 and prays for an award of its damages, together with costs, statutory interest, attorney fees and any and all such other relief as the Court deems appropriate, however, the amount in controversy in this action, to a reasonable probability, actually exceeds the sum of $75,000.00, exclusive of interest and costs in that:

       a.    Plaintiff alleges within its Complaint that there remains due and owing from Defendant to Plaintiff the sum of $75,000.00, exclusive of interest and late fees, and, upon information and belief, the sum or value of Plaintiff's alleged late fees equals or exceeds one cent. *See* ¶ 9 of Plaintiff's Complaint. Accordingly, the amount sought by Plaintiff exceeds the sum or value of $75,000.00, exclusive of interest and costs; and

b.     Defendant, at the time of removal, had asserted and filed compulsory counterclaims in the state court action alleging causes of action against Plaintiff where Defendant has demanded, in its counterclaims, an amount equal to $290,320.00 plus other damages.1    *See* Defendant's Answer and Defenses and Counterclaims, attached hereto as Exhibit No. B; *see also, Swallow & Associates v. Henry Molded Products, Inc.*, 794 F.Supp. 660 (E.D. Mich. 1992)(recognizing that damages pled in defendant's counterclaim exceeded the amount in controversy prerequisite to federal diversity jurisdiction thereby making removal proper).

7.     Accordingly, based upon the reasons put forth in paragraph 6, above, this court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between corporations deemed citizens of different states, and, therefore, removal to this Court is proper pursuant to 28 U.S.C. § 1441.

8.     Upon the filing of this Notice of Removal, Defendant will provide written notice to Andrew T. Baran of Giarmarco, Mullins & Horton, P.C., attorney for Plaintiff, and Defendant will file the accompanying Notice of Filing of Removal with the Clerk for the Circuit Court for the County of Wayne, State of Michigan.

---

1 Plaintiff's state court action is a preemptive one which was filed in response to Defendant's imminent threat of litigation and which was designed to be a first strike attack against Defendant's substantial and significant claims which comprise the primary issues in dispute between the parties; all purposefully designed to attempt to deny Defendant a federal forum for its claims.

WHEREFORE, Defendant provides Notice of Removal of this Action from the Circuit

Court for the County of Wayne, State of Michigan, to the United States District Court for the

Eastern District of Michigan.

Dated this 29th day of May, 2008.

_____
Joseph E. Gumina
One of its Attorneys

Joseph E. Gumina
Ann M. Maher
Eric J. Meier
WHYTE HIRSCHBOECK DUDEK S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
(414) 978-5326 (phone)
(414) 223-5000 (fax)
E-Mail: jgumina@whdlaw.com

_____
Catherine T. Dobrowitsky
One of its Attorneys

LOCAL COUNSEL:
Catherine T. Dobrowitsky
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
313-963-6420 (phone)
313-496-8454 (fax)
E-Mail: dobrowitsky@millercanfield.com

**ATTORNEYS FOR DEFENDANT and COUNTER-PLAINTIFF**